1

**FOLEY & LARDNER LLP**
ATTORNEYS AT LAW
ONE MARITIME PLAZA, SIXTH FLOOR
2   SAN FRANCISCO, CA 94111-3409
TELEPHONE: 415.434.4484
3   FACSIMILE: 415.434.4507

MICHAEL E. DELEHUNT, BAR NO. 070619
4   DAVID W. SIMON (ADMITTED PRO HAC VICE)
PAGE R. BARNES, BAR NO. 154539
5   MICHAEL A. NARANJO, BAR NO. 221449
SEAN P. WELCH, BAR NO. 227101
6   Attorneys for Plaintiff and Counterdefendant,
AMERICAN MEDICAL RESPONSE, INC., a Delaware
Corporation

7

8

9                          UNITED STATES DISTRICT COURT

10                         EASTERN DISTRICT OF CALIFORNIA

11

12   AMERICAN MEDICAL RESPONSE, INC., )   Case No. 2:05-CV-01316-DFL-PAN
     a Delaware corporation            )
13                                      )   **MEMORANDUM OF POINTS AND**
                                        )   **AUTHORITIES IN SUPPORT OF**
                  Plaintiff,            )   **AMERICAN MEDICAL RESPONSE,**
14                                      )   **INC.'S MOTION FOR SUMMARY**
            v.                          )   **JUDGMENT, OR, IN THE**
15                                      )   **ALTERNATIVE, FOR SUMMARY**
     CITY OF STOCKTON, a California      )   **ADJUDICATION**
16   MUNICIPAL CORPORATION; DOES 1      )
     THROUGH 50,                        )
17                                      )
                  Defendants.           )
18   _____  )
     CITY OF STOCKTON, a California      )
19   MUNICIPAL CORPORATION,             )
                                        )
20                Counterclaimant,       )
                                        )
21          v.                          )   DATE:    September 14, 2005
                                        )   TIME:    10:00 A.M.
22   AMERICAN MEDICAL RESPONSE, INC.,   )   DEPT.:   7
     a Delaware corporation             )
23                                      )   CASE FILED: June 28, 2005
                  Counterdefendant.     )   JUDGE: Hon. David F. Levi
24                                      )
                                        )
25   _____  )

26   ///

27   ///

28   ///

016.367744.1

1

# TABLE OF CONTENTS

2

TABLE OF AUTHORITIES ........................................................................................... ii

3

I.      INTRODUCTION ............................................................................................1

4

II.     FACTS .............................................................................................................2

5

        A.      AMR and Stockton Both Provide Ambulance Service in San Joaquin

6                County. ....................................................................................................2

7       B       The Market for Ambulance Service in San Joaquin County and the
                County's Decision to Create Exclusive Operating Areas.........................3

8

9       C.      Stockton's Response to the County Decision to Create an EOA in the
                Stockton Zone...........................................................................................4

10      D.      The Memorandum of Understanding is Negotiated and Signed. .............5

11      E.      A Joint Venture Agreement is Negotiated and Signed..............................7

12      F.      AMR Identifies and Raises Antitrust Concerns with the JVA. ...............10

13      G.      The Negotiations Break Down and AMR Withdraws...............................11

14      H.      Stockton's Response to AMR's Withdrawal............................................12

15      III.    STANDARD OF REVIEW .............................................................................13

16      IV.     LEGAL DISCUSSION....................................................................................13

17      A.      Illegal Contracts are Void and Unenforceable. .....................................14

18      B.      The MOU and the JVA are *Per Se* Illegal Under the Sherman Antitrust
                Act. ........................................................................................................15

19

20              1.      The JVA purports to allocate the market for emergency ambulance
                        service...........................................................................................16

21              2.      The JVA also purports to allocate the market for non-emergency
                        ambulance service.........................................................................18

22

23              3.      As interpreted by Stockton, the bidding restriction of the MOU and
                        the JVA would constitute *per se* illegal bid rigging. ...................19

24      C.      The "Talisman" of "Joint Venture" Cannot Save the MOU and JVA from
                *Per Se* Condemnation. ...........................................................................21

25

26      D.      The *COMPACT* Case is on All Fours and Illustrates the Inherently
                Anticompetitive Nature of the Restriction on Bidding...........................23

27      E.      That Stockton is a Municipality Has No Effect on the Antitrust Analysis............25

28      V.      CONCLUSION ...............................................................................................26

i

016.367744.1

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

4   *Alpha Beta Food Markets v. Amalgamated Meat Cutters & Butcher Workmen*, 147 Cal.
App. 2d 343 (1956)...........................................................................................................14, 15

5   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)......................................................13

6   *Beck v. America Health Group International, Inc.*, 211 Cal. App. 3d 1555, 1565 (1989) ...........14

7   *Blackburn v. Sweeney*, 53 F.3d 825 (7th Cir. 1995)......................................................15, 17

8   *Broad. Music, Inc. v. Columbia Broad. System, Inc.*, 441 U.S. 1 (1979)......................................22

9   *Capital Imaging Associates, P.C. v. Mohawk Valley Medical Associates, Inc.*, 996 F.2d
10   537 (2d Cir. 1993) ..........................................................................................................13

11   *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...............................................................13

12   *City Lincoln-Mercury Co. v. Lindsey*, 52 Cal. 2d 267 (1959) ...........................................15

13   *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365 (1991) ..............................25

14   *COMPACT v. Metropolitan Government of Nashville*, 594 F. Supp. 1567 (M.D. Tenn.
1984)..............................................................................................................................passim

15   *Cont'l Airlines, Inc. v. United Airlines*, 277 F.3d 499 (4th Cir. 2002) ............................16

16   *Copeland v. Baskin Robbins U.S.A.*, 96 Cal. App. 4th 1251 (2002) ................................13

17   *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) ..........................22

18   *County of San Bernardino v. City of San Bernardino*, 15 Cal. 4th 909 (1997).......................3, 26

19   *Dagher v. Saudi Refining, Inc.*, 369 F.3d 1108 (9th Cir. 2004) ......................................19, 21, 22

20   *Energex Lighting Industrial, Inc. v. N. America Philips Lighting Corp.*, 765 F. Supp. 93
21   (S.D.N.Y. 1991)..............................................................................................................15

22   *Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1 (1st Cir. 1979) ...............................17, 21

23   *Freeman v. San Diego Association of Realtors*, 322 F.3d 1133 (9th Cir. 2003)..............16, 21, 22

24   *Gen'l Leaseways, Inc. v. National Truck Leasing Association*, 744 F.2d 588 (7th Cir.
1984)..............................................................................................................................15

25   *Hahn v. Or. Physicians' Serv.*, 868 F.2d 1022 (9th Cir. 1988)........................................16

26   *LaFortune v. Ebie*, 26 Cal. App. 3d 72, 74-75 (1972)......................................................14

27   *Lafayette v. La. Power & Light Co.*, 435 U.S. 389 (1978).................................................25

28   *Law v. NCAA*, 134 F.3d 1010 (10th Cir. 1998) ................................................................22

1  *Mason v. Hosta*, 152 Cal. App. 3d 980 (1984) ............................................................................. 14

2  *Morey v. Paladini*, 187 Cal. 727, 734-38 (1922) ......................................................................... 14

3  *Movie 1 & 2 v. United Artists Commc'ns., Inc.*, 909 F.2d 1245 (9th Cir. 1990) ........................... 20

4  *National Collegiate Athletic Association v. Board of Regents of University of Okla.*, 468
5     U.S. 85 (1984) .......................................................................................................................... 15

   *National Society of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978) ..................................... 16
6
   *N.Y. ex rel. Spitzer v. Saint Francis Hospital*, 94 F. Supp. 2d 399 (S.D.N.Y. 2000) ............. 13, 17
7
   *Norfolk S. Bus Corp. v. Va. Dare Transport Co*, 159 F.2d 306 (4th Cir. 1947) ........................... 15
8
   *Oberweis Dairy, Inc. v. Associated Milk Producers, Inc.*, 568 F. Supp. 1096 (N.D. Ill.
9     1983) .......................................................................................................................................... 15

10 *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990) .................................................................... 17

11 *Polygram Holding, Inc. v. FTC*, No. 03-1293, 2005 WL 1704732 (D.C. Cir. 2005) ................... 19

12 *Russel v. Soldinger*, 131 Cal. Rptr. 145 (Ct. App. 1976) ............................................................. 15

13 *State Oil Co. v. Khan*, 522 U.S. 3 (1997) ...................................................................................... 16

14 *Tatterson v. Kehrlein*, 88 Cal. App. 34 (1927) ............................................................................. 15

15 *Timken Roller Bearing Co. v. United States*, 341 U.S. 593 (1951), *overruled on other
16    grounds by Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) ............... 22

