*American Medical Response, Inc. v. City of Stockton*
*United States District Court- Eastern District No. 2:05-CV-01316-DFL-PAN*

# GILLIS DEPO

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

AMERICAN MEDICAL RESPONSE,         )
INC., a Delaware Corporation,      )
                                   )
                Plaintiff,         )
                                   )    No. 2:05-CV-01316-DFL-PAN
        vs.                        )
                                   )
CITY OF STOCKTON, a California     )
Municipality                      )
                                   )
                Defendants.        )
_____)
                                   )
AND RELATED CROSS ACTIONS          )
_____)

**DEPOSITION OF W. GARY GILLIS, FIRE CHIEF**

DATE:  Friday, August 5, 2005 at 1:00 p.m.

DEPOSITION OFFICER:  BOBBIE JO HARR
                     CSR No. 6090, RMR

TAKEN AT:
GAROUTTE'S
120 North Hunter Street, Suite 104
Stockton, California  95202


GAROUTTE'S
Certified Shorthand Reporters
120 North Hunter Street, Suite 104
Stockton, California  95202
(209) 942-2100 or Nationwide (800) 942-2103
FAX (209) 942-2150

1

1           W. GARY GILLIS, FIRE CHIEF,

2    the deponent herein, having been first duly and regularly

3    sworn by the Certified Shorthand Reporter, deposed and

4    testified as follows:

5

6           ** EXAMINATION BY MS. BARNES **

7           MS. BARNES:  Q.  Good afternoon.  Could you state

8    your name for the record?

9        A.   William Gareth Gillis.  That's it.

10       Q.   Should I call you Chief Gillis?

11       A.   You can call me Chief Gillis, Gary, whatever you

12   want.

13       Q.   Okay.  Chief Gillis, I already introduced myself.

14   My name is Page Barnes.  I represent American Medical

15   response in its litigation with the City of Stockton.

16           Just before we get started, have you ever had

17   your deposition taken before?

18       A.   Yes, ma'am.

19       Q.   Okay.  Roughly how many times?

20       A.   Six or seven, I guess.

21       Q.   Okay.  You've probably been through this before,

22   though, but just for the record, I just wanted to go over

23   a few of the ground rules for what was going to be going

24   on here this afternoon.

25       A.   This is Michael Rishwain.  He's Assistant City

1  Attorney.

2          MS. BARNES:  Hi.  Why don't we go off the record

3  for one second.

4          (Off the record.)

5          MS. BARNES:  Q.  Let's go back on.

6          As I said, I just wanted to go over a few of

7  the grounds rules.

8          You've already taken an oath, and that's the

9  same oath that you would take as if you were appearing

10  in a court of law.

11          Do you understand that?

12  A.    Yes, ma'am.

13  Q.    Okay.  As we're going through the process this

14  afternoon, I'm going to be asking you a series of

15  questions.  The court reporter here is going to be taking

16  down a transcript of what we say here today.

17          For that reason, if you could wait until I

18  finish my questions, and I will try and wait until you

19  finish your answer before we speak again, because that

20  way it will make her job much easier and the transcript

21  much clearer.

22          Do you understand that?

23  A.    Yes.

24  Q.    Okay.  If there's any question you don't

25  understand, please let me know.  I will try and rephrase

7

1    it.  If you don't tell me that you have a problem with the

2    question, I'm going to assume you understand it.

3         Is that okay?

4    A.   Yes.

5    Q.   All right.  And last but not least, you're doing

6    a good job of this so far, but please make sure to give

7    audible answers, in terms of yes or no.  Shakes of the

8    head, uh-huh's, huh-uhs, won't come across in the

9    transcript.

10        So will you try to do that?

11   A.   Yes.

12   Q.   Okay, thank you.

13        Is there any reason why you are not able to

14   give accurate testimony this afternoon?

15   A.   No.

16   Q.   Okay.  Or truthful testimony?

17   A.   No.

18   Q.   Could you tell me what your current position is?

19   A.   I am the Fire Chief for the City of Stockton.

20   Q.   How long have you been Fire Chief for the City of

21   Stockton?

22   A.   Little over five years.

23   Q.   What was your position before that?

24   A.   Deputy Fire Chief for Operations for the City of

25   Stockton.

1      Q.    Okay.  As part of your responsibilities, are you

2   responsible for negotiating or drafting agreements on

3   behalf of the fire department?

