*American Medical Response, Inc. v. City of Stockton*
*United States District Court- Eastern District No. 2:05-CV-01316-DFL-PAN*

# MEYER DEPO PART 1

1

2

3              IN THE UNITED STATES DISTRICT COURT

4          IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

5

6  AMERICAN MEDICAL RESPONSE, INC.)
   a Delaware Corporation,        )
7                                 )
                   Plaintiff,     )
8                                 )   No. 2:05-CV-01316-DFL-PAN
            vs.                   )
9                                 )
   CITY OF STOCKTON, a California )
10  Municipality                  )
                                  )
11                 Defendants.    )
   _____)
12  AND RELATED CROSS ACTIONS     )
   _____)
13

14              **DEPOSITION OF LOUIS MEYER**

15

            DATE:  Monday, August 8, 2005 at 10:00 a.m.
16

17          DEPOSITION OFFICER:  BOBBIE JO HARR
                                 CSR No. 6090, RMR
18

19          TAKEN AT:
            GAROUTTE'S
20          120 North Hunter Street, Suite 104
            Stockton, California  95202
21

22

23                    GAROUTTE'S
                Certified Shorthand Reporters
24          120 North Hunter Street, Suite 104
                Stockton, California  95202
25       (209) 942-2100 or Nationwide (800) 942-2103
                  FAX (209) 942-2150

1

1                    LOUIS MEYER,

2     the deponent herein, having been first duly and regularly

3     sworn by the Certified Shorthand Reporter, deposed and

4     testified as follows:

5

6              ** EXAMINATION BY MR. HIGGINS **

7              MR. HIGGINS:  Q.  Good morning, sir.

8        A.    Good morning.

9        Q.    My name is Mike Higgins.  Would you please state

10    your name, for the record?

11       A.    Yeah.  Louis Meyer.

12       Q.    Mr. Meyer, do you realize that the oath that

13    you've just taken is the same oath that you would take in

14    a court of law in California before testifying?

15       A.    Yes.

16       Q.    Have you had your deposition taken before?

17       A.    Once.

18       Q.    When was that?

19       A.    Back in '96 or '97.

20       Q.    Where was it taken at?

21       A.    Where was the deposition taken?

22       Q.    Yes.

23       A.    Sacramento.

24       Q.    What was the nature of the lawsuit?

25       A.    It was an anti-trust case.

1       Q.   Who were the parties?

2       A.   The City of Sacramento and American Medical

3    Response.

4       Q.   Who was the plaintiff?

5       A.   The City of Sacramento.

6            No, excuse me.  AMR was the plaintiff.

7       Q.   You sued the City of Sacramento -- AMR sued the

8    City of Sacramento.

9       A.   That's correct.

10      Q.   When you say "AMR," you mean American Medical

11   Response?

12      A.   That's correct.

13      Q.   If we refer to it as "AMR," you understand me to

14   mean the company?

15      A.   Exactly.

16      Q.   Okay.  As you probably remember, the procedure's

17   pretty straightforward.  I ask questions, you answer

18   questions.  Occasionally your attorney may state

19   objections, for the record.

20           Unless your attorney instructs you not to

21   answer a question, you should answer a question.

22           Do you understand that?

23      A.   I do.

24      Q.   Okay.  If something I say is unintelligible to

25   you, if I mumble or if it is just confusing, you don't

                                                        9

1    understand, please let me know.  I'll try to figure out

2    what's wrong with the question and fix it, okay?

3         A.   Okay.

4         Q.   Are you employed?

5         A.   I am.

6         Q.   Who is your employer?

7         A.   American Medical Response.

8         Q.   And that's AMR.

9              What's your position with AMR?

10        A.   I'm a Regional Chief Executive Officer.

11        Q.   How long have you been a Regional Chief Executive

12   Officer for AMR?

13        A.   Since '96.

14        Q.   What region are you Chief Executive Officer of?

15        A.   The northwest plains region.

16        Q.   Has that region remained essentially the same in

17   scope during the period of time that you've been regional

18   CEO?

19        A.   No.

20        Q.   How is it changed?

21        A.   It included -- the Rocky Mountain-Plains area was

22   included in the region approximately a year and a half

23   ago.

24        Q.   To whom do you report to at AMR?

25        A.   Currently I report to the president and the chief

                                                    10

1    operating officer.

2        Q.   Is that the same person?

3        A.   The president and chief operating officer is one

4    individual.

5        Q.   And who is that?

6        A.   Don Harvey.

7        Q.   And does Mr. Harvey report to anyone at AMR?

8        A.   To the board of directors.

9        Q.   Before you were a regional CEO, did you have a

10   position with AMR?

11       A.   Yes.

12       Q.   What was that position?

13       A.   I was Chief Operating Officer for their Northern

14   California division.

15       Q.   When did you become Chief Operating Officer for

16   the Northern California division of AMR?

17       A.   1993.

18       Q.   Are AMR's operations national in the United

19   States in scope?

20            MR. DELEHUNT:  Objection, vague.

21            You can answer.

22            THE WITNESS:  AMR is a national company, yes.

23            MR. HIGGINS:  Q.  Does AMR do business in every

24   state in the United States?