   *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106 (E.D. Cal. 2002) ..................................... 15, 16
17
   *Town of Hallie v. City of Eau Claire*, 471 U.S. 34 (1985) ............................................................ 25
18
   *Traweek v. City & County of San Francisco*, 920 F.2d 589 (9th Cir. 1990) ................................. 25
19
   *United States v. Brighton Building & Maintenance Co.*, 598 F.2d 1101 (7th Cir. 1979) ............. 20
20
   *United States v. Capitol Serv., Inc.*, 756 F.2d 502 (7th Cir. 1985) ............................................... 20
21
   *United States v. Columbia Pictures Industrial, Inc.*, 507 F. Supp. 412 (S.D.N.Y. 1980) ............ 22
22
   *United States v. Guthrie*, 814 F. Supp. 942 (E.D. Wash. 1993) ................................................... 20
23
   *United States v. Koppers Co.*, 652 F.2d 290 (2d Cir. 1981) ......................................................... 20
24
   *United States v. Portac*, 869 F.2d 1288 (9th Cir. 1989) ............................................................... 20
25
   *United States v. Portsmouth Paving Corp.*, 694 F.2d 312 (4th Cir. 1982) ................................... 20
26
   *United States v. Reicher*, 983 F.2d 168 (10th Cir. 1992) ............................................................. 20
27
   *United States v. Seville Industrial Machine Corp.*, 696 F. Supp. 986 (D.N.J. 1988) ................... 21
28

1  *United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972) ........................................................ 17

2  *United States v. W.F. Brinkley & Son Construction Co.*, 783 F.2d 1157 (4th Cir. 1986)............. 16

3  *United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539 (9th Cir. 1989) ............ 13

4  *Venture v. LMI Insurance Co.*, 66 Cal. App. 4th 478 (1998) .......................................................... 15

5

**STATUTES**

6

15 U.S.C. § 1 (2004).......................................................................................................................... 15

7

Cal. Health & Safety Code § 1797.200 *et seq* ................................................................................... 3

8

Cal. Health & Safety Code § 1797.224 (West 2004) ............................................................... 3, 26

9

Cal. Health & Safety Code § 1797.85 ................................................................................................ 3

10

Fed. R. Civ. P. 56(c) ......................................................................................................................... 13

11

**MISCELLANEOUS**

12

11 Herbert Hovenkamp, *Antitrust Law* ¶ 1911a (1998) .................................................................. 16

13

ABA Section of Antitrust Law, *Antitrust Law Developments* 89-90 (5th ed. 2002)...................... 20

14

ABA Section of Antitrust Law, *Antitrust Law Developments* 410 (5th ed. 2002)................. 21, 23

15

*Antitrust Guidelines for Collaborations Among Competitors* § 3.2, 2000 WL 33534553............ 22

16
17
18
19
20
21
22
23
24
25
26
27
28

016.367744.1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF AMERICAN MEDICAL RESPONSE, INC.'S MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION
CASE NO. 2:05-CV-01316-DFL-PAN

1   Plaintiff and Counterdefendant AMERICAN MEDICAL RESPONSE, INC. ("AMR")

2   hereby submits its brief in support of its motion for summary judgment.

3   **I.   INTRODUCTION**

4   This lawsuit arises because the City of Stockton ("Stockton") wants to prevent AMR

5   from submitting a competitive bid to San Joaquin County (the "County") in response to the

6   County's request for proposals to provide emergency ambulance service to its residents (the

7   "RFP").

8   AMR and Stockton attempted to negotiate an arrangement through which they would

9   jointly bid the RFP, and, it was anticipated, would jointly provide emergency ambulance service

10   for certain exclusive zones in the County.   The parties outlined the skeleton of a joint venture in

11   a pair of documents titled "Memorandum" (the "MOU") and "Joint Venture Agreement" (the

12   "JVA"), but never reached agreement on the essential terms of the arrangement.

13   Stockton now asks the Court to enforce certain provisions of the MOU and the JVA, even

14   though they constitute, at most, an unenforceable "agreement to agree," and even though, as

15   interpreted by Stockton, they would violate antitrust law.   Most critically, Stockton – an actual

16   and potential competitor to AMR in the San Joaquin County market for ambulance service –

17   claims that a provision in the JVA prevents AMR from submitting its own independent bid to the

18   County.   As interpreted by Stockton, this provision would unreasonably restrain trade and,

19   indeed, would be *per se* illegal under the Sherman Act.

20   The MOU and the JVA, had they been implemented, would have created other serious

21   antitrust problems as well.   The agreements, as written, anticipate dividing up the market for

22   providing emergency ambulance service among horizontal competitors.   They also anticipate

23   dividing up the market for providing non-emergency ambulance service – a market not covered

24   by the RFP – among horizontal competitors.   These market allocation agreements, had they been

25   implemented, would have been *per se* illegal under the Sherman Act.

26   Almost a year ago, AMR identified and sought to correct the antitrust infirmities of the

27   proposed deal with Stockton.   AMR proposed and attempted to negotiate an alternative

28   arrangement – a legitimate joint venture with Stockton – for responding to the County's RFP.

1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF AMERICAN MEDICAL RESPONSE,
INC.'S MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION
CASE NO. 2:05-CV-01316-DFL-PAN

1   The parties were unable to reach an agreement on forming a true joint venture, however, and on

2   June 23, 2005, AMR notified Stockton that it would submit its own independent bid to the

3   County and suggested that Stockton do the same.  In response, Stockton informed AMR that it

4   would seek to enforce the restriction on bidding, precipitating this declaratory relief action.

5        Because the restriction on bidding, which Stockton claims prevents AMR from

6   submitting its own independent bid to the County, would be illegal and contrary to public policy,

7   it is void and unenforceable.  Moreover, because there are absolutely no genuine disputes of fact

8   regarding the illegality of such a restriction, the Court can and should grant AMR's motion for

9   summary judgment and declare the restriction void and unenforceable.

10  **II.   FACTS**

11       **A.   AMR and Stockton Both Provide Ambulance Service in San Joaquin County.**

12       For approximately 12 years, AMR has provided emergency and non-emergency

13  ambulance services in San Joaquin County, including services within the City of Stockton.  *See*

14  San Joaquin County EMS Transportation Plan at p. 31 (Welch Decl. Ex. 11).  In 2002, Stockton,

15  through its Fire Department, decided to enter the emergency ambulance services market in and

16  around the City of Stockton.  *See id.* at p. 31; Gillis Dep., 19:4-6 (Welch Decl. Ex. 1); Rodriguez

17  Dep., 20:11-14 (Welch Decl. Ex. 2); Lewis Dep., 7:23-8:7 (Welch Decl. Ex. 4).   Stockton

18  anticipated that the new ambulance service would generate enough revenue to cover the its

19  operating costs and to pay back a loan from the city's general fund that was intended to cover the

20  program's startup costs.  *See* Lewis Dep., 12:12-13:3 (Welch  Decl. Ex. 4); Rodriguez Dep.,

21  18:21-19:2 (Welch Decl. Ex. 2).

22       Stockton's projections proved to be overly optimistic.  Competition among ambulance

23  service providers in Stockton was fierce and new competitors continued to enter the market.

24  Gillis Dep., 18:20-19:6 (Welch Decl. Ex. 1); Rodriguez Dep., 22:14-25 (Welch Decl. Ex. 2).  As

25  a result, the city's ambulance program operated at a deficit.   Eventually, the ambulance

26  program's deficit reached approximately $3.5 million.  *See* Butterworth Dep., 19:23-20:4 (Welch

27  Decl. Ex. 5); Gillis Dep., 18:20-19:14 (Welch Decl. Ex. 1); Rodriguez Dep., 23:1-9 (Welch Decl.

28  Ex. 2).

016.367744.1

1    **B.    The Market for Ambulance Service in San Joaquin County and the County's
           Decision to Create Exclusive Operating Areas.**

2

3         From prior to 2002 and up to the present, the greater Stockton, Lodi, and Tracy

4    metropolitan areas, all within San Joaquin County, have been competitive markets for ambulance

5    services, with private ambulance companies and municipal fire departments competing to

6    provide service to the residents of the County. *See* Gillis Dep., 21:14-22:12 (Welch Decl. <u>Ex. 1</u>);

7    Rodriguez Dep., 16:1-4, 20, 21:21-22:25, 30:3-10, 32:20-33:3, (Welch Decl. <u>Ex. 2</u>); Hafey Dep.,

8    53-54 (Welch Decl. <u>Ex. 3</u>).  Since 2002, and continuing to the present, there have been various

9    competing providers of emergency ambulance services operating within these areas on a non-

10   exclusive competitive basis, including AMR and Stockton (through its Fire Department).  *See*

11   Gillis Dep., 18:24-19:23, 21:20-22:2 (Welch Decl. <u>Ex. 1</u>); Rodriguez Dep., 16:7-11, 21:21-

12   22:25, 32:20-33:3 (Welch Decl. <u>Ex. 2</u>); Lewis Dep., 7:23-8:7 (Welch Decl. <u>Ex. 4</u>); Butterworth

13   Dep., 10:1-8 (Welch Decl. <u>Ex. 5</u>); Hakeem Dep., 12:23-13:8 (Welch Decl. <u>Ex. 6</u>).

14        Emergency ambulance services in California are regulated by counties, acting through

15   their designated local emergency medical services agencies. *See* Cal. Health & Safety Code

16   § 1797.200 *et seq.* (West 2004); *see also County of San Bernardino v. City of San Bernardino,*

17   15 Cal. 4th 909, 916 (1997).  Counties have the authority to establish exclusive operating areas

18   ("EOAs") in which one or more providers are given the exclusive right to provide emergency

19   ambulance services within designated boundaries. *See* Cal. Health & Safety Code §§ 1797.85,

20   1797.224; *County of San Bernardino,* 15 Cal. 4th at 931.  Cities have no such authority and, with

21   limited exceptions not applicable here, are subject to regulation by counties to the same extent as

22   private providers. *San Bernardino,* 15 Cal. 4th at 933-34.  Here, the County, acting through the

23   County Emergency Medical Services Agency (the "County EMS Agency"), is the agency with

24   regulatory authority over the delivery of ambulance services within the County. *See* San Joaquin

25   County EMS Transportation Plan at p. 3 (Welch Decl. <u>Ex. 11</u>).

26        On January 28, 2003, the County EMS Agency issued a recommendation to the County

27   Board of Supervisors that the County establish and award EOAs for the provision of emergency

28   ambulance services within the County, which would be implemented through a competitive

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF AMERICAN MEDICAL RESPONSE,
INC.'S MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION
CASE NO. 2:05-CV-01316-DFL-PAN

1   bidding process. (*See* AMR's Separate Statement of Undisputed Material Facts ("Statement of

2   Undisputed Facts") ¶ 1.) The end result of the County EMS Agency's recommendation would

3   be to grant the winning bidder in each EOA the exclusive right to provide emergency ambulance

4   service within that designated area.