4           MR. HIGGINS:  I object.  That's vague.

5           THE WITNESS:  You object?

6           MS. BARNES:  Q.  Unless he instructs you not to

7   answer.

8           MR. HIGGINS:  I'm sorry, it is just for the

9   record.

10          THE WITNESS:  Partially.

11          MS. BARNES:  Q.  Okay.  In what ways are you

12   responsible for that?

13      A.    I share responsibility with others.

14      Q.    Okay.  And who would those other people be?

15      A.    That would depend on the agreement or contract or

16   whatever we were talking about.  It could be any number of

17   people in city government, from City Manager's office,

18   from the Human Resources Department, from Housing and

19   Redevelopment.  It depends on what you're looking for.

20      Q.    Okay.  In connection with the provision of

21   ambulance services in the City of Stockton, have you ever

22   been involved in negotiating or drafting agreements?

23      A.    Yes.

24      Q.    Okay.  Was anyone else from the City of Stockton

25   involved in the process of negotiating or drafting

                                                        9

1   agreements relating to the provision of the ambulance

2   services?

3         MR. HIGGINS:   That's vague and ambiguous.

4         THE WITNESS:   Yes.

5         MS. BARNES:   Q.   Okay.   Prior to 2003, were you

6   involved in any sort of negotiations relating to the

7   provision of ambulance services within the City of

8   Stockton?

9         A.   Prior to 2003?

10        Q.   Right.

11        MR. HIGGINS:   I'm sorry, can I have that question

12  read back.

13        (Whereupon the record was read.)

14        MR. HIGGINS:   It is vague, "any sort of."   It is

15  confusing.

16        THE WITNESS:   I'm struggling with that question,

17  because I cannot recall exactly when we started to do

18  that.

19        MS. BARNES:   Q.   Okay.   At some point in time did

20  you become involved in issues related to who was going to

21  provide ambulance services in the City of Stockton?

22        A.   Yes.

23        Q.   Okay.   When did you first get involved in that

24  process?

25        A.   If I understand the question -- could you give me

                                                          10

1             MS. BARNES:  Yes.

2             THE WITNESS:  Who should be providing?

3             I don't know how to answer that question.  I'm

4    sorry, the question --

5             MR. HIGGINS:  Okay.

6             THE WITNESS:  I don't understand the question.

7             MR. HIGGINS:  Well, maybe she can explore it,

8    what you didn't understand about it.

9             MS. BARNES:  Could you read the question back.

10            (Whereupon the record was read.)

11            THE WITNESS:  I would have to say no.

12            MS. BARNES:  Q.  Okay.  Do you know whether

13   anyone else from the city had discussions with

14   representatives of the county about who should be

15   providing ambulance services in Stockton?

16        A.   I don't know, no.

17        Q.   Is the Stockton Fire Department currently

18   involved in providing ambulances services within the city?

19        A.   Yes.

20        Q.   Okay.  How long has the fire department been

21   doing that?

22        A.   Since approximately September of 2002.

23        Q.   Before September of 2002, who was providing

24   ambulance services in the city?

25        A.   Within the City of Stockton would have been AMR,

                                                        12

1    and A-1 would be the preeminent providers.  I don't

2    believe -- there was sporadically others, but nothing of

3    significance.

4        Q.   At some point in time, did the Stockton Fire

5    Department decide that it wanted to get involved in

6    providing ambulance services?

7        A.   Yes.

8        Q.   Okay.  When did discussions about that first

9    start?

10       A.   Probably -- to be quite frank with you, there had

11   been discussions of that since the Stockton Fire

12   Department started the paramedic program in '75.  So 1975,

13   but off and on.  Most recently, since I've been Fire

14   Chief, sometime time late in 2001.

15       Q.   And were you involved in those discussions,

16   starting in late 2001?

17       A.   Yes.

18       Q.   What was your understanding of the reasons why

19   the fire department wanted to get involved in providing

20   ambulance services?

21       A.   We felt that the provision for ambulance services

22   from the private providers was less than what the citizens

23   of Stockton deserved and expected on the emergency side,

24   911 ambulances.