25       A.   No.

11

1     Q.   Do you know how many states in the United States

2   AMR does business in?

3     A.   I believe it is 32.

4     Q.   In June of this year, Mr. Meyer, you personally

5   terminated a joint business relationship between the City

6   of Stockton and AMR; is that right?

7     A.   Yes, sir.

8          MR. DELEHUNT:   Objection.   Vague and overbroad.

9          Mr. Meyer, please give me a chance to put an

10   objection on the record, if I need to.

11         MR. HIGGINS:   Q.   Did you personally make the

12   decision to terminate that business relationship?

13    A.   I did.

14    Q.   And did you consult with anyone else at AMR

15   before you made that decision?

16    A.   I did.

17    Q.   Okay.   With whom did you consult?

18    A.   Don Harvey, the Chief Operating Officer.

19    Q.   And when did you consult with Don Harvey about

20   terminating that business relationship?

21    A.   The day before.

22    Q.   And what day was that, do you recall?

23    A.   I don't recall the date.   I'm sure it is on the

24   record.

25    Q.   Okay.   How did you consult with Mr. Harvey?

1     A.   Mine through Mike Hakeem.

2     Q.   Okay.  So did you tell Mr. Lewis that you wanted

3 to meet with him without the other people present on this

4 day?

5     A.   I believe initially, yes.

6     Q.   Okay.

7     A.   When I first entered the room.

8     Q.   So the other people left the room?

9     A.   Yes.

10     Q.   And then you entered the second phase of the

11 meeting?

12     A.   No, that was still the first phase.

13     Q.   Okay.  And -- okay.

14     How long did this first phase last after the

15 other people left, you and Mr. Gillis and Mr. Lewis,

16 alone in the City Manager's office?

17     A.   Maybe 15 minutes.

18     Q.   And Mark Lewis was the City Manager you referred

19 to?

20     A.   Yes.

21     Q.   When did the second phase of the meeting begin?

22     A.   Immediately following.

23     Q.   Okay.  And what happened during this second

24 phase?

25     A.   Mark Lewis requested the other parties to come

1 | back into the room and for me to again reiterate what I

2 | had just told him and the Chief.

3 |    Q.   Okay.  What did you tell Mr. Lewis and Chief

4 | Gillis during the first phase of the meeting?

5 |    A.   I stated that I had hoped that this day had never

6 | come, and that I needed to let them know that we were not

7 | going to be able to continue in building a joint RFP

8 | because we were unable to meet the terms of an Agreement.

9 | And that I believed that it was in both the City's

10 | interest and AMR's interest to make that notification

11 | prior to the RFP being released, which at that time was

12 | scheduled for July 12th.

13 |         MR. HIGGINS:  Could you read that answer back to

14 | me again, please?

15 |             (Whereupon the record was read.)

16 |         MR. HIGGINS:  Q.  Building a joint RFP, was that

17 | the purpose of the business relationship that you

18 | terminated on that day with the City of Stockton?

19 |    A.   Yes.

20 |    Q.   Okay.  When you say that you were unable to meet

21 | the terms of an Agreement, what terms were you unable to

22 | meet?

23 |    A.   I don't believe I used the word "terms."

24 |    Q.   I'm sorry.  I was simply repeating what I heard

25 | from the court reporter.

1        A.   We weren't able to reach an agreement on the

2   terms.

3            Well, we were -- we were attempting to put

4   together not only a Joint Venture Agreement, but a

5   Operating Agreement.  And in doing so, we were trying to

6   nail down what each party would be responsible for on a

7   cost perspective.  And we were unable to reach agreement

8   on those items.

9        Q.   Is it your recollection that at this time in June

10  of 2005, AMR was engaged in negotiations over the terms of

11  a Joint Venture Agreement with the City of Stockton?

12       A.   Yes.

13       Q.   Okay.  Isn't it a fact that at this time in

14  June 2005 when you terminated the business relationship

15  between AMR and the City of Stockton, a joint venture

16  involving those two parties already existed?

17            MR. DELEHUNT:  Calls for a legal conclusion.

18            You can answer.

19            THE WITNESS:  My perspective was we were still

20  negotiating terms of that Agreement.

21            MR. HIGGINS:  Q.  Which terms of that Agreement

22  were you, AMR and the City of Stockton, still negotiating?

23            MR. DELEHUNT:  Objection, overbroad.  Vague.

24            You can answer.

25            THE WITNESS:  All of them.

                                                    22

1            MR. HIGGINS:  Q.  What were those terms, to your

2    recollection?

3            MR. DELEHUNT:  Same objection.

4            You can answer to the best of your

5    recollection.

6            THE WITNESS:  We were, again, attempting to

7    negotiate the structure of the Limited Liability

8    Corporation.  We were attempted -- attempting to negotiate

9    the overall costs associated with the Limited Liability

10   Corporation.  Those were the main issues that we were

11   still trying to get through, and we weren't -- we had

12   never moved on to anything else in reference to an

13   Operating Agreement --

14       Q.   Okay.

15       A.   -- because of the difficulty we were having with

16   the initial discussions.

17       Q.   How long had these initial discussions gone on?

18       A.   Two years.

19       Q.   You mentioned a Limited Liability Company.  So

20   you were negotiating an agreement to form a Limited

21   Liability Company, a Joint Venture Agreement, and an

22   Operating Agreement at the same time?

23       A.   Correct.

24       Q.   Isn't it a fact that AMR -- during this two-year

25   period of negotiation, that people at AMR during this

                                                      23

1 | two-year period of negotiation, regularly and repeatedly

2 | referred to the business relationship with the City of

3 | Stockton to build a joint RFP as a joint venture?