5          On April 22, 2003, the County Board of Supervisors ("Board of Supervisors") accepted

6   the County EMS Agency's recommendation and adopted a resolution authorizing the County

7   EMS Agency to create an EMS Transportation Plan (the "Transportation Plan") providing for the

8   creation and award of certain EOAs through a competitive bidding process in which providers

9   would respond to a request for proposals (the "RFP"). (Statement of Undisputed Facts ¶ 2.) The

10  Board of Supervisors adopted the Transportation Plan on July 20, 2004.   (Statement of

11  Undisputed Facts ¶ 3.)

12         The Transportation Plan provided for the creation of multiple EOAs. One of the EOAs

13  provided for in the Plan encompasses areas previously designated by the County EMS Agency as

14  Zones 1, 2 and 3, which cover the Stockton metropolitan area. The Transportation Plan proposed

15  to combine these three zones into a single EOA (the "Stockton Zone"). (*See* Statement of

16  Undisputed Facts ¶ 4.)

17         **C.     Stockton's Response to the County Decision to Create an EOA in the
18                  Stockton Zone.**

19         The County's decision created substantial concern for Stockton, as it had only recently

20  created its ambulance program and had invested substantial city funds into the program.  If a

21  provider other than Stockton were given the exclusive right to provide emergency ambulance

22  service in the Stockton Zone, the city would be unable to continue its ambulance program and its

23  substantial investment in the program would be lost. *See* Hafey Dep., 54:5-14 (Welch Decl.

24  Ex. 3); Lewis Dep., 26:1-18, 80:8-19 (Welch Decl. Ex. 4).  So concerned was Stockton that it

25  actually lobbied against the proposal. *See* Letter from Gary A. Podesto to Michael Herrera,

26  M.D., and Roger Speed, dated November 15, 2002 (Welch Decl. Ex. 25); Hafey Dep., 60:6-14

27  (Welch Decl. Ex. 3); Rodriguez Dep., 33:16-34:8 (Welch Decl. Ex. 2).

28         Once the County's decision was made, Stockton considered submitting a bid for

4

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF AMERICAN MEDICAL RESPONSE,
INC.'S MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION
CASE NO. 2:05-CV-01316-DFL-PAN

1   emergency ambulance services on its own and also considered submitting a joint bid with one or

2   more other public or private providers. *See* Rodriguez Dep., 38:17-40:21 (Welch Decl. Ex. 2);

3   Hafey Dep., 62:15-63:24, 64:18-65:4, 67, 68 (Welch Decl. Ex. 3). Ultimately, Stockton chose to

4   pursue the second option and, after interviewing several private providers, chose AMR, its

5   largest competitor, as its prospective partner. *See* Lewis Dep., 28:7-30:12 (Welch Decl. Ex. 4);

6   Rodriguez Dep., 41:13-18 (Welch Decl. Ex. 2); Recommendation from W. Gary Gillis, dated

7   June 10, 2003 (Welch Decl. Ex. 13); Rodriguez Dep., 39:15-23, 41:2-45:21, 47:2-49:25 (Welch

8   Decl. Ex. 2); Hafey Dep., 71:22-72:11 (Welch Decl. Ex. 3).

9       At the time the County made its decision to create the EOAs, AMR was capable of

10   providing all of the emergency ambulance services within the Stockton Zone on its own. *See*

11   Meyer Decl., ¶ 4. Stockton also was capable of providing all of the emergency ambulance

12   services within the Stockton Zone on its own. *See* Rodriguez Dep., 38:7-24 (Welch Decl. Ex. 2);

13   Hafey Dep., 62:15-64:3, 124:7-20 (Welch Decl. Ex. 3); Lewis Dep., 16:4-17 (Welch Decl.

14   Ex. 4). Together, AMR and Stockton performed most of the emergency ambulance services

15   within the Stockton Zone.

16     **D.**   **The Memorandum of Understanding is Negotiated and Signed.**

17       In early 2003, AMR and Stockton began discussions regarding a potential collaboration

18   on a joint proposal in response to the County's expected RFP for exclusive emergency

19   ambulance services. (Statement of Undisputed Facts ¶ 6.) In June of 2003, Stockton, AMR, and

20   A-One Ambulance Service ("A-One")[1] executed a document entitled "Memorandum," which

21   memorialized the proposed business relationship between the parties with respect to the RFP.

22   (Statement of Undisputed Facts ¶ 7.)

23       The MOU contemplated the formation of a joint venture between Stockton, AMR, and A-

24

25

     [1]   A-One was a small private provider of ambulance services. At the time of the MOU, A-

26   One was also a competitor to AMR and Stockton in the Stockton Zone. *See* San Joaquin County EMS
Transportation Plan at p. 31 (Welch Decl. Ex. 11); Lewis Dep., 30:13-20 (Welch Decl. Ex. 4). A-One has

27   since gone out of business. Letter from Steve Riley to "The Record", dated December 5, 2003 (Welch
Decl. Ex. 20); Meyer Dep., 65:6-10 (Welch Decl. Ex. 8).

28

016.367744.1

1    One for purposes of jointly participating in the anticipated County RFP process by bidding for

2    the Stockton Zone. (Statement of Undisputed Facts ¶¶ 8, 9.)  The MOU was very preliminary,

3    and did not reflect any agreements on how the potential joint venture would operate or how the

4    parties would respond to the RFP. *See* MOU (Welch Decl. Ex. 9).

5        The MOU contains language that purports to preclude a party from submitting an

6    independent bid to provide services in the Stockton Zone if that party withdraws from the MOU

7    (Statement of Undisputed Facts ¶ 10), and also purports to preclude a party from partnering with

8    a non-signatory to the MOU to submit a competing bid on the Stockton Zone.  (Statement of

9    Undisputed Facts ¶ 11.)  Specifically, the MOU provides:

10           4.      …If any party withdrawls [sic] from the joint venture prior
             to an award of contract from the SJCEMSA or accepts an offer
11           from another bidder to compete for the same service area, that
             party is precluded from continuing in the bidding for a RFP in
12           Zones 1, 2, and 3.

13   (Statement of Undisputed Facts ¶ 12.)

14       The MOU also contains language that anticipates the division and allocation between the

15   parties of the exclusive rights to perform both emergency and non-emergency ambulance

16   services in the Stockton Zone, if the parties were successful in their bid.   (Statement of

17   Undisputed Facts ¶ 13.)   With respect to the division and allocation of non-emergency

18   ambulance services, Section 1 of the MOU states:

19           1.     . . . Our unified response to the RFP will provide
             exclusivity for the non-emergency ambulance transportation to
20           include all parties.    AMR and A-One will be exclusively
             responsible for non-emergency interfaculty transfers, critical care
21           transfers, long distance transfers, scheduled wait and returns and
             HMO/PPO contractual agreements.  The City, AMR and A-One
22           may all participate in the following non-emergency activities:

23                   a.  City sponsored events

24                   b.  Memorials

25                   c.  Emergency Department Requests

26                   d.  SFD Family Members or City Employee Members and
                         their families
27
                     e.  AMR/A-One Requests
28
                     f.  Police and Fire Olympics

                                        6

1    g. Sporting Events in the City of Stockton.

2  (Statement of Undisputed Facts ¶ 14.)

3    The MOU also anticipates the division and allocation of the provision of 9-1-1

4  emergency ambulance services in the Stockton Zone.  In that regard, Section 2 of the MOU

5  states:

6    2.   The following parameters will be a part of the operating
     agreement between these parties in the final RFP proposal
7    submitted by the joint venture:

8    . . .

9    b. The implementation schedule of 9-1-1 dedicated emergency
     ambulances within Zones 1, 2 and 3 by each provider will be as
10   follows:

11   i. Initially and continuing, *SFD and AMR shall each place
     into service an adequate and even number of ALS*
12   *ambulance units*.  A-One shall place one ALS ambulance
     Unit in service.
13
     ii.  *Any additional increase in emergency ambulance*
14   *resource needs shall be alternated between the three*
     *parties* for implementation with SFD having the first right
15   of refusal, AMR having the second and A-One having the
     third.  This schedule of increased resource alternation will
16   continue through the life of the operating agreement
     between each provider.  The order of the right of refusal
17   will rotate between the parties to maintain parity.  A-One
     ambulance service will expand to a total of two (2)
18   ambulance units.