25       Q.   Can you give me an idea of what some of the

                                                          13

1    deficiencies were that you were concerned about?

2            MR. HIGGINS:  That's vague.

3            THE WITNESS:  We were concerned that oftentimes

4    the metropolitan Stockton area had few or no ambulances

5    available for emergency response, and it became a very

6    frequent happening, running out of resources.

7            MS. BARNES:  Q.  When the city -- excuse me.

8    When the fire department decided that it might want to get

9    into the provision of ambulance services, did the fire

10   department perform any sort of financial analysis of what

11   it might cost the city?

12       A.   Yes.

13       Q.   Okay.  Who did that analysis?

14       A.   Members of my staff.

15       Q.   Do you remember any names?

16       A.   I would think that Dave Hafey, Ed Rodriguez, Mark

17   Parret, Ray Call.

18            There may have been others.

19       Q.   Up to the time when the city started providing

20   ambulance services, which I think you said was in

21   September of 2002, was there any discussion about whether

22   the fire department should become the exclusive providers

23   of ambulance services in the city?

24       A.   I believe so, yes.

25       Q.   What do you recall about those discussions?

                                              14

1        A.    I recall that there were individuals in city

2    government and within my department who felt that we could

3    provide a much higher level of service to the citizenry on

4    the emergency side.

5             But any discussion on the nonemergency side was

6    very brief and most people agreed with me that that

7    should be better handled by private enterprise.

8             So there was never any serious discussion

9    around me, at least, of taking over the entire ambulance

10   service within the city.

11       Q.    Were there any discussions of taking over the

12   nonemergency services, just having the fire department do

13   those?

14       A.    Nonemergency?  No.

15       Q.    Excuse me.  Strike -- let me -- let me ask

16   another question.

17            Were there any discussions of the fire

18   department exclusively doing emergency services,

19   ambulance services?

20       A.    Yes.

21       Q.    Okay.  What do you recall about those

22   discussions?

23       A.    Well, that was a long time ago, so I can say that

24   there was many, many discussions, and many, many venues

25   with many, many different people.

1          To summarize, I would say that our goal was

2     then and has been, and I've been very careful with this

3     to try to guide this in this direction, that we would

4     work hand in hand with private enterprise and be an

5     addition to, to supplant private enterprise -- not

6     supplant, to -- to support and dedicate ourselves to the

7     911 system, which they don't do, typically.

8          So around me, at least my attitude has never

9     been to take over completely any -- any portion of the

10    ambulance service, but has been to be in addition to on

11    the emergency side.

12    Q.    I think you told me that before the fire

13    department got involved in actually providing ambulance

14    services there had been a financial analysis done, right?

15    A.    Yes.

16    Q.    Okay.  What did -- what was your understanding of

17    what the financial impact would be if the financial

18    department took over -- excuse me, if the fire department

19    started providing ambulance services in the city?

20         MR. HIGGINS:  Vague as to time.

21         THE WITNESS:  I don't understand the question.

22         MS. BARNES:  Q.  Okay.  Let me try --

23    A.    To whom?

24    Q.    You said there was a financial analysis done,

25    right?

1   entire staff and -- and our labor group.  There was a lot

2   of discussion on that issue.

3       Q.   Okay.  What do you recall about what your staff

4   told you about why the county was interested in entering

5   into these exclusive operating agreements?

6       A.   That's a tough question, because I don't think my

7   staff told me anything.  I think we had discussions, and a

8   lot of it was supposition.  It was a little difficult to

9   get any hard and fast information as to what or why,

10  because those decisions were being made at the board

11  level.

12      Q.   What was the -- I'm sorry.

13      A.   At the Board of Supervisors.

14      Q.   What was the suppositions?

15      A.   The county had a -- an emergency services -- EMS

16  Agency, Emergency Medical Services Agency, who was, in our

17  estimation, under-staffed and under-funded.  And they were

18  having a difficult time controlling the ambulance

19  situation in San Joaquin County.