4 |      MR. DELEHUNT:  Vague and compound.  Calls for a

5 | legal conclusion.  Calls for speculation.

6 |      MR. HIGGINS:  Q.  Isn't that a fact?

7 |      MR. DELEHUNT:  Same objections.

8 |      THE WITNESS:  No, it is not.

9 |      MR. HIGGINS:  Q.  So the people at AMR did not

10 | refer to the business as a joint venture.  That's your

11 | testimony?

12 |      MR. DELEHUNT:  Same objection.

13 |      THE WITNESS:  Well, what my knowledge is that we

14 | were working towards the negotiation of the joint venture,

15 | so I'll just leave it at that.

16 |      MR. HIGGINS:  Q.  But my question is, did people

17 | at AMR refer to this business relationship with the City

18 | of Stockton regularly and repeatedly as a joint venture,

19 | the actual business relationship that existed?

20 |      MR. DELEHUNT:  Objection.  Calls for a legal

21 | conclusion.  Asked and answered.  Overbroad and vague.

22 |      THE WITNESS:  The end result would have been a

23 | joint venture.

24 |      MR. HIGGINS:  Q.  Well, I understand that part of

25 | your testimony, sir.

24

1 | had the ability -- equal ability to seek their own

2 | approach.

3 |     Q.   Why was that AMR's best interest?

4 |     A.   Well, I was hoping that we wouldn't end up where

5 | we are today, and that is in a legal challenge.

6 |     Q.   So you thought that if AMR terminated the

7 | business relationship before the RFP came out, AMR's legal

8 | exposure would be reduced?

9 |     MR. DELEHUNT:  Calls for a legal conclusion.

10 |     THE WITNESS:  Yes.

11 |     MR. HIGGINS:  Q.  Did anyone representing AMR

12 | contact the Board of Supervisors of San Joaquin County and

13 | report back to you about the RFP process before you

14 | decided to terminate the business relationship with the

15 | City of Stockton which you've been testifying about?

16 |     MR. DELEHUNT:  Vague, ambiguous, as to time.

17 |     You can answer.

18 |     Also overbroad.

19 |     THE WITNESS:  We had numerous communications with

20 | the Board of Supervisors in reference to the RFP process

21 | prior to them even hiring consultants to move forward with

22 | an RFP.

23 |     MR. HIGGINS:  Q.  Okay.  Did AMR have a

24 | representative who tested certain ideas related to a

25 | potential to RFP with any of the supervisors?

1          MR. DELEHUNT:  Vague and ambiguous, overbroad,

2    calls for speculation.

3          You can answer.

4          THE WITNESS:  Yes.

5          MR. HIGGINS:  Q.  Who tested members of the Board

6    of Supervisors in this way?

7          MR. DELEHUNT:  Objection.

8          You can answer.

9          I think we're tripping on our lines a little

10   bit.  Part of that is my fault.  I just have to slow

11   down.

12         THE WITNESS:  Don Parsons.

13         MR. HIGGINS:  Q.  Okay.  Did Don Parsons report

14   back to you personally about the results of his testing of

15   the supervisors?

16         MR. DELEHUNT:  Vague and ambiguous and overbroad.

17         THE WITNESS:  Yes.

18         MR. HIGGINS:  Q.  Did anything that Don Parsons

19   told you about the testing of the Board of -- the

20   supervisors, add to your decision to terminate the

21   business relationship?

22         MR. DELEHUNT:  Vague and ambiguous as to the

23   definition of "testing" and other elements of the

24   question, but you can answer.

25         THE WITNESS:  The testing of the board was prior

27

1    to my decision by a good period of time.

2            MR. HIGGINS:  Q.  Excuse me.  Finish, please.

3        A.    The rationale for the testing was for both

4    parties, the City and AMR, to have some type of an

5    understanding of the tolerance that the board would have

6    had for increased cost not associated with the deployment

7    of an ambulance transportation system.

8        Q.    How long before you reached your decision to

9    terminate the business relationship with the City of

10   Stockton did this testing with the Board of Supervisors

11   occur?

12           MR. DELEHUNT:  Vague and ambiguous.

13           THE WITNESS:  I believe it was at least six

14   months.

15           MR. HIGGINS:  Q.  Did you -- well, first of all,

16   let's back up.

17           Do you know how Mr. Parsons tested the

18   supervisors?

19       A.    No.

20       Q.    Did Mr. Parsons use the term "test"?

21       A.    That was my term.

22       Q.    Your term.

23           Did you instruct Mr. Parsons to test the Board

24   of Supervisors on certain issues?

25       A.    I did.

1             (Whereupon Plaintiff's Exhibit 4 was

2             marked for Identification.)

3          MR. HIGGINS:  Q.  Mr. Meyer, would you please

4    take a look at the document that the court reporter has

5    marked Exhibit 4.

6          A.   Okay.

7          Q.   Do you recognize the document that's been marked

8    Exhibit 4?

9          A.   I do.

10         Q.   For the record, the document bears the Bate stamp

11   CS 001803, 001804.

12              Is that your signature at the bottom of the

13   first page of Exhibit 4?