19

20  (Statement of Undisputed Facts ¶ 15 (emphasis added).)

21    **E.    A Joint Venture Agreement is Negotiated and Signed.**

22    In addition to providing for the creation of an EOA for the Stockton Zone, the

23  Transportation Plan also provides for the creation of an EOA encompassing the Lodi

24  metropolitan area, previously designated as Zone 4 (the "Lodi Zone").  (Statement of Undisputed

25  Facts ¶ 16.)  In an effort to also bid for the Lodi Zone, in June and July 2004, AMR, A-One,

26  Stockton, and the City of Lodi ("Lodi") executed a document entitled "Joint Venture

27  Agreement."  (Statement of Undisputed Facts ¶ 17.)

28    The JVA incorporates language similar to the MOU and describes a desire to collaborate

7

016.367744.1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF AMERICAN MEDICAL RESPONSE,
INC.'S MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION
CASE NO. 2:05-CV-01316-DFL-PAN

on the terms of a joint bid in response to the County RFP for the Stockton Zone and the Lodi Zone, and to negotiate the terms of an operating agreement for the provision of emergency ambulance service in these areas. (Statement of Undisputed Facts ¶¶ 18, 19.) As was true of the MOU, the parties to the JVA had not agreed on how the venture would bid or operate or on other essential terms such as billing, ambulance units, or deployment plans. *See* JVA (Welch Decl. Ex. 10); *see also* Hafey Dep., 123:10-124:6 (Welch Decl. Ex. 3); Rodriguez Dep., 71:23-72:1, 75:24-76:10 (Welch Decl. Ex. 2).

Like the MOU, the JVA includes language purporting to require the parties to bid jointly or not at all:

> 4.    The parties shall equally participate in the RFP process.  If any party withdraws from the joint venture prior to an award of contract from the SJCEMSA or accepts an offer from another bidder to compete for the same service area, that party will be precluded from bidding in the San Joaquin County RFP for ambulance services.

(*See* Statement of Undisputed Facts ¶¶ 20-22.)

In addition to the Stockton and Lodi Zones, the Transportation Plan provides for the creation and award of EOAs in part of the County, previously designated as Zone 5, which encompasses the City of Tracy and the unincorporated area around it.  The language in the JVA thus purports to preclude a party to the JVA from submitting bids for *any part of the County*, including parts of the County not included in the proposed joint bid, if it withdraws from that effort. *See* JVA (Welch Decl. Ex. 10).

The JVA, like the MOU, also contains language that purports to divide, and to allocate between the parties, the exclusive rights to perform both emergency and non-emergency ambulance services within the Stockton and Lodi Zones.  In that regard, Section 1 of the JVA states, in pertinent part, as follows:

> 1.    The parties to this agreement will jointly submit a response to the San Joaquin County Request For Proposal (RFP) for the award of exclusive rights to emergency and non-emergency ambulance transportation within the areas known as Ambulance Zones 1, 2, 3, and 4.  The emergency and non-emergency transportation program is administered through the San Joaquin County Emergency Medical Services Agency (SJCEMSA).

016.367744.1

1 | (Statement of Undisputed Facts ¶ 24.)

2 | Section 1 of the JVA further provides for the specific division and allocation of non-

3 | emergency ambulance services as follows:

> Except as set forth below, the response to the RFP will allow each signatory to provide non-emergency ambulance transportation within their own zones. AMR and A-One will be exclusively responsible for non-emergency interfacility transfers, critical care transfers, long distance transfers, scheduled wait and returns and HMO/PPO contractual agreements. The parties to this agreement may participate in transfers or calls arising out of the following non-emergency activities:
>
> a.  City sponsored events
>
> b.  Memorials
>
> c.  Emergency Department Requests
>
> d.  Requests from city employees and families
>
> e.  AMR/A-One Requests
>
> f.  Police and Fire Events
>
> g.  Sporting and entertainment events.

16 | (Statement of Undisputed Facts ¶ 24.)

17 | The JVA also provides for the specific division and allocation of the provision of 9-1-1

18 | emergency ambulance services in the Stockton Zone. In that regard, Section 2 of the JVA states,

19 | in pertinent part, as follows:

> 2.  The following parameters will be a part of the operating agreement between these parties in the final RFP proposal submitted by the joint venture:
>
> . . .
>
> b.  The implementation schedule of 9-1-1 dedicated emergency ambulances specifically within the areas known as Ambulance Zones 1, 2 and 3 by SFD, AMR, and A-One will be as follows:
>
> i.  Initially and continuing, **SFD and AMR shall each place into service an equal and even number of ALS ambulance units.** A-One shall place one ALS ambulance unit in service.
>
> ii.  **Any additional increase in emergency ambulance resource needs shall be alternated between the three**

9

1
2
3
4

> ***parties for implementation*** with SFD having the first right
> of refusal, AMR having the second and A-One having the
> third. The schedule for resource increases will continue
> through the life of the operating agreement between each
> provider. The order of the right of refusal will rotate
> between the parties to maintain parity. A-One ambulance
> service may expand to a total of two (2) ambulance units.

5 (Statement of Undisputed Facts ¶ 25 (emphasis added).)

6 Moreover, the JVA provides for the specific division and allocation of the provision of

7 9-1-1 emergency ambulance services in the Lodi Zone. In that regard, Section 11 of the JVA

8 states as follows:

9
10
11
12
13

> 11. AMR will initially provide a predetermined amount of
> ambulance units in service in the area known as Ambulance
> Zone 4. Should the Lodi City Council direct the LFD to provide
> emergency ambulance transportation, and if additional ambulance
> resources are needed after review, additional ambulance resources
> shall be alternated between LFD and AMR, with LFD having the
> first right of refusal. The schedule for resource increases will
> continue throughout the life of the operating agreement between
> each provider.

14 (Statement of Undisputed Facts ¶ 26.)

15 **F.   AMR Identifies and Raises Antitrust Concerns with the JVA.**

16 In or around August 2004, AMR informed Stockton and Lodi that it believed the MOU

17 and JVA created serious antitrust compliance issues. *See* Hafey Dep., 102:2-10 (Welch Decl.

18 Ex. 3); Lewis Dep., 56:22-57:25 (Welch Decl. Ex. 4). In order to address the antitrust infirmities

19 of what was contemplated in the MOU and JVA, AMR proposed a new form of Memorandum of

20 Understanding, which would create a Limited Liability Company to combine resources, share

21 risk and create additional clinical and operational capabilities (the "LLC"). *See* Hafey Dep.,

22 103:1-104:24 (Welch Decl. Ex. 3.); Lewis Dep., 55:23-56:25 (Welch Decl. Ex. 4); Meyer Decl.,

23 ¶ 7). The parties promptly began negotiations relating to the terms of a new MOU setting forth

24 the terms of the LLC and the manner in which it would operate. In addition to resolving AMR's

25 antitrust compliance concerns, the parties hoped to include specific details relating to the terms

26 of their bid, such as the rates they would need to charge ambulance users, the manner in which

27 they would allocate revenue and profits and other essential details that were missing from the

28 MOU and JVA. AMR and Stockton were never able to reach an agreement on a new

1  Memorandum of Understanding or on the terms of the LLC. *See* Gillis Dep., 110:9-112:22

2  (Welch Decl. Ex. 1); Lewis Dep., 93:17-20 (Welch Decl. Ex. 4); Meyer Dep., 21:3-23:23, 25:1-

3  25 (Welch Decl. Ex. 8).

4  ### G.   The Negotiations Break Down and AMR Withdraws.

5  The parties began serious negotiations relating to the terms of their proposed joint bid in

6  2005. As the negotiations progressed, AMR became concerned that the City was attempting to

7  recover costs related to the City's previously accrued deficit, as well as other inappropriate costs,

8  in the rate structure to be submitted in the bid proposal. AMR told the City that any attempt to

9  include such costs was unacceptable because it would make the bid non-competitive. *See* Letter

10  from Louis Meyer to Mark Lewis, dated June 25, 2005 (Welch Decl. Ex. 23); Letter from Louis

11  Meyer to Gary Gillis, dated March 21, 2005 (Welch Decl. Ex. 24).

12  Negotiations among the parties were further complicated because certain representatives

13  of the City would purport to make agreements with respect to the content of the new MOU and

14  the terms of the proposed bid which later were contradicted by other representatives of the City.

15  By June of 2005, it became apparent to AMR that the parties would not be able to reach an

16  agreement with respect to the proposed LLC or the bid terms. *See id.; see also* Gillis Dep.,

17  110:9-112:22 (Welch Decl. Ex. 1); Lewis Dep., 93:17-20 (Welch Decl. Ex. 4); Meyer Dep.,

18  21:3-23:23, 25:1-25 (Welch Decl. Ex. 8).

19  On June 23, 2005, negotiations between AMR and Stockton broke down. *See* Lewis

20  Dep., 83:1-84:25, 93:17-20 (Welch Decl. Ex. 4); Meyer Dep., 14:3-23, 21:3-23:23, 25:13-22,

21  50:1-51:1 (Welch Decl. Ex. 8). On that date, AMR executive Lou Meyer personally informed

22  Stockton City Manager Mark Lewis, in a meeting at Stockton City Hall, that AMR would

23  discontinue negotiations with the City so that both parties could submit their own bids. Mr.