20           They saw us enter into the system because we

21  were able to, and then more and more ambulance companies

22  started to come into, specifically Stockton, but also

23  Lodi and Tracy, Hughson Ambulance, Priority One

24  Ambulance, First Responder.  There was even some

25  inquiries from some others.  So there was a rapidly

21

1   expanding number of ambulances in the streets, which was

2   good for the consumer.

3         But there was a lot of complaints flying

4   around.  Ambulance wars, they were talking about.  So,

5   you know, there was accusations of people jumping calls.

6   In other words, taking calls away from other people.

7   And just issue after issue that the EMS Agency and the

8   County Board of Supervisors felt needed to have more

9   control.  And since the -- excuse me.

10        The tenancy in the state is to have exclusive

11  operating areas.  They felt that it was time to do that

12  in San Joaquin County.  That was our take on it.

13     Q.   At some point in time did you learn that the

14  county was considering putting out a request for proposals

15  relating to the provision of ambulance services throughout

16  the county?

17     A.   Yes.

18     Q.   Okay.  How did you learn about that?

19     A.   I don't recall.

20     Q.   What was the fire department's reaction when you

21  learned that the county was going to put out a request for

22  proposals?

23        MR. HIGGINS:  That's vague.

24        THE WITNESS:  We were opposed to their position,

25  initially.

                                                      22

1          MS. BARNES:  Q.  Why was that?

2      A.   I don't recall.

3      Q.   And after your initial opposition, what happened

4  then?

5      A.   Well, we thought that we would enter into a

6  public private partnership, because we never considered

7  doing it by ourselves in the first place.

8      Q.   Why did you never consider doing it by yourself?

9      A.   As I stated previously, we were only interested

10  in the emergency side, number one.  Number two, we had

11  always seen ourselves as an addition to, as opposed to an

12  exclusive sole provider.

13      Q.   Why were you only interested in the emergency

14  ambulance service?

15      A.   That's what we do.

16          MR. HIGGINS:  I think that's been asked and

17  answered.

18          THE WITNESS:  We're in the emergency business.

19          MS. BARNES:  Q.  So when the fire department

20  decided that it wanted to enter into some sort of private

21  public partnership, what did the department do to advance

22  that?

23      A.   What did we do to advance that?  Well, if I

24  understand the question, I believe we let it be known that

25  we were looking for a partner or partners.  And I

                                                    23

1   believe -- I know I used the term on multiple occasions,

2   we would court all suitors.

3       Q.   Who did you talk to about -- what other private

4   entities did you talk to about entering into some sort of

5   partnership with them?

6            MR. HIGGINS:  And this is the fire department or

7   Chief Gillis?

8            MS. BARNES:  The fire department.

9            THE WITNESS:  I think we talked to probably a

10  dozen different providers.  Some in the county, some

11  outside the county.

12           MS. BARNES:  Q.  Can you name names?

13      A.   Well, I know I personally talked to Hughson

14  Ambulance, I talked to AMR, I talked to A-1 Ambulance.  I

15  talked to First Responder out of Sacramento.  And I got

16  phone calls from probably three or four other ambulance

17  companies whose names I don't recall at this time that I

18  personally talked to, and I know that people in my staff

19  talked to others, also.

20      Q.   And eventually you decided to get involved with

21  AMR in the provision of ambulance services?

22      A.   AMR and A-1.

23      Q.   Right.  How -- why did you choose to partner up

24  with them?

25      A.   Actually, I believe they chose us.  Lou Meyer had

                                                        24

1    always talked about public private partnerships.  He was

2    the CEO of -- of AMR.  Donna McCann had been a long term

3    provider in this area.  She had talked about it.  She was

4    good friends with Lou.  And they didn't particularly care

5    for some of the other ambulance companies.  So they kind

6    of nixed the other folks.

7        Q.    Did you have any other providers offer to partner

8    up with the city?

9        A.    Yes.

10       Q.    And why did you decide not to partner up with

11   those providers?

12       A.    We didn't.

13       Q.    They decided not to?

14       A.    No.  AMR decided that they didn't want them.

15       Q.    So was it your impression that AMR had to be part

16   of the -- the program that was going to provide ambulance

17   services?