14         A.   It is.

15         Q.   Did you send this letter to Mark Lewis?

16         A.   I did.

17         Q.   Did you send it on or about June 24th of this

18   year?

19         A.   I did.

20         Q.   Did you draft this letter yourself, sir?

21         A.   I did.

22         Q.   Did anyone review it before you sent it?

23              MR. DELEHUNT:  I would instruct you that if

24   there's any attorney/client communication involved in

25   that process, that you refrain from answering the

                                                        32

 1 | question.

 2 |         MR. HIGGINS:  Q.  The answer to the question is

 3 | either yes or no.  That wouldn't disclose any

 4 | attorney/client information.  The next question he might

 5 | appropriately --

 6 |         MR. DELEHUNT:  That's fair enough.

 7 |         You can answer that question.

 8 |         MR. HIGGINS:  Q.  Did anyone review this letter

 9 | before you sent it, sir, Exhibit 4?

10 |    A.    Yes.

11 |    Q.    Who reviewed it?

12 |         MR. DELEHUNT:  If it is a situation where you'd

13 | be disclosing attorney/client communication, I instruct

14 | you not to answer.

15 |         THE WITNESS:  I can't answer the question.

16 |         MR. HIGGINS:  Q.  Very well.

17 |         You see the large paragraph here in the middle

18 | of Exhibit -- the first page of Exhibit 4?

19 |    A.    Yes.

20 |    Q.    You see the -- the number 2 in parentheses about

21 | two-thirds of the way through that paragraph?

22 |    A.    Yes.

23 |    Q.    Does this refresh your recollection that during

24 | the meeting that you had with Mr. Lewis and Chief Gillis,

25 | that you talked about damage to reputation was one of the

1    reasons that you were terminating the business

2    relationship with the City of Stockton?

3         A.    Yes, I did state that.

4         Q.    To the best of your recollection, when you talked

5    about damage to reputation, what did you say?

6         A.    Actually, what's drafted in this June 25th letter

7    is what I said.

8         Q.    And what's that?  What part of this letter?

9         A.    It would be the last sentence of the letter.  The

10   last sentence of that paragraph.

11        Q.    So you said AMR and you -- you said -- you

12   specified both of you.

13        A.    I did.

14        Q.    Would not damage both of your reputations; is

15   that right?

16        A.    Yes.

17        Q.    Okay.  And then you explained that the damage

18   would flow from submission of a proposal to the county,

19   that you then go on to describe in the letter?

20        A.    Yes.

21        Q.    How would that damage your personal reputation?

22        A.    I have a 30-year reputation of submitting

23   proposals to numerous counties throughout the state, or

24   actually the country, that are responsive and competitive.

25        Q.    Have you ever submitted responses to proposals

                                                              34

 1 | that weren't effective, that didn't result in the award of
 2 | a contract?
 3 |     A.    Yes.
 4 |     Q.    Overall, you say you submitted proposals on
 5 | behalf of AMR; is that correct?
 6 |     A.    That's correct.
 7 |     Q.    How many such proposals do you believe that you
 8 | submitted personally on behalf of AMR?
 9 |           MR. DELEHUNT:  Objection.  Overbroad and vague as
10 | to time, but you can answer.
11 |           Calls for speculation, perhaps.
12 |           THE WITNESS:  It would be a wild guess.
13 |           MR. HIGGINS:  Q.  More than a hundred?
14 |     A.    No, I don't believe hundreds --
15 |     Q.    More than 50?
16 |     A.    Could be.
17 |     Q.    And what percentage of the time do you fail to
18 | get the award of a contract --
19 |           MR. DELEHUNT:  Calls for --
20 |           MR. HIGGINS:  Q.  -- in that history?
21 |           MR. DELEHUNT:  I'm sorry.  Calls for speculation.
22 | It is vague and ambiguous.
23 |           THE WITNESS:  Less --
24 |           MR. DELEHUNT:  Incomplete hypothetical.
25 |           Excuse me.  Please go ahead and answer.

                                                          35

1          THE WITNESS:  I believe it is less than

2    one percent.

3          MR. HIGGINS:  Q.  Going back to the paragraph

4    here in the middle of the first page of Exhibit 4, do you

5    see the sentence there that's introduced by the number 1

6    in parentheses?

7    A.    Yes.

8    Q.    See at the end the phrase beginning, "Thereby

9    causing significantly higher rates"?

10   A.    Yes.

11   Q.    Now, is what you were describing in that phrase

12   that begins "Thereby causing," is that directly related to

13   the phrase at the end of the paragraph there, "Excess

14   costs not related to the Provision of emergency ambulance

15   services"?

16         MR. DELEHUNT:  Vague and ambiguous as phrased,

17   compound.

18         You can answer.

19         THE WITNESS:  Can you ask the question again?

20         MR. HIGGINS:  Q.  Yeah.  The description that

21   begins, "Thereby causing," okay?

22   A.    Okay.

23   Q.    And does that relate directly to the phrase at

24   the very end of the paragraph, "Excess costs not related

25   to the provision of emergency ambulance services"?

                                                    36

1          MR. DELEHUNT:  Argumentative.  Asked and

2     answered.  Misstates prior testimony.