24  Meyer memorialized that meeting in a letter delivered the following day, in which he explained

25  the reasons for AMR's decision:

26  > As I explained today, my staff and I have spent countless hours
   > meeting with City of Stockton Fire Department ("Department")
27  > personnel in an attempt to reach agreement on the terms of a joint
   > venture agreement that would permit the parties to submit a joint
28  > proposal to the County in response to the upcoming ambulance
   > RFP. ...

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF AMERICAN MEDICAL RESPONSE,
INC.'S MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION
CASE NO. 2:05-CV-01316-DFL-PAN

1         Despite our best and most diligent efforts to reach agreement with
2         the Department, it is now clear to us that the Department is not
        negotiating in good faith, and that it will not be possible to forge an
3         alliance capable of either winning the contract or of delivering high
        quality, cost effective emergency services. ...

4         At this juncture, AMR has determined that it will not be possible to
        work with the Department in a collaborative relationship to
5         achieve the goals specified above... Consequently, AMR intends
        to proceed with its own proposal to be submitted to the County.
6         Providing the City with notice at this time provides the City with
        plenty of time to prepare its own proposal.
7

8 Letter from Louis Meyer to Mark Lewis, dated June 24, 2005 (Welch Decl. Ex. 21).

9     **H.**    **Stockton's Response to AMR's Withdrawal.**

10         After AMR's withdrawal, Stockton considered several options for responding to the

11 County RFP. Rodriguez Dep., 100:24-101:14 (Welch Decl. Ex. 2); Hafey Dep., 124:7-126:4

12 (Welch Decl. Ex. 3). Although Stockton believed it was capable of submitting its own

13 independent bid to the County after AMR's withdrawal, *see* Hafey Dep.,124 (Welch Decl.

14 Ex. 3), the City again chose to pursue a public-private partnership with a private ambulance

15 provider. *See* Gillis Dep., 117:12-18 (Welch Decl. Ex. 1); Hafey Dep., 124:7-126:18 (Welch

16 Decl. Ex. 3); Lewis Dep., 84:15-85:23 (Welch Decl. Ex. 4). Ultimately, Stockton selected AMR

17 competitor Rural Metro Corporation ("Rural Metro") as its partner, and has entered into an

18 agreement with Rural Metro to submit a joint bid in response to the County RFP. *See*

19 Stockton/Rural Metro Memorandum of Understanding (Welch Decl. Ex. 16); Letter from Mark

20 Lewis to Dan Burch, dated July 26, 2005 (Welch Decl. Ex. 17).

21         Stockton has expressed its intent to submit a bid, in response to the County RFP, in

22 conjunction with Rural Metro and independent of the proposed joint venture with AMR. *See*

23 Statement of Undisputed Facts ¶ 28; *see also* Gillis Dep., 117:12-18 (Welch Decl. Ex. 1); Hafey

24 Dep., 124:7-126:18 (Welch Decl. Ex. 3); Lewis Dep., 84:15-85:23 (Welch Decl. Ex. 4);

25 Stockton/Rural Metro Memorandum of Understanding (Welch Decl. Ex. 16); Letter from Mark

26 Lewis to Dan Burch, dated July 26, 2005 (Welch Decl. Ex. 17).

27         AMR also intends to submit a bid in response to the County RFP, independent of the

28 proposed joint venture with Stockton. (Statement of Undisputed Facts ¶ 27.) The City, however,

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF AMERICAN MEDICAL RESPONSE,
INC.'S MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION
CASE NO. 2:05-CV-01316-DFL-PAN

1   takes the position that AMR is precluded from bidding, and notified AMR that it intended to sue

2   AMR to prohibit AMR from submitting its own bid.  Gillis Dep., 30:3-21 (Welch Decl. Ex. 1);

3   Hafey Dep., 82:7-83:23 (Welch Decl. Ex. 3); Lewis Dep., 44:12-45:2 (Welch Decl. Ex. 4).

4   Accordingly, AMR filed this action seeking declaratory relief.

5   **III.   STANDARD OF REVIEW**

6        Familiar standards govern motions for summary judgment.   Summary judgment is

7   appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file,

8   together with the affidavits, if any, show that there is no genuine issue as to any material fact and

9   that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex*

10  *Corp. v. Catrett,* 477 U.S. 317, 322 (1986).   "A 'scintilla of evidence,' or evidence that is

11  'merely colorable' or 'not significantly probative,' is not sufficient to present a genuine issue as

12  to a material fact." *United Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539, 1542 (9th

13  Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986)).

14       Summary judgment is a "vital procedural tool to avoid wasteful trials and may be

15  particularly important in antitrust litigation to prevent lengthy and drawn-out litigation that has a

16  chilling effect on competitive market forces."   *N.Y. ex rel. Spitzer v. Saint Francis Hosp.,*

17  94 F. Supp. 2d 399, 407 (S.D.N.Y. 2000) (quoting *Capital Imaging Assocs., P.C. v. Mohawk*

18  *Valley Med. Assocs., Inc.,* 996 F.2d 537 (2d Cir. 1993)).   Summary judgment is appropriate

19  "when the conduct at issue falls with those categories of practices traditionally treated as *per se*

20  unlawful." *COMPACT v. Metropolitan Government of Nashville,* 594 F. Supp. 1567, 1580

21  (M.D. Tenn. 1984).

22  **IV.   LEGAL DISCUSSION**

23       There are no genuine disputes of fact relating to whether the JVA, as interpreted by

24  Stockton, is an illegal agreement in restraint of trade.[2]  It is well-established that a contract that

25

26          [2]   Again, the JVA is an unenforceable "agreement to agree."   The parties never got beyond

27  the initial stages of negotiating the joint bid and never reached agreement on such essential terms as the bid price, billing mechanisms, allocation of profits and expenses, deployments plans, and ambulance

28  units. *Copeland v. Baskin Robbins U.S.A.*, 96 Cal. App. 4th 1251, 1256 (2002) ("It is still the general rule that where any of the essential elements of a promise are reserved for the future agreement of both parties, (Continued)

1  explicitly restricts bidding by, and divides markets among, horizontal competitors, is *per se*

2  illegal under the Sherman Act.   It is equally well-established that such contracts are not

3  enforceable, and numerous courts have refused to enforce, and have declared void, similar

4  agreements.

5        AMR recognized the antitrust infirmities of the MOU and the JVA as written nearly a

6  year ago, and it made every effort to remedy the problem.   In or around August 2004, AMR

7  informed Stockton that it believed that the MOU and the JVA created antitrust issues. *See* Hafey

8  Dep., 102:2-10 (Welch Decl. Ex. 3); Lewis Dep., 56:22-57:25 (Welch Decl. Ex. 4).   At this time,

9  the joint venture was nascent, with the parties not having settled on its material terms.   The

10  parties had the chance the cure the antitrust infirmities or abandon the deal prior to bidding,

11  when any actual harm to competition would occur.   As explained above, AMR tried to address

12  these issues through the creation of a new antitrust-compliant entity, but the parties were unable

13  to reach agreement on AMR's proposal.   AMR then walked away before the consummation of an

14  illegal joint bid and before any harm was inflicted on competition.

15        AMR made a good faith effort to negotiate a legal contract with Stockton.   Due to

16  Stockton's intransigence, however, the parties were unable to reach agreement. Now, Stockton

17  seeks to hold AMR to a contract it never made – and an illegal contract at that.   Clear law

18  prevents the Court from doing that.

19        **A.**     **Illegal Contracts are Void and Unenforceable.**

20        Any contract calling for the performance of an illegal act is void and unenforceable. *See*

21  *Beck v. Am. Health Group Int'l, Inc.*, 211 Cal. App. 3d 1555, 1565 (1989); *Mason v. Hosta*,

22  152 Cal. App. 3d 980, 987 (1984).   Thus, a contract that violates the Sherman Act is void.

23  *Morey v. Paladini*, 187 Cal. 727, 734-38 (1922) (finding a contract illegal as being in violation of

24  the Sherman Act); *LaFortune v. Ebie*, 26 Cal. App. 3d 72, 74-75 (1972) (holding that a breach of

25  federal antitrust law provides a valid defense in an action for breach of contract); *Alpha Beta*

26

27  _____

28  no legal obligation arises until such future agreement is made." (internal quotations omitted)).

016.367744.1     MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF AMERICAN MEDICAL RESPONSE,
INC.'S MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION
CASE NO. 2:05-CV-01316-DFL-PAN

1  *Food Mkts. v. Amalgamated Meat Cutters & Butcher Workmen*, 147 Cal. App. 2d 343, 346
2  (1956) (holding that a contract was "illegal and void as being in violation of the federal and state
3  antitrust laws").

4      Courts have applied this universally accepted principle frequently and without hesitation.
5  *See, e.g., Blackburn v. Sweeney*, 53 F.3d 825, 829 (7th Cir. 1995); *Norfolk S. Bus Corp. v. Va.*
6  *Dare Transp. Co*, 159 F.2d 306, 311 (4th Cir. 1947) (refusing to enforce a contract that violated
7  the Sherman Act); *Energex Lighting Indus., Inc. v. N. Am. Philips Lighting Corp.*, 765 F. Supp.
8  93, 107 (S.D.N.Y. 1991) ("This agreement is in violation of the Sherman Act and this court will
9  not enforce it."); *Oberweis Dairy, Inc. v. Associated Milk Producers, Inc.*, 568 F. Supp. 1096,
10  1099 (N.D. Ill. 1983) (holding that a contract was void as contrary to the public policy of the
11  Sherman Act).