18            MR. HIGGINS:  That's argumentative.

19            THE WITNESS:  Had to be?  No.

20            MS. BARNES:  Q.  I'm just trying to understand.

21   You said AMR didn't want to partner up with anybody else.

22   They chose you.  You were in discussions with other

23   people.  Did you feel like the fire department had to have

24   AMR involved in the process?

25       A.    I wouldn't say had to, no.

                                                          25

1    Q.   Okay.  So why was it that you decided to go with

2    AMR, as opposed to doing it with somebody else?

3    A.   We didn't decide to go with just AMR.  We decided

4    to go with AMR and A-1.

5    Q.   Did you consider any other options besides that

6    relationship?

7    A.   Yes.

8    Q.   Okay.  And why did you decide to go with the AMR,

9    A-1 partnership, as opposed to the other options?

10   A.   We had long-term relationships with these folks,

11   and they were long-term providers in this county.  And

12   they had objections to some of the other ambulance

13   companies, so that's how it shook out.

14   Q.   Prior to the time that you decided to enter into

15   this relationship with AMR and A-1, what sort of

16   relationship, if any, had the fire department had with

17   AMR?

18           MR. HIGGINS: That's confusing.

19           THE WITNESS:  Do you mean me or the entire

20   department -- I don't really understand the question.

21   There's a lot of people in the fire department.

22           MS. BARNES:  Q.  I understand.

23           How about you?

24   A.   Me?

25   Q.   Yeah.

26

1    are the folks that I remember in particular, because those

2    were the ones we were hammering out the issues with.

3        Q.    If I could direct your attention to the second

4    page of Exhibit 1, paragraph four.

5        A.    Yes.

6        Q.    Do you remember any discussions about paragraph

7    four?

8        A.    Yes.

9        Q.    What do you recall about those discussions?

10       A.    I recall that it was agreed by the parties that

11   what we were trying to do was create, in essence, a

12   marriage, and that we were entering into a joint

13   partnership for the purposes of responding to an

14   anticipated RFP, and that the intent was we would be

15   attached to the hip, basically, and either bid -- in other

16   words, you can't withdraw.  You can't withdraw.  Otherwise

17   you would not be allowed to bid, if you did withdraw, you

18   would not be allowed to bid.

19       Q.    And --

20       A.    So that gave everybody that level of -- of

21   comfort with each other.

22       Q.    And in this -- is it your understanding that you

23   wouldn't be allowed to bit for Zones 1, 2 and 3, or would

24   it be anywhere in the county?

25       A.    You know, I'm not real clear on that right now.

                                                           30

1          MS. BARNES:  You're free to object.

2          (Whereupon Mr. Rishwain left the proceedings.)

3          MS. BARNES:  Q.  Actually, rather than spending

4     an hour reading through this, let's forget about Exhibit

5     2.

6     A.   Okay.  Sorry.

7     Q.   No, that's okay.

8          At some point in your time -- at some point in

9     time, is it your understanding that the fire department

10    gave AMR confidential information?

11    A.   Yes.

12    Q.   Okay.  What confidential information did the fire

13    department give to AMR?

14         MR. HIGGINS: Excuse me.  You're asking him

15    personally what he knows?

16         MS. BARNES:  Yes.

17         THE WITNESS:  I know that we gave them financial

18    information, as far as our collection rates, our payor

19    mix, our numbers for transport, our costs and revenue,

20    among other things.  Because those are not statistics that

21    I would compile, but those are general categories of

22    statistics that I would -- that I know that they received,

23    because I was there when they were looking at them, or had

24    them.

25    Q.   Okay.  With respect to collection rates, how did

1     A.   I wouldn't think so, but I have no personal

2   knowledge of that.

3     Q.   How about with respect to any other city, do you

4   know whether information related to costs have been shared

5   with any other city?

6            MR. HIGGINS:   Ambulance costs?

7            MS. BARNES:   Yes, thank you.

8            THE WITNESS:   Other than the City of Lodi, I have

9   no personal knowledge.  And I'm not sure exactly how much

10   Lodi knows or has been shown.

11            MS. BARNES:   Q.   How about with respect to

12   revenues, do you have personal knowledge about whether

13   information about revenues has been shared with anyone --

14   any fire department, other than Lodi, in connection with

15   this RFP process?