3          MR. HIGGINS:  Q.  Isn't that right?

4     A.   I did not have -- that particular conversation I

5     did not have directly from Chief Hafey.

6     Q.   Okay.

7     A.   Well --

8          MR. DELEHUNT:  If there's something that's

9     inaccurate and you feel you should correct it.

10         THE WITNESS:  It is not inaccurate.  It is -- can

11    we take a moment?

12         MR. DELEHUNT:  Yes.  We can, if you'd like.  Take

13    a couple minutes.

14         MR. HIGGINS:  Yes.  A couple minutes is fine.

15         (Recess.)

16         MR. HIGGINS:  Q.  Back on the record.

17         Did you want to make any statement of

18    clarification?

19    A.   No.

20    Q.   Okay.

21         MR. HIGGINS:  Let's mark next in order here.

22         (Whereupon Plaintiff's Exhibit 5 was

23         marked for Identification.)

24         MR. HIGGINS:  Q.  Would you take a look at this,

25    please.

1      A.    Okay.

2      Q.    Do you recognize the document that the court

3   reporter has marked Exhibit 5, sir?

4      A.    I do.

5      Q.    On page 3 of this Exhibit 5, is that your

6   signature?

7      A.    It is.

8            MR. HIGGINS:  For the record, Exhibit 5 bears the

9   Bate numbers 002583 to 2585, dated June 24th, 2005.

10     Q.    Did you draft this letter, sir?

11     A.    I had a hand in drafting this letter.

12     Q.    Who else assisted in drafting this letter?

13           MR. DELEHUNT:  If your response would require you

14   to reveal communications with legal counsel, I instruct

15   you not to answer at this point.

16           THE WITNESS:  I can't answer.

17           MR. HIGGINS:  Q.  Did anyone other than an

18   attorney assist you in drafting Exhibit 5?

19     A.    No.

20     Q.    When was the final draft of this letter

21   completed?

22     A.    It was either the late afternoon of the 23rd, or

23   the morning of the 24th of June.

24     Q.    Did you personally hand deliver this letter to

25   Mark Lewis at the City of Stockton?

                                                            44

1    A.   No, I did not.

2    Q.   Does this letter, Exhibit 5, memorialize the

3  meeting that you have described where you notified the

4  City of Stockton that AMR was terminating the business

5  relationship?

6         MR. DELEHUNT:  Objection, vague.

7         But you can answer.

8         THE WITNESS:  Yes.

9         MR. HIGGINS:  Q.   Okay.  Before that meeting

10  started, had anyone else working for AMR reviewed this

11  letter, Exhibit 5?

12        MR. DELEHUNT:  Objection, assumes facts not in

13  evidence.

14        THE WITNESS:  Depends on your definition of

15  "reviewed."

16        MR. HIGGINS:  Q.   Seen it?

17    A.   Yes.

18    Q.   Okay.  Who at AMR had seen the final draft of

19  this letter before the meeting commenced which you've

20  described?

21        MR. DELEHUNT:  Assumes facts not in evidence, and

22  contradicts prior testimony as to why the letter was

23  created.

24        THE WITNESS:  This letter, folks had knowledge

25  that this letter was being delivered.  Those individuals

                                                    45

1       A.    Yes.

2       Q.    Personally?

3       A.    Yes.

4       Q.    Did anyone else at AMR review the terms before

5    you signed it?

6            MR. DELEHUNT:  Answer the question, if you can

7    exclude legal counsel's reviewing it.

8            Did anybody else at AMR besides legal counsel,

9    if any?

10           MR. HIGGINS:  Well, anybody else.  He can answer

11   yes or no.  It doesn't reveal anything except that

12   somebody reviewed it.  And then I have no intent to

13   improperly invade any privilege.

14      Q.    So did anyone else representing AMR, other than

15   you, review the 2003 Agreement that you described before

16   you signed it?

17      A.    Yes.

18      Q.    Did any nonattorney affiliated with AMR, other

19   than you, review the terms of that 2003 Agreement before

20   you signed it?

21      A.    I'm trying to think back.

22           Again, I don't recall if Barry Elzig was yet

23   involved in the process.  If he was involved in the

24   process at this point, he would have reviewed it.

25      Q.    Okay.  Can you take a look at what was earlier

                                                    55

1          (Whereupon Plaintiff's Exhibit 8 was

2          marked for Identification.)

3          MR. HIGGINS:  Q.  Okay.  For the record, what the

4     court reporter has marked Exhibit 8 is Bates stamped --

5     two pages Bate stamped AMR 002683 to 2684, a letter on the

6     letterhead of Hakeem, Ellis and Morengo.

7          Have you seen Exhibit 8 before, Mr. Meyer?

8     A.    I believe so.

9     Q.    Okay.  On the second page BCC that -- you're at

10    the top of the list, Lou Meyer; is that correct?

11    A.    Yes.

12    Q.    Were you aware in June of 2003 that your

13    attorney, Mr. Hakeem, was negotiating with members of the

14    City Attorney's office at the City of Stockton to modify

15    the terms of Exhibit 1 that you've already looked at here

16    today?

17    A.    Yes.

18    Q.    Do you recall if the terms of Exhibit 1 in fact

19    were modified in June of 2003 as described in this letter,

20    Exhibit 8?

21    A.    I don't recall if a new document was drafted and

22    signed.  I do recall agreeing to the content of this

23    letter to Mike Rishwain.