12      Illegal contracts are void, not voidable.   *Tatterson v. Kehrlein*, 88 Cal. App. 34, 49
13  (1927).  Therefore, "[t]he defenses of estoppel, waiver, and ratification are not available in the
14  case of an illegal contract."  *Id.; see also City Lincoln-Mercury Co. v. Lindsey*, 52 Cal. 2d 267,
15  273-74 (1959); *Russell v. Soldinger*, 59 Cal. App. 3d 633, 646 (1976).  "It is clear that estoppel
16  cannot be relied upon to defeat the operation of a policy protecting the public." *Venture v. LMI*
17  *Ins. Co.*, 66 Cal. App. 4th 478, 511 (1998).  In particular, courts have made "clear that whenever
18  some maxim of equity (such as that to get equitable relief you must have 'clean hands') collides
19  with the objectives of the antitrust laws, the equity maxim must give way."  *Gen'l Leaseways,*
20  *Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 597 (7th Cir. 1984).

21      **B.**    **The MOU and the JVA are *Per Se* Illegal Under the Sherman Antitrust Act.**

22      Put simply, the bidding restrictions and the contemplated market allocation provisions of
23  the MOU and the JVA are anticompetitive and *per se* illegal under the Sherman Antitrust Act.
24  Section One of the Sherman Act proscribes "[e]very contract, combination in the form of trust or
25  otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with
26  foreign nations."  15 U.S.C. § 1 (2004).  As interpreted, Section One "does not condemn a mere
27  'restraint of trade,' but instead bars only 'unreasonable restraints of trade.'"  *Toscano v. PGA*
28  *Tour, Inc.*, 201 F. Supp. 2d 1106, 1120 (E.D. Cal. 2002) (quoting *Nat'l Collegiate Athletic Ass'n*

1  | *v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 98 (1984)).   Courts employ three tests to

2  | determine whether an agreement constitutes an unreasonable restraint of trade:   (1) *per se*

3  | analysis; (2) "quick look" analysis; and (3) the rule of reason.   *Id.*   These tests, though nominally

4  | discrete, "are best viewed as a continuum, on which the 'amount and range of information

5  | needed' to evaluate a restraint varies depending on how 'highly suspicious' and how 'unique' the

6  | restraint is."   *Cont'l Airlines, Inc. v. United Airlines*, 277 F.3d 499, 509 (4th Cir. 2002) (quoting

7  | 11 Herbert Hovenkamp, *Antitrust Law* ¶ 1911a (1998)).

8  | Scrutiny of the MOU and the JVA starts – and finishes – at the *per se* end of the

9  | continuum.   The *per se* analysis applies to agreements that "have such predictable and pernicious

10 | anticompetitive effect, and such limited potential for procompetitive benefit, that they are

11 | deemed unlawful *per se*."   *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).   Examples include price

12 | fixing agreements, *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1144 (9th Cir.

13 | 2003), horizontal output restrictions, *Toscano*, 201 F. Supp. 2d at 1120, horizontal market

14 | division, *Hahn v. Or. Physicians' Serv.*, 868 F.2d 1022, 1026 (9th Cir. 1988), and bid rigging,

15 | *United States v. W.F. Brinkley & Son Constr. Co.*, 783 F.2d 1157, 1160 (4th Cir. 1986).   Because

16 | the "nature and necessary effect" of such agreements "are so plainly anticompetitive," "no

17 | elaborate study of the industry is needed to establish their illegality."   *Nat'l Soc'y of Prof'l*

18 | *Eng'rs v. United States*, 435 U.S. 679, 692 (1978).   Because the agreement that Stockton seeks to

19 | enforce partakes of multiple of these competitive evils, they are illegal *per se* and, therefore, void

20 | and unenforceable.

21 |
22 | **1.    The JVA purports to allocate the market for emergency ambulance service.**

23 | At its core, the parties' alleged agreement contemplates the division of the market for

24 | emergency ambulance service in the Stockton Zone and the Lodi Zone.   Under the JVA,

25 | Stockton and AMR would take equal shares of the market for emergency ambulance

26 | transportation in the Stockton Zone, with a single ambulance slot allotted to A-One.   (Statement

27 | of Undisputed Facts ¶ 25.)   Additional demand in the Stockton Zone would be satisfied on a

28 | rotating basis by Stockton, AMR, and A-One, respectively.   (*See id.*)   The Lodi Zone would have

1  been allocated to AMR, though Lodi would have had the option to satisfy additional demand on

2  a rotating basis with AMR.  (Statement of Undisputed Facts ¶ 26.)

3      Such agreements among competitors to allocate markets are *per se* illegal.  *Palmer v.*

4  *BRG of Georgia, Inc.*, 498 U.S. 46, 49-50 (1990) ("One of the classic examples of a *per se*

5  violation of §1 is an agreement between competitors at the same level of the market structure to

6  allocate territories in order to minimize competition." (internal quotation omitted)); *Blackburn*,

7  53 F.3d at 829 ("Horizontal agreements to allocate markets among competitors are *per se*

8  violations of § 1 of the Sherman Act."); *Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1,

9  11 (1st Cir. 1979) (condemning a division of markets between potential competitors as per se

10  illegal); *N.Y. ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 399, 414 (S.D.N.Y. 2000)

11  ("Like price fixing, a horizontal agreement among competitors to eliminate competition by

12  allocating markets is a per se violation of Section One of the Sherman Act.").  The Supreme

13  Court "has reiterated time and time again that 'horizontal territorial limitations ... are naked

14  restraints of trade with no purpose except stifling of competition.'"  *Palmer*, 498 U.S. at 49

15  (quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972)).  "Such agreements are

16  anticompetitive regardless of whether the parties split a market within which both do business or

17  whether they merely reserve one market for one and another for the other."  *Id.* at 49-50.

18      The proposed division of the emergency ambulance market falls squarely within the rule

19  condemning horizontal market allocation.  AMR and Stockton are competing providers –

20  actually, the two largest providers – of emergency ambulance transportation service in the

21  Stockton Zone.  (Statement of Undisputed Facts ¶ 5)  *See also* Rodriguez Dep., 21:21-22:25,

22  36:11-37:12 (Welch Decl. Ex. 2); Hafey Dep., 31:20-32:4, 70:9-17 (Welch Decl. Ex. 3); Lewis

23  Dep., 103:9-16 (Welch Decl. Ex. 4).  Each party had and has the ability to provide all of the

24  emergency ambulance services in the Stockton Zone on its own.  *See* Meyer Decl., ¶¶ 3,4

25  (AMR); Rodriguez Dep., 38:7-24 (Welch Decl. Ex. 2); Hafey Dep., 62:15-64:3, 124:7-20 Welch

26  Decl. Ex. 3); Lewis Dep., 16:4-17 (Welch Decl. at Ex. 4) (Stockton).  In fact, each party

27  considered submitting a bid to the County on its own.  *See* Meyer Decl., ¶ 3 (AMR); Rodriguez

28  Dep., 38:17-40:21 (Welch Decl. Ex. 2); and Hafey Dep., 62:15-63:24, 65:1-4, 67, 68 (Welch

1  Decl. Ex. 3) (Stockton).   Indeed, Deputy Chief Hafey testified that Stockton was capable of

2  bidding alone in response to the County RFP, both when the RFP was first announced in 2003,

3  and when AMR withdrew from its relationship with Stockton in 2005.  (*See* Hafey Dep., 62-64

4  & 124 (Welch Decl. Ex. 3).)

5         Despite each being fully capable of providing emergency ambulance services on their

6  own, the parties allegedly agreed to submit a joint bid under which they would simply rotate in

7  providing service.  The resulting harm to competition is apparent – the County would have

8  received a single bid from the two competitors most able to perform the contract.  Indeed, the

9  testimony of Stockton City Manager Mark Lewis makes clear the patently anticompetitive effect

10 of the agreement:

11        Q.     There were other anticipated competing bidders, weren't
          there?
12
          A.     Not any significant ones.
13
          Q.     So you viewed it as a high level of certainty that you were
14 going to win the bid with AMR?

15        A.     I think we had a very, very good chance.

16        Q.     And you have a different assessment of that now?

17        A.     Sure.  We're running -- AMR is a tough competitor, and
          we're running right down their nose.
18
          *   *   *
19
          Q.     You know, [on] June 22nd, the County only had one,
20 according to your view of it, one serious bidder.  And now there's
          at least two, right?
21
          A.  Well, there's at least two serious bidders, you bet.  And there
22 were other bidders previously, but I don't think anybody -- you
          know, the City and AMR combination would have been really
23 tough to beat.