16     A.   I don't even believe that's been shared with

17   Lodi.  May have been, but I don't see a reason for it.

18     Q.   Have you ever had any conversations with anyone

19   regarding the collection rates related to the ambulance

20   services?

21            I'm sorry, that was a bad question.

22            Have you ever had any conversations with anyone

23   other than a city employee about collection rates

24   related to the provision of ambulance services?

25     A.   Yes.

1           MR. HIGGINS:  Any conversations with attorneys

2    are privileged, so don't say anything about attorneys.

3           MS. BARNES:  Q.  Who have you discussed it with?

4           MR. HIGGINS:  Other than attorneys.

5           THE WITNESS:  Our billing service folks, and

6    several people with AMR, including Lou Meyer, Brad White,

7    Barry Elzig, and some of his other financial folks, whose

8    names I don't know.

9           MS. BARNES:  Q.  Anyone else?

10          MR. HIGGINS:  Other than attorneys

11   representing -- other than attorneys representing the

12   city.

13          THE WITNESS:  Discussed collection rates?

14          MS. BARNES:  Q.  Yes.

15     A.    That's not something I would discuss, typically,

16   with other people that didn't need to know that

17   information, so I would say no.

18     Q.    Okay.

19     A.    We were told very early on by AMR and other folks

20   in the business that this type of information was

21   extremely sensitive and should be maintained confidential.

22     Q.    Who told you that?

23     A.    Lou Meyer and many people in his organization.

24     Q.    You said he told you this type of information.

25   What did you mean by that?

                                                    77

1     A.   Those types of things.  And what they said was it

2  would reflect the market, and that's how you make the bid.

3     Q.   Anything else, other than those areas?

4     A.   I'm sure I'm missing a couple.

5     Q.   Did AMR ever give the City information about its

6  own payor mix?

7     A.   I heard conversations concerning that, and I

8  don't believe I ever saw anything.  And there was

9  complaints from my folks that the information seemed to be

10  flowing one way, from us to AMR.

11     Q.   Who complained about that?

12     A.   Those folks that were working on the -- on the

13  bid with AMR, or on the RFP process with AMR.

14     Q.   And that would be Hafey, Rodriguez --

15     A.   That would be Ed Hafey, Ed Rodriguez.  And they

16  had people helping them, so there was other folks involved

17  with it also.

18     Q.   Do you know whether AMR ever gave its information

19  about its collection rates?

20     A.   I don't know.  I never saw it.

21     Q.   Were you ever involved in any conversations with

22  AMR in which information about its payor mix was -- AMR's

23  payor mix was discussed?

24     A.   Yes.

25     Q.   What do you recall about those discussions?

1  knowledge, that's fine.

2       MS. BARNES:  Okay, fine.

3       Q.   Do you see that there's a difference between --

4  in the last portion of that paragraph, in Exhibit 1, it

5  says that the party is precluded from continuing to bid

6  for a RFP in Zones 1, 2 and 3, correct?  That's in Exhibit

7  1?

8       MR. HIGGINS:  The question is does he see that in

9  Exhibit 1?

10       THE WITNESS:  That party is precluded from

11  continuing in the bidding for a RFP in Zones 1, 2 and 3,

12  is what it says.

13       MS. BARNES:  Okay.  And Exhibit 3 -- excuse me.

14  Yeah, Exhibit 3, that language is different.  It says,

15  shall be -- will be precluded from bidding in the San

16  Joaquin County RFP for ambulance services.

17       Do you see that?

18       A.   Yes.

19       Q.   Do you know why the language is different in

20  Exhibits 1 and 3?

21       MR. HIGGINS:  Object.  Calls for a legal

22  conclusion.

23       THE WITNESS:  No.

24       MS. BARNES:  Q.  Do you recall any conversations

25  about changing the language in paragraph four?

92

1        A.    Specifically in paragraph four?  No.

2        Q.    Do you recall any discussions about whether a

3    withdrawing party would be precluded from participating in

4    the RFP process outside of Exhibits 1, 2 and 3 -- excuse

5    me, outside of Zones 1, 2 and 3?

6        A.    Can you say that question again?  I'm sorry.

7        Q.    Yeah.  Do you recall any discussions as to

8    whether a party that withdrew from this partnership would

9    be precluded from bidding to provide ambulance services

10   outside of Zones 1, 2 and 3?