24    Q.    Who is Donna McCann?

25    A.    She was the president of A-1 Ambulance Service in

                                                        64

1   Stockton.

2       Q.   And initially, was Ms. McCann's company a member

3   of the joint effort to build a response to the RFP that

4   began involving the City of Stockton and AMR in 2003?

5       A.   Yes.

6       Q.   You say that Ms. McCann "was."  Is her company

7   still in existence?

8       A.   It is not.

9       Q.   How do you know that?

10      A.   Because her company went bankrupt.

11      Q.   Do you know how old Ms. McCann is now?

12      A.   I would say her early sixties.

13      Q.   Do you recall the type of involvement that

14  Ms. McCann had in the joint effort to build the RFP in

15  2003?

16      A.   She was involved in some of the initial

17  discussions, yes.

18      Q.   How many ambulances did Ms. McCann's company

19  operate in 2003?

20      A.   Two, but I don't believe they were both

21  full-time.

22      Q.   In 2003, when the City of Stockton and AMR were

23  working to build joint RFP, AMR was operating ambulances

24  within the City of Stockton, correct?

25      A.   Yes.

1 | this joint effort?

2 | MR. DELEHUNT:  Vague and ambiguous.

3 | THE WITNESS:  I don't understand "orders."

4 | MR. HIGGINS:  Q.  Well, did he tell them what to

5 | do in connection with the effort to build a joint RFP?

6 | MR. DELEHUNT:  Vague and ambiguous.  Calls for

7 | speculation.

8 | THE WITNESS:  His comments were more along the

9 | line of this is what the City Manager wants.

10 | MR. HIGGINS:  Q.  This joint effort, was any one

11 | person in charge of saying, "Here's what we're going to do

12 | and how we're going to do it"?

13 | MR. DELEHUNT:  That's vague and ambiguous.

14 | Overbroad.

15 | MR. HIGGINS:  Q.  To your knowledge --

16 | A.  Ask the question again.

17 | Q.  To your knowledge, was any one person in charge

18 | of deciding what the people involved in this effort to

19 | build the joint RFP -- was one person saying, "Here's what

20 | we're going to do and this is how we're going to do it,"

21 | something like that?

22 | MR. DELEHUNT:  Vague and ambiguous.

23 | THE WITNESS:  Again, it was clear to my

24 | management team, as well as myself, that Dave Hafey was

25 | driving the negotiations from the City's side, and I had

75

1   Brad White driving it from my side.

2            MR. HIGGINS:  Q.  Okay.  So Mr. White and

3   Mr. Hafey were collaborating in this effort?

4       A.   Well, between Mr. White and Mr. Elzig, there were

5   communications with Dave Hafey.

6       Q.   Okay.  And on behalf of AMR, they collaborated

7   with Mr. Hafey in this effort to build a joint RFP in

8   2003, 2004?

9            MR. DELEHUNT:  Vague and ambiguous, calls for

10  speculation.

11           THE WITNESS:  I guess it depends on your term

12  "collaborate."

13           MR. HIGGINS:  Q.  Yeah, work together.

14      A.   They were attempting to do that, yes.

15      Q.   Okay.

16           MR. DELEHUNT:  Counsel, can I interrupt you for

17  just a second, please?

18           We've gone just about two hours.  What's

19  your -- what's your plan?  Do you want to just take

20  about a ten-minute break and go through lunch?  Do you

21  want to break for lunch?  I'll talk to my client about

22  what his preference is, but what's yours?

23           MR. HIGGINS:  I want to just go through, if we

24  can do it.  But if you want to take a lunch break, I can

25  do that, too.

1           MR. HIGGINS:  Q.  Did AMR ever consider including

2      the City of Tracy in the new Joint Venture Agreement in

3      2004?

4           MR. DELEHUNT:  Calls for speculation as phrased.

5           THE WITNESS:  Yes.

6           MR. HIGGINS:  Q.  Did you personally consider

7      that possibility in 2004?

8      A.    Yes.

9      Q.    Tracy did not join the others in the joint

10     effort, though; isn't that right?

11     A.    Yes.

12     Q.    Do you remember why?

13     A.    I believe the chief of that department was not

14     interested in moving forward with a public-private

15     partnership.

16     Q.    Do you recall having any meetings with people

17     from the City and the City of Lodi -- the City of Stockton

18     and the City of Lodi to negotiate the terms of the new

19     Joint Venture Agreement in 2004?

20     A.    Yes.

21     Q.    Did you participate in those meetings, you

22     personally?

23     A.    I believe one.

24     Q.    Okay.  When was the one meeting that you recall?

25     A.    You're trying to drag dates, and I can't remember

                                                        78

1   all these dates.  I don't recall the date.  I do remember

2   the parties in the room.

3       Q.   Who was in the room?

4       A.   I believe that Chief Pretz was in the room, Chief

5   Gillis, Chief Hafey.  There was another gentleman that

6   Chief Pretz had with him, and I cannot recall his name.

7   And I believe during that meeting, the City's outside

8   counsel was in the room, and I think that Mike Rishwain

9   was in the room.

10      Q.   And how long did that meeting last?

11      A.   I would say a couple hours.

12      Q.   Okay.  Was there an actual Draft Agreement under

13  discussion in that meeting?