24 Lewis Dep., 102-03 (Welch Decl. Ex. 4).

25        **2.     The JVA also purports to allocate the market for non-emergency**
               **ambulance service.**
26

27        The alleged agreements also purport to allocate a separate market not covered by the

28 RFP, namely the market for ***non-emergency*** ambulance service in the Stockton Zone and the

18

1   Lodi Zone. (Statement of Undisputed Facts ¶ 24.) In particular, under the JVA, AMR and A-
2   One would be allocated the exclusive right to provide non-emergency interfacility transfers,
3   critical care transfers, long distance transfers, scheduled wait and returns, and HMO/PPO
4   contractual arrangements. (*Id.*)

5       This provision represents an even more flagrant violation of the rule against market
6   division than the purported allocation of the emergency ambulance market. In the latter case,
7   because the County RFP encompasses emergency ambulance services, the JVA at least veils the
8   market division with the rhetorical cloth of "joint bid." In contrast, because the RFP does not
9   encompass the non-emergency ambulance markets, the partition of these markets as
10  contemplated by the MOU and the JVA would have been blatant market allocation. *See*
11  *Polygram Holding, Inc. v. FTC*, No. 03-1293, 2005 WL 1704732 at *7 (D.C. Cir. 2005) ("An
12  agreement between joint venturers to restrain price cutting and advertising with respect to
13  products not part of the joint venture looks suspiciously like a naked price fixing agreement
14  between competitors, which would ordinarily be condemned as *per se* unlawful."); *Dagher v.*
15  *Saudi Ref., Inc.*, 369 F.3d 1108, 1118 (9th Cir. 2004) (posing the hypothetical of Coca Cola and
16  Pepsi entering a joint venture to research a new soda flavor and illegally fixing prices on all soda
17  sold nationwide as part of the research agreement).

18          **3.**    **As interpreted by Stockton, the bidding restriction of the MOU and**
19                  **the JVA would constitute *per se* illegal bid rigging.**

20      To implement this prospective allocation of markets, the MOU and the JVA purport to
21  prevent any party from submitting a bid to the County in response to the RFP outside of the joint
22  venture, leaving the buyer (the County) without competitive choices from the two parties most
23  qualified to respond. In particular, the JVA provides that any party that withdraws from the
24  "joint venture" prior to an award on the RFP or that accepts an offer from another bidder to
25  compete for the same service area is precluded from bidding in response to the RFP. (Statement
26  of Undisputed Facts ¶¶ 20-22.)³ Stockton interprets this provision as surviving AMR's
27

28      ³    Notably, the joint bid was to cover only the Stockton Zone and the Lodi Zone, while the JVA purports to prevent a withdrawing party from bidding on any of the zones covered by the RFP.

016.367744.1   MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF AMERICAN MEDICAL RESPONSE, INC.'S MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION CASE NO. 2:05-CV-01316-DFL-PAN

1  withdrawal from the arrangement and as preventing AMR from now submitting an independent

2  bid.

3       As interpreted by Stockton, this restriction would result in bid rigging, which is *per se*

4  illegal.[4] *United States v. Reicher*, 983 F.2d 168, 170 (10th Cir. 1992); *United States v. Capitol*

5  *Serv., Inc.*, 756 F.2d 502, 506 (7th Cir. 1985); *United States v. Portsmouth Paving Corp.*, 694

6  F.2d 312, 317 (4th Cir. 1982); *United States v. Koppers Co.*, 652 F.2d 290, 294 (2d Cir. 1981);

7  *United States v. Brighton Bldg. & Maint. Co.*, 598 F.2d 1101, 1106 (7th Cir. 1979).  Bid rigging,

8  in antitrust parlance, means any "agreement between competitors pursuant to which contract

9  offers are to be submitted [to] or withheld from a third party." *Reicher*, 983 F.2d at 170 (quoting

10  *Portsmouth Paving*, 694 F.2d at 325); *see also United States v. Guthrie*, 814 F. Supp. 942, 950

11  (E.D. Wash. 1993) (defining bid rigging as "an agreement between two or more persons to

12  eliminate, reduce, or interfere with competition for a job or contract that is to be awarded on the

13  basis of bids"). "Per se illegal bid rigging can take various forms, including comparing bids

14  prior to submission, operating bid depositories, rotating bids, agreeing to refrain from bidding,

15  knowingly submitting noncompetitive bids, and agreeing to rig bids by creating sham

16  competition." ABA Section of Antitrust Law, *Antitrust Law Developments* 89-90 (5th ed. 2002).

17  Such practices harm competition by eliminating "not only price competition, but also

18  competition in service and product quality." *Portsmouth Paving*, 694 F.2d at 317.

19       Courts repeatedly have held that this rule encompasses agreements among competitors

20  not to bid. *See, e.g., Movie 1 & 2 v. United Artists Commc'ns., Inc.*, 909 F.2d. 1245, 1253 (9th

21  Cir. 1990) (applying *per se* analysis to an agreement between motion picture exhibitors to refrain

22  from bidding for licensing rights to films); *United States v. Portac*, 869 F.2d 1288, 1291 (9th Cir.

23  1989) (determining that an agreement not to bid against a competitor in timber sale constituted

24  per se illegal bid rigging); *Guthrie*, 814 F. Supp. at 950 (condemning as *per se* illegal an

25

26

27      [4]    As one court has observed, in cases of bid rigging, "the Sherman Act will be read as simply saying: 'An agreement among competitors to rig bids is illegal.'" *Koppers*, 652 F.2d at 294 (quoting *Brighton Bldg. & Maint. Co.*, 598 F.2d at 1106).

28

016.367744.1

1  agreement to not bid at a foreclosure sale), *aff'd*, 17 F.3d 397 (9th Cir. 1994)); *United States v.*

2  *Seville Indus. Mach. Corp.*, 696 F. Supp. 986, 989-90 (D.N.J. 1988) (observing that "courts have

3  repeatedly held that a simple agreement not to bid is itself a <u>per se</u> antitrust violation").

4  As these cases illustrate, a ban on independent bidding for the Stockton Zone and the

5  Lodi Zone would be *per se* illegal. But the restriction Stockton seeks to enforce would go even

6  further. It would preclude independent bidding, not just on the Stockton Zone and the Lodi

7  Zone, but also on Zone 5, which was not to be covered by the joint bid. (Statement of

8  Undisputed Facts ¶ 21.) This ban would seal a *per se* illegal agreement not to compete in the

9  ambulance market as a whole in San Joaquin County.

10  ## C.   The "Talisman" of "Joint Venture" Cannot Save the MOU and JVA from

11  *Per Se* Condemnation.

12  That the parties contemplated the creation of a "joint venture" does not insulate the MOU

13  and the JVA from *per se* condemnation. "The talisman of 'joint venture' cannot save an

14  agreement otherwise inherently illegal." *Engine Specialties*, 605 F.2d at 11. "[T]he Supreme

15  Court has declined to immunize joint ventures from *per se* antitrust scrutiny." *Dagher*, 369 F.3d

16  at 1124. Joint ventures "which partake of behavior identified as inherently pernicious to

17  competition such as price fixing or territorial allocations will be judged under the per se rule

18  rather than the rule of reason." *Engine Specialties*, 605 F.2d at 11; *see also Freeman*, 322 F.3d

19  at 1151.

20  Courts have recognized that, as a category, "joint ventures" defy "well established rules

21  for evaluating their competitive impact," *COMPACT v. Metro. Gov't*, 594 F. Supp. 1567, 1574

22  (M.D. Tenn. 1984), and can either enhance or harm competition, depending on the

23  circumstances. On the one hand, joint ventures "can create additional productive capacity

24  through the formation of a new operating unit, engage in research and development (R&D) for a

25  new product or technology, lower costs through economies of scale and scope, achieve synergies

26  from the pooling of complimentary resources, facilitate entry into new markets, and share or

27  diversify risks." ABA Section of Antitrust Law, *Antitrust Law Developments* 410 (5th ed. 2002).

28  On the other hand, joint ventures "also may provide a venue for collusion among venture parents

016.367744.1

1  and third parties, create or enhance market power of the venture or its parent, foreclose
2  competitors from access to a competitively advantageous resource, or eliminate potential
3  competition." *Id*

4      Given their dual nature, courts analyze joint ventures in two steps. First, they ask
5  whether the joint venture is legitimate or simply a ruse to cover anticompetitive conduct.
6  *Dagher*, 369 F.3d at 1121. Courts have made it clear that competitors cannot "suppress
7  competition among themselves and others ... by labeling the project a 'joint venture.'" *Timken*
8  *Roller Bearing Co. v. United States*, 341 U.S. 593, 598 (1951), *overruled on other grounds by*
9  *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984). Second, if the joint
10 venture is bona fide, a court inquires whether the attendant competitive restraints are "ancillary"
11 or "naked." *Dagher*, 369 F.3d at 1118, 1121; *Freeman*, 322 F.3d at 1151. A restraint is
12 "ancillary" – and, hence, legal – if it "is reasonably necessary to further the legitimate aims of
13 the joint venture." *Dagher*, 369 F.3d at 1121.