11       A.    Yes.

12       Q.    Okay.  What do you recall about those

13   conversations?

14       A.    If I understand the question, we were always --

15   Stockton Fire Department was always -- always focussed on

16   old Zones 1, 2 and 3, which is now Zone B.

17       Q.    Uh-huh.

18       A.    And it was our understanding that if somebody

19   were to withdraw from this Agreement, they could not bid

20   against their former partners.

21       Q.    For Zones 1, 2 or 3?

22             MR. HIGGINS:  That's argumentative.

23             MS. BARNES:  Q.  Well, let me --

24             MR. HIGGINS:  That's not what he testified to.

25   That's your testimony.

                                                    93

1           And for us, of course internally, we looked at

2    how many calls we went with our own folks, and of course

3    our ambulance core would have to charge -- would have to

4    pay back to the fire department that amount.

5           So, yes, there was a dollar amount, but the

6    more important issue was there was actual agreement as

7    to what marginal costs meant, and that went back and

8    forth quite a bit.

9       Q.   Were you involved in conversations with AMR as to

10   this agreement as to marginal costs?

11      A.   Yes.

12      Q.   Who did you talk to about it?

13      A.   Lou Meyer.

14      Q.   Do you recall when you had these conversations

15   with him?

16      A.   Not specifically.  But I do know that I had a

17   meeting in his office, and that was part of that

18   conversation in his office.  And I had conversations on

19   the telephone with him about it.  And Lou and I came to an

20   agreement that I had to confirm with my boss, the City

21   Manager.  And I went in to my boss, the City Manager, Mark

22   Lewis, and told him, this is what we want and this is what

23   it means.  And he with agreed to that.  And I called Lou

24   and said, "It is done."

25           So any time we really had an issue that was a

                                                        102

1    difficult issue, it was handled with -- between Lou and

2    I, or between Lou and Mark Lewis. If there was any

3    other discussions down below us, that people weren't

4    getting along or whatever or weren't agreeing, it didn't

5    matter, because the agreement was going to be made

6    between Mr. Meyer and Mr. Lewis and myself.

7        Q.   What other difficult issues did you discuss with

8    Mr. Meyer?

9        A.   Oh, shoot. Discussed the city's need to get to a

10   certain cost level so that -- in other words, reduce our

11   costs to the point where AMR felt comfortable that we were

12   going to be able to submit a competitive bid and not, you

13   know, be out of whack with what the market was -- was

14   going to be able to support. That was probably the most

15   important issue right there.

16       Q.   What did Mr. Meyer tell you about his concerns

17   about the competitiveness of the bid?

18          MR. HIGGINS: When? Vague as to time.

19          MS. BARNES: Q. At any point in time.

20       A.   Excuse me?

21       Q.   At any point in time.

22       A.   Any point in time. He told me a lot of things.

23   Lou and I have had lots of conversations over the years.

24        Most recently, he looked at our budget,

25   apparently, and he saw how much it would cost, and he

 1 | said under his estimation, we needed to pair X amount of
 2 | dollars off of our budget, over a million bucks. And I
 3 | meant for the ambulance core itself, for ambulance
 4 | division.

 5 | And I told him that we would get there. And
 6 | then I told him the evening that he came to the City
 7 | Council and donated two ambulances to our sister city in
 8 | Mexico, Empalme, through the City of Stockton, I told
 9 | him and Brad White and Barry Elzig that we, in fact,
10 | through negotiations with our Local and other cost
11 | savings in the budgetary process, that we were going to
12 | get to their number no problem.

13 | Q. After Exhibit 3 was signed, are there any --
14 | excuse me, strike that.

15 | At the time that Exhibit 3 was signed, did you
16 | have any understanding that there were any other items
17 | that needed to be negotiated amongst the parties?

18 | MR. HIGGINS: I think that's been asked and
19 | answered. I think it is also vague.

20 | MS. BARNES: Q. Other than what you've already
21 | testified to.

22 | A. Quite frankly, in my conversations with Mr.
23 | Meyer, he occasionally expressed some concern about
24 | individual issues, but he expressed that, for the most
25 | part, when Mark Lewis and I and Lou got into the room

1      A.    There was -- whatever way we were going to pay

2   for it, but it was not going to be part of this thing.