14      A.   Yes.

15      Q.   Did the meeting result -- or end with anyone

16  signing a written Agreement?

17      A.   During that meeting?

18      Q.   Yes.

19      A.   No.

20      Q.   How soon after that meeting -- how much time

21  elapsed between that meeting you recall and actual signing

22  of the Joint Venture Agreement in 2004?

23      A.   I believe it was quite some time.

24      Q.   More than a month?

25      A.   I believe so.

1      Q.    Okay.  Could you take a look at Exhibit 1 again.

2            And turn to the second page.

3      A.    Of Exhibit 1?

4      Q.    Yeah.

5      A.    That's the first document.

6      Q.    There you go.

7            In paragraph 4.

8            The second sentence, did you read that sentence

9      in this document before you signed it?

10     A.    Are you talking about the sentence starting with

11     "If any party"?

12     Q.    Yes.

13     A.    Yes.

14     Q.    And at the time that you signed this document,

15     did you have an understanding of what that second sentence

16     in paragraph 4 meant?

17            MR. DELEHUNT:  Calls for a legal conclusion,

18     overbroad, vague.

19            THE WITNESS:  My understanding of that sentence

20     is that once all the agreements were put together, that

21     once a proposal was ready to be submitted, that we would

22     not back away from it.

23            (Whereupon Plaintiff's Exhibit 9 was

24            marked for Identification.)

25            MR. HIGGINS:  For the record, what the court

1    reporter has marked Exhibit 9 is a multi-page document

2    Bates numbered AMR 003820 through and including 3824.

3         Q.    Have you reviewed Exhibit 9, Mr. Meyer?

4         A.    I have.

5         Q.    Okay.  See the first page, there's a printout of

6    part of an e-mail.  Do you recognize that document, page

7    1?

8         A.    I recognize it as an e-mail.

9         Q.    Okay.  You don't recognize that particular

10   printout of the e-mail?

11        A.    Well, looking at it, it appears I was copied on

12   it.

13        Q.    But a document with this e-mail in it, have you

14   seen one before, a printed document?

15             MR. DELEHUNT:  Excuse me, I'm sorry.  Could you

16   read that back?  I didn't hear.

17             MR. HIGGINS:  I'll repeat it.

18        Q.    A printed document containing this printed

19   e-mail, have you seen such a document before?

20        A.    I don't know if it was printed or not or if I

21   just read it on my e-mail system.

22        Q.    Okay.  The e-mail appears to be from Brad White,

23   and you're cc'd along with others.

24             And the text says, "Hi, Dave.  With Lou and

25   Barry's input, I have created a revised Draft of your

                                                           81

1   Draft document."

2           Do you recall whether the time frame stated in

3   this e-mail, January 2004, you personally were working

4   on a draft of a new Joint Venture Agreement?

5       A.   I would have reviewed one, yes.

6       Q.   Okay.  Turning over to what is the third page of

7   this document, it says, up at the top, "Draft Joint

8   Venture Agreement."

9       A.   Yes.

10      Q.   Okay.  Who added that title, "Joint Venture

11  Agreement," do you know?

12      A.   It most likely came from Dave Hafey.

13      Q.   What makes you think that?

14      A.   Because he was the one doing the initial

15  drafting.

16      Q.   But this is from Brad White going back to Dave

17  Hafey, and Brad White saying that the draft has been

18  revised and that you've been involved in the revising.  So

19  isn't it possible that you and Brad White added this

20  legend "Joint Venture Agreement"?

21          MR. DELEHUNT:  Calls for speculation.  Calls for

22  speculation as phrased, vague and ambiguous.

23          THE WITNESS:  Let me state that I did not put

24  that on the document.

25          MR. HIGGINS:  Q.  Do you know who did?

                                                          82

1     A.    No.

2     Q.    Okay.   Turn over to the next page.   See paragraph

3     6 there?

4     A.    Yes.

5     Q.    Okay.   Did you understand that -- that this term

6     and this proposed Agreement stated that first responder

7     fees would be part of the RFP proposal that the parties

8     would prepare?

9          MR. DELEHUNT:   Calls for a legal conclusion,

10    calls for speculation, incomplete hypothetical.

11          THE WITNESS:   Ask your question again.

12          MR. HIGGINS:   Q.   Sure.   Did you understand at

13    the time you were negotiating this Agreement, that this

14    term, this proposed term, provided that the RFP proposal

15    would include as part of the proposal first responder

16    fees?

17          MR. DELEHUNT:   Same objections.

18          THE WITNESS:   Yes.

19          MR. HIGGINS:   Q.   Okay.   Looking back to Exhibit

20    1 on page 2, in paragraph 6 on page 2.   At the time that

21    you signed this document, Exhibit 1, did you understand

22    that that term, "All parties agreed to include as part of

23    the fee structure first responder and dispatch recovery

24    fees," did you understand that that term meant the parties

25    were agreeing to include first responder fees in response

83

1    to the RFP?

2           MR. DELEHUNT:  Calls for speculation, calls for a

3    legal conclusion, incomplete hypothetical, vague and

4    ambiguous.

5           THE WITNESS:  At the time that we were discussing

6    that, yes.