14      "Ordinarily, the threshold issue with respect to a joint venture involving actual or
15 potential competitors is whether it involves a sufficient integration of economic resources of the
16 parties to escape condemnation as a per se unlawful cartel arrangement under Section 1 of the
17 Sherman Act." ABA Section of Antitrust Law, *supra*, at 412; *see also COMPACT*, 594 F. Supp.
18 at 1574. Where "the whole is truly greater than the sum of its parts," *Broad. Music, Inc. v.*
19 *Columbia Broad. Sys., Inc.*, 441 U.S. 1, 21-22 (1979) – that is, where the joint venture "hold[s]
20 the promise of increasing a firm's efficiency and enabling it to compete more effectively,"
21 *Copperweld*, 467 U.S. at 768 – it is analyzed under the rule of reason. *See, e.g., Law v. NCAA*,
22 134 F.3d 1010, 1019 (10th Cir. 1998). Conversely, the *per se* rule applies to "sham" joint
23 ventures. *Engine Specialties*, 605 F.2d at 11; *COMPACT*, 594 F. Supp. at 1576-79; *United*
24 *States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412, 429 (S.D.N.Y. 1980). "The mere
25 coordination of decisions on price, output, customers, territories, and the like is not integration,
26 and cost savings without integration are not a basis for avoiding per se condemnation." *Antitrust*
27 *Guidelines for Collaborations Among Competitors* § 3.2, 2000 WL 33534553, at *7 (Dep't of
28 Justice & Fed. Trade Comm'n 2000).

1   This is not a case where "the whole is truly greater than the sum of its parts." *Broad.*

2   *Music,* 441 U.S. at 21-22. As an initial matter, as noted above, both Stockton and AMR were

3   capable of bidding alone. A "joint venture" was not required to pool resources to make it

4   possible to respond to the County's RFP. Moreover, the JVA did not include any integration of

5   the parties' operations. Indeed, the JVA was clear that each party would continue to operate its

6   own ambulance units. *See* JVA at ¶ 2.b. (Welch Decl. <u>Ex. 10</u>). There is no provision for the

7   joint purchase of capital or other equipment, the combination of resources, the hiring of

8   employees of the "joint venture," or for any sort of financial integration or risk sharing. *Id.* In

9   short, the JVA contemplates nothing beyond working together to submit a bid to the County,

10  under which each separate provider would continue to operate separately and independently, but

11  would share in the spoils of the County contract.

12  Given that the parties remain at arm's length, it is unsurprising that the prospective "joint

13  venture" would not have produced any of the pro-competitive benefits that potentially justify

14  collaborations among competitors. The mere agreement to "take turns" in the provision of

15  service does not create a new product, generate additional productive capacity, facilitate research

16  and development, promise economies of scale or scope, allow entry into new markets, or share or

17  diversify risk. ABA Section of Antitrust Law, *supra,* at 410 (identifying ways in which a joint

18  venture might enhance competition). Rather, the term "joint venture" is simply window dressing

19  for what would have been horizontal market division.

20  **D.   The *COMPACT* Case is on All Fours and Illustrates the Inherently**
21  **Anticompetitive Nature of the Restriction on Bidding.**

22  In *COMPACT,* 594 F. Supp. 1567, the court correctly condemned an analogous "joint

23  venture" that restricted independent bidding by its members as *per se* illegal. In that case, the

24  court found that a joint venture agreement between three minority-owned architectural firms,

25  created for purposes of submitting joint bids on public contracts seeking minority participation,

26  was *per se* illegal. *Id.* at 1577-81. In the agreement, the individual members "covenanted not to

27  pursue work on [projects targeted by the joint venture] in their individual capacities or to

28  associate themselves in any way with the project[s] except in their role as members of [the joint

---

23

016.367744.1

1  venture."[5]  *Id.* at 1569.  In effect, the members of the joint venture "agreed to band together in a

2  'joint venture' to present a united front for negotiating contracts on projects seeking minority

3  business participation." *Id.*

4  The court concluded that the restriction on bidding constituted a *per se* violation of

5  Section 1 of the Sherman Act.  *Id.* at 1577-79.  Specifically, the court determined that "the

6  agreement by each...member to refrain from bidding [joint venture]-designed contracts and to

7  pursue those projects only under the banner of [the joint venture] represent[ed] an attempt to peg

8  the price of minority participation." *Id.* at 1578.  Although not constituting bid rigging or price

9  fixing in the traditional sense, the *COMPACT* court held that "[a]n agreement between

10  competitors that creates a joint venture having the power to direct individual competitors to

11  refrain from bidding on contracts interferes with the free market price structure" and is therefore

12  *per se* unlawful. *Id.*

13  In addition to the unlawful covenant to refrain from submitting independent bids, the

14  joint venture agreement in *COMPACT* was illegal because it constituted nothing more than a

15  veiled attempt by its members to allocate territories while at the same time insulating each other

16  from competing bids.  The court read the arrangement as "an agreement between competitors to

17  conspire to allocate territories, customers and contracts and to fix the price of minority architect

18  participation on public contracts." *Id.* at 1575-76.

19  The court rejected the argument that the agreement was a legitimate joint venture subject

20

21

22  [5]  The portions of the joint venture agreement determined to be a *per se* unlawful restraint
on competitive bidding in *COMPACT* provided as follows:

23  5. COMPACT shall delineate specifically and in writing the areas of marketing
for architectural contracts which it wishes to pursue on a joint venture basis for
24  the benefit of its members and shall also designate specifically the areas which
members are free to pursue in their own private marketing activities apart from
25  COMPACT.  *No member shall pursue or accept as an individual firm without
agreement of all members of COMPACT in writing in advance, any project*
26  *which COMPACT has targeted or is pursuing in any way as a potential project*
*for COMPACT.*

27

28  594 F. Supp. at 1569 (emphasis added).

016.367744.1

1   to analysis under the rule of reason. "Net productive capacity of all members of [the joint

2   venture]," the court observed, "is not increased by [the joint venture's] operation, it is reduced."

3   *Id.* at 1575. Because there were no redeeming efficiencies other than the reduction of potential

4   bids from three to one, *id.* at 1579, the court "[did] not hesitate" to find the joint venture

5   agreement *per se* illegal, *id.* at 1575.

6          This Court could borrow the language of the *COMPACT* court to condemn the

7   restrictions on bidding in the MOU and the JVA. The alleged agreement would "stabilize[] the

8   price" of ambulance service by requiring AMR and Stockton "to come together to exchange

9   price and performance data in setting a joint bid and determining how to split up the work and

10  profits." *Id.* at 1577. A joint bid, as outlined in the MOU and the JVA, would not create any

11  efficiencies or other competitive benefits, and thus Stockton cannot "hide the collusive nature of

12  the mutual concessions by labeling [the alleged agreement a] joint venture[]." *Id.* at 1574. In

13  short, elimination of competition between AMR and Stockton "compromises consumer welfare

14  and, hence, runs afoul of Section 1 of the Sherman Act." *Id.* at 1579.

15         **E.     That Stockton is a Municipality Has No Effect on the Antitrust Analysis.**

16         Nor does the state action doctrine shield the MOU and the JVA from the Sherman Act.

17  As a general rule, the anticompetitive actions of a *state* are immune from the reach of federal

18  antitrust law. *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 370 (1991). "In

19  creating this immunity, the Supreme Court recognized that the free market principles espoused in

20  the Sherman Antitrust Act end where the countervailing principles of federalism and respect for

21  state sovereignty begin." *Traweek v. City & County of San Francisco*, 920 F.2d 589, 591 (9th

22  Cir. 1990).

23         Cities and other local governments, however, "are not beyond the reach of the antitrust

24  laws by virtue of their status because they are not themselves sovereign." *Town of Hallie v. City

25  of Eau Claire*, 471 U.S. 34, 38 (1985). "Rather, to obtain exemption, municipalities must

26  demonstrate that their anticompetitive activities were authorized by the State 'pursuant to state

27  policy to displace competition with regulation or monopoly public service.'" *Id.* (quoting

28  *Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 413 (1978)).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF AMERICAN MEDICAL RESPONSE,
INC.'S MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION
CASE NO. 2:05-CV-01316-DFL-PAN

1   Here, the State of California has not displaced competition.  To the contrary, it has
2   expressly mandated competition.   The EMS Act authorizes counties – not cities or other
3   municipalities – to create exclusive operating areas for the provision of ambulance service.
4   Importantly, though, subject to an exception not applicable here, the creation of an exclusive
5   operating area is permitted only "if a competitive process is utilized to select the provider or
6   providers of the services."  Cal. Health & Safety Code § 1797.224 (West 2004).  State law, thus,
7   does not authorize anticompetitive conduct by cities bidding on an exclusive operating area, but
8   instead expressly prohibits it.  *San Bernardino*, 15 Cal 4th at 933-34.  Axiomatically, the state
9   action doctrine does not immunize action taken in violation of state law.

10  **V.    CONCLUSION**

11  For the foregoing reasons, AMR respectfully requests that that the Court grant it
12  summary judgment by declaring the MOU and the JVA violate Section 1 of the Sherman
13  Antitrust Act and are therefore void and unenforceable.

14  DATED:  August 17, 2005                        FOLEY & LARDNER LLP
                                                    MICHAEL E. DELEHUNT
15                                                  DAVID W. SIMON
                                                    PAGE R. BARNES
16                                                  MICHAEL A. NARANJO
                                                    SEAN P. WELCH
17

18

19                                                  _____
20                                                       MICHAEL E. DELEHUNT
                                                    ATTORNEYS FOR PLAINTIFF AND
21                                                  COUNTERDEFENDANT, AMERICAN
                                                    MEDICAL RESPONSE, INC., A
22                                                  DELAWARE CORPORATION

23

24

25

26

27

28

26
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF AMERICAN MEDICAL RESPONSE, INC.'S MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION CASE NO. 2:05-CV-01316-DFL-PAN

016.367744.1