3      Q.    And then with respect to the issues that Mr.

4   Meyer had about the people involved, what did he tell you

5   about the problems that he had there in that respect?

6      A.    Over several years, he had some general

7   complaints about my lead guy, Deputy Chief Dave Hafey, and

8   asked me to replace him with somebody else.

9           But then after we discussed it, he understood

10  my position, that this was a young man who I had great

11  respect and admiration for and needed him in this

12  position.

13          And Mr. Hafey had requested to be removed.   And

14  I told him as soon as the ambulance agreement was done

15  and we were operating, then he could move onto another

16  area in the fire service.

17          Lou also suggested that we use, you know, a

18  couple other people.   But he has to understand we have a

19  rank structure and we have a civil service structure.

20  He understood my internal politics problem, also.

21          So he agreed that though he did not personally

22  like the individual and he thought the individual was a

23  problem, he agreed that -- I told him "I'm going to

24  leave him there.   I have to."

25          And he said, "That's fine."   And that's the

                                                    107

1   last it was, between he and I, before the date when he

2   informed us that he was going to unilaterally pull out

3   of the Agreement.

4      Q.   What did Mr. Meyer tell you about why he thought

5   Mr. Hafey was a problem?

6          MR. HIGGINS:  That misstates his prior

7   testimony.  I object.

8          THE WITNESS:  Can you restate that question?

9          MS. BARNES:  Q.  What -- what did Mr. Meyer tell

10  you about why he wanted Mr. Hafey replaced on this -- on

11  these negotiations?

12     A.   He told me a lot of different things over a

13  number of different years.

14     Q.   What did he tell you?

15     A.   I can't recall it all.

16     Q.   Can't recall any specific problems that Mr. Meyer

17  had with Mr. Hafey?

18     A.   I can recall that he thought that Dave was asking

19  for things that he was not willing to give, meaning Lou

20  Meyer or AMR.

21         And I told him "Lou, you know the Agreement's

22  going to be made in Mr. Lewis's office with me."  And

23  then he would calm down and then he would say "Yes, I

24  understand that."

25         He also would relay some comments made by his

1   STATE OF CALIFORNIA   )
      COUNTY OF SAN JOAQUIN )   ss.

2

3       I, BOBBIE JO HARR, Certified Shorthand Reporter herein, do hereby certify:
      That on August 5, 2005, at 1:00 p.m., the witness

4   herein, W. GARY GILLIS, FIRE CHIEF, was duly sworn:

5       That said witness' testimony and the proceedings had at the time of such testimony were taken down in shorthand

6   notes by me; I thereafter caused said shorthand notes to be transcribed into longhand typewriting, the following being a

7   full, true, and correct transcription therein;
      That I am a disinterested person, and am not in any way

8   interested in the outcome of said action; nor connected with nor related to any of the parties in said action, nor to

9   their respective counsel;
                  ---o0o---

10       On August 8, 2005, all counsel were given notice of the preparation of the deposition, and the original deposition

11   was available for reading, correcting, approval, or signing in our offices until September 11, 2005.

12                   ---o0o---
    _____The witness signed the deposition and made no

13   corrections.
    _____The witness and parties waived examination and reading

14   of the deposition at the time of the taking of the deposition.

15     _____The witness corrected, approved, or refused to approve the deposition by letter to me attached thereto, and copies

16   of the letter were sent to all counsel.
    _____The witness failed to appear at my office.

17     _____The witness appeared in my office, made changes to the deposition, and counsel were provided with copies of the

18   changes.
    _____The witness refused to approve or sign the deposition

19   for the following reasons: _____

20   _____.
    _____Other: _____.

21       IN WITNESS WHEREOF, I have hereunto subscribed my hand.
    DATE: _____

22         *Bobbie Jo Harr* (signature)
        BOBBIE JO HARR, CSR NO. 6090, RMR

23   COUNSEL: YOU WILL BE NOTIFIED OF ANY CHANGES OR CORRECTIONS TO THE DEPOSITION. CONTACT OUR OFFICE IF YOU HAVE ANY

24   QUESTIONS.

25

                                              4