7           MR. HIGGINS:  Q.  Okay.  Looking, again, at

8    Exhibit 9, I'd like you to look at paragraph 4, Mr. Meyer.

9       A.   Paragraph 4?

10      Q.   Yes.  This provision ends with "That party is

11   precluded from continuing in the bidding for a RFP in

12   Zones 1, 2, 3, 4 and 5."

13           Do you see that?

14      A.   I do.

15      Q.   Does Zone 5 encompass Tracy; is that right?

16      A.   Yes.

17      Q.   And Zone 4 encompasses Lodi; is that right?

18      A.   I believe that's the sequence of the numbers.

19      Q.   Okay.  So 4 and 5 were here in paragraph 4

20   because at this time, AMR and the City of Stockton and A-1

21   Ambulance were considering adding both Lodi and Tracy to

22   the venture; is that correct?

23           MR. DELEHUNT:  Calls for speculation.

24           MR. HIGGINS:  Q.  Excuse me, sir, I didn't hear

25   your answer.

                                                          84

1      A.   I didn't answer yet.

2      Q.   Oh, I'm sorry.  I thought you did.

3      A.   Yes.

4      Q.   Okay.

5           MR. HIGGINS:  Let's mark next in order.

6           (Whereupon Plaintiff's Exhibit 10 was

7           marked for Identification.)

8           MR. HIGGINS:  And, for the record, the court

9   reporter has marked as Exhibit 10 a single-page document

10  entitled "Agenda" at the top.  It is Bates number AMR

11  003461.

12     Q.   Do you recognize Exhibit 10, Mr. Meyer?

13     A.   No.

14     Q.   You don't know if you've ever seen Exhibit 10

15  before?

16     A.   No.

17     Q.   Do you recall having a meeting in March of 2004

18  to discuss the then current draft of the new Joint Venture

19  Agreement?

20     A.   I -- I don't recall if I had a meeting on March 4

21  or not.

22     Q.   In March, do you recall having a meeting?

23     A.   Well, I don't recall this agenda, so there may

24  have been other discussions.  I don't recall this agenda.

25     Q.   Okay.  So you don't know who drafted this agenda?

85

1      A.    Not by looking at it.

2      Q.    You don't know who under .4 referred to

3    "currently a part of the joint venture" -- or, excuse me,

4    referred to "those currently a part of the joint venture"?

5    You don't know who wrote those words?

6      A.    No.

7           MR. HIGGINS:  Mark next in order.

8           (Whereupon Plaintiff's Exhibit 11 was

9           marked for Identification.)

10          MR. HIGGINS:  For the record, the court reporter

11   has marked as Exhibit 11 a two-page document, Memorandum

12   letterhead of AMR.  The document Exhibit 11 is Bates

13   numbered AMR 004107 and AMR 004108.

14     Q.    Do you recognize Exhibit 11, Mr. Meyer?

15     A.    I do.

16     Q.    Is this a Memorandum that you received from Brad

17   White in 2004?

18     A.    Yes.

19     Q.    Did you read this Memorandum when you received

20   it?

21     A.    Yes.

22     Q.    What is this -- the purpose of this Memorandum,

23   as far as you know?

24     A.    It is an overview of the areas that Mr. White's

25   responsible for.

1     Q.   Looking down to the next to last entry on the

2  first page, "San Joaquin," that's a description of what's

3  going on in San Joaquin County; is that correct?

4     A.   Yes.

5     Q.   Okay.  And you see the second bullet point, the

6  first sentence says, "Preliminary RFP work is underway

7  with SFD and A-1 Ambulance."

8         Is SFD Stockton Fire Department, to your

9  knowledge?

10    A.   Yes.

11    Q.   Okay.  So when you read this, that's what you

12  understood that's what Mr. White was referring to?

13    A.   Yes.

14    Q.   And A-1 Ambulance is Ms. McCann's company?

15    A.   Yes.

16    Q.   "Preliminary RFP work underway."  At this time,

17  did you know what preliminary RFP work was underway?

18    A.   I don't know what -- to what extent, no.

19    Q.   Okay.  And then you see the next sentence,

20  "Anticipate LFD."  Did you have an understanding what

21  "LFD" referred to?

22    A.   Yes.

23    Q.   What was that?

24    A.   Lodi Fire Department.

25    Q.   "Anticipate LFD joining the joint venture by

1  May 2004."

2      When you read this, did you have an

3  understanding what Mr. White meant by "the joint

4  venture"?

5      A.  Yes.

6      Q.  What was it?

7      A.  It was the agreement that we were attempting to

8  respond to an RFP.

9      Q.  Isn't it a fact that people at AMR repeatedly

10  referred to the effort to build a joint RFP as a joint

11  venture in 2004?

12      MR. DELEHUNT:  Calls for speculation, calls for a

13  legal conclusion, incomplete hypothetical.  Vague and

14  ambiguous.

15      THE WITNESS:  I think the word "interchangeable

16  terms" is being used.

17      MR. HIGGINS:  Q.  But "joint venture" was the

18  term AMR used to describe the effort in 2004.

19      MR. DELEHUNT:  Same objection.

20      THE WITNESS:  It may have been.

21      MR. HIGGINS:  Q.  Mr. White used it right there

22  in that exhibit, didn't he, Exhibit 11?

23      MR. DELEHUNT:  Same objections.

24      THE WITNESS:  Yes.

25      MR. HIGGINS:  Q.  Okay.  Mr. White was