*American Medical Response, Inc. v. City of Stockton*
*United States District Court- Eastern District No. 2:05-CV-01316-DFL-PAN*

# MEYER DEPO PART 2

1           MR. DELEHUNT:  Take your time.

2           MR. HIGGINS:  Q.  Do you recognize Exhibit 3, Mr.

3   Meyer?

4       A.   Yes.

5       Q.   What is Exhibit 3?

6       A.   It was the Agreement adding Lodi Fire to the

7   public-private partnership.

8       Q.   Okay.  On the last page there, page 3, is that

9   your signature above American Medical Response, Inc.?

10      A.   Yes.

11      Q.   Did you sign this document on or about June 16th,

12  2004?

13      A.   Yes.

14      Q.   Did you read this document before you signed it?

15      A.   Yes.

16      Q.   I'd like you to -- let's see.  I don't know how

17  we're going to do this because of the way in which the...

18      A.   I'm flexible.

19      Q.   Yeah.  Well, you'll notice there's already been

20  confusion because of the nature of this exhibit.

21          MR. HIGGINS:  Is it possible to take this apart?

22          THE REPORTER:  Yes.

23          MR. HIGGINS:  Let's go off the record.

24          (Off the record.)

25          MR. HIGGINS:  Q.  So I will give you --

                                              90

1       A.    You gave me 1.

2       Q.    1 and 3.  We can go back on the record.

3            Mr. Meyer, I'd like to compare a couple of

4   parallel provisions between Exhibit 1 and Exhibit 3.

5            First of all, you see the first sentence of

6   Exhibit 3, "The purpose of this document is to establish

7   a Joint Venture Agreement between the City of Stockton,"

8   and then there's a list of all the parties.

9       A.    Yes.

10      Q.    Do you see that?

11      A.    Yes.

12      Q.    And when you read that, did you understand that

13  this Joint Venture Agreement was establishing a joint

14  venture?

15           MR. DELEHUNT:  Calls for a legal conclusion,

16  incomplete hypothetical.  Asked and answered, vague and

17  ambiguous.

18           THE WITNESS:  My understanding was that there was

19  still points to be negotiated to create the entities

20  necessary to a joint bid.

21           MR. HIGGINS:  Q.  Okay.  But did you understand

22  that this Agreement established a joint venture involving

23  the parties named here --

24           MR. DELEHUNT:  Asked and answered.  I'm sorry.

25           MR. HIGGINS:  Q.  The City of Stockton, City of

                                                          91

1  Lodi, AMR, and A-1?

2          MR. DELEHUNT:  Asked and answered.  Calls for a

3  legal conclusion, incomplete hypothetical, vague and

4  ambiguous.

5          THE WITNESS:  My understanding of this document

6  was the inclusion of Lodi Fire.

7          MR. HIGGINS:  Q.  And Lodi Fire was joining a

8  joint venture, correct?

9          MR. DELEHUNT:  Calls for a legal conclusion,

10  asked and answered, incomplete hypothetical.

11          THE WITNESS:  Lodi Fire was joining the effort to

12  present a joint bid.

13          MR. HIGGINS:  Q.  Okay.  Now, you see over in

14  Exhibit 1 the paragraph at the top, the first paragraph,

15  without a number.

16          The last sentence begins, "The terms will be

17  refined into a Joint Venture Agreement."

18          Do you see that?

19      A.  Yes.

20      Q.  Okay.  If you look at the first paragraph of

21  Exhibit 3, the last sentence, that particular language is

22  no longer in the document; is that right?

23      A.  Yes.

24      Q.  Okay.  Who removed that language?

25      A.  I have no idea.

1        A.    Yes.

2        Q.    Okay.

3              MR. HIGGINS:   Let's mark next in order.

4              (Whereupon Plaintiff's Exhibit 12 was

5              marked for Identification.)

6              MR. HIGGINS:   This is Exhibit 12.   For the

7    record, the court reporter has marked as Exhibit 12 a

8    two-page document entitled "Confidential Memorandum," on

9    AMR letterhead, with Bates numbers AMR 004105 through AMR

10   004106.

11             THE WITNESS:   This exhibit has a blank page.

12             MR. HIGGINS:   That's a mistake.   It should be a

13   two-page exhibit.   That's a photocopying error.

14             Can you agree?   It is not Bates numbered.

15             MR. DELEHUNT:   Yeah, that's fine.

16             MR. HIGGINS:   The machine -- let me see if I can

17   remove it.   Easier said than done, maybe.

18             THE WITNESS:   As long as everybody understands

19   there's a blank page there.

20             MR. DELEHUNT:   We can correct the deposition.

21             MR. HIGGINS:   We'll correct the record by

22   removing the improper blank page between the Bates

23   numbered pages in Exhibit 12.

24       Q.    Do you recognize this document?

25       A.    Yes.

1    Q.   What is this document?

2    A.   It is a memo from Brad White to myself in

3  reference to a proposal for hiring Donna McCann.

4    Q.   You see it is cc'd to Chief Gillis and Barry

5  Elzig, Division Chief Hafey and Captain Ed Rodriguez.  Do

6  you see that?

7    A.   Yes.

8    Q.   Okay.  And Chief Gillis, Chief Hafey, Captain

9  Rodriguez, they all represented the City of Stockton in

10  connection with the joint effort to respond to the RFP,

11  right?

12    A.   Yes.

13    Q.   And this was a Confidential Memorandum that went

14  to them?

15    A.   Yes.

16    Q.   What did you expect those representatives of the

17  City of Stockton to do to maintain the confidence of this

18  particular document?

19        MR. DELEHUNT:  Calls for speculation.

20        THE WITNESS:  Number one, I didn't identify it as

21  a Confidential Memorandum, but the writer of the document

22  did.

23        MR. HIGGINS:  Q.  Okay.

24    A.   What's the question?

25    Q.   Well, when you saw that these people were being

                                              103

1    A.   Yes.

2    Q.   Okay.  Did the members of the joint effort, City

3    of Stockton, City of Lodi, Ms. McCann, to your knowledge,

4    did they understand that information they shared was going

5    to be kept confidential by AMR?

6         MR. DELEHUNT:  Calls for speculation, state of

7    mind of another person, vague and ambiguous.

8         MR. HIGGINS:  Q.  To your knowledge.

9    A.   I would assume so.

10   Q.   Why?

11   A.   Because we weren't discussing any of this

12   information outside AMR organization.

13   Q.   Why not?

14   A.   Because we were in the process of a joint bid.

15   Q.   Okay.  So the other members of that joint venture

16   could trust AMR to keep things confidential?

17        MR. DELEHUNT:  Argumentative as phrased, calls

18   for speculation.

19        THE WITNESS:  I would assume so.

20        MR. HIGGINS:  Q.  Why?  Why would you assume so?

21        MR. DELEHUNT:  Argumentative.  Asked and

22   answered.

23        THE WITNESS:  Our general approach to RFPs is to

24   not put information out into the public.

25        MR. HIGGINS:  Q.  Why is that?

108

1    A.   So other bidders cannot have that information.

2    Q.   Okay.  Did you personally ever tell anyone

3  affiliated with the City of Stockton to keep this

4  information, some particular information, confidential?

5    A.   I personally don't recall doing that.

6    Q.   Is there any side agreement addressing the

7  party's obligations to maintain information and

8  confidence, that you're aware of, that related to the

9  joint effort in response to the RFP?

10       MR. DELEHUNT:  Vague and ambiguous, calls for

11  legal conclusion and speculation.

12       THE WITNESS:  No.

13       MR. HIGGINS:  Q.  Do you recall whether the City

14  disclosed to AMR information about its ambulance service's

15  collection rates?

16       MR. DELEHUNT:  Vague and ambiguous.  Calls for

17  speculation.

18       THE WITNESS:  Yes.

19       MR. HIGGINS:  Q.  Did the City of Stockton reveal

20  such information to AMR?

21    A.   Its agent did.

22    Q.   And who was that agent?

23    A.   AIS.

24    Q.   Okay.  How about payor mix, did the City of

25  Stockton or anyone representing the City of Stockton

109

1    numbers for its ambulance service?

2         A.   I did not.

3              MR. DELEHUNT:  Overbroad.  Vague as phrased.

4              MR. HIGGINS:  Q.  Do you know if anyone else at

5    AMR reviewed that kind of information?

6              MR. DELEHUNT:  Objection, overbroad and vague as

7    phrased.

8              THE WITNESS:  I don't know.

9              MR. HIGGINS:  Q.  Okay.  And who at AMR reviewed

10   the City of Stockton's ambulance service costs

11   information, to your knowledge?

12        A.   Tim Dorn.

13        Q.   Anyone else?

14        A.   Possibly Brad White and Barry Elzig, but, again,

15   I'm not sure.

16        Q.   How about the City of Stockton's ambulance

17   service revenue information, who at AMR reviewed that?

18        A.   I don't recall if we have that information.

19        Q.   Okay.  Is AMR currently preparing a response to

20   the RFP the county issued?

21        A.   Yes.

22        Q.   Is AMR working on that effort?

23        A.   Yes.

24        Q.   Okay.  And who at AMR -- which actual employees

25   or representatives or contractors, who is doing that work

                                                      114

1 | for AMR, which individuals?

2 |     MR. DELEHUNT:  I'm going to let this line of

3 | questioning go for awhile, but there's going to be a time

4 | when I'm going to cut it off.  But you can go ahead and;

5 | ask the question.

6 |     THE WITNESS:  Can you ask the question?

7 |     MR. HIGGINS:  Q.  Yeah.  What specific

8 | individuals at AMR presently are working on AMR's response

9 | to the county's RFP?

10 |     A.  Employees as well as contractors.

11 |     Q.  Let's do employees first.

12 |     MR. DELEHUNT:  Before we do that, we're going

13 | to -- we're going to put this under seal, because I'm not

14 | going to allow this to be -- I'm going to allow it to be

15 | responded to in a limited fashion, but we're not going to

16 | allow this to go beyond attorneys' eyes only.

17 |     MR. HIGGINS:  I think that's fine.  I forgot to

18 | mention, at the first deposition, Chief Gillis's

19 | deposition, Ms. Barnes and I agreed that originally all

20 | deposition testimony would be designated on attorneys'

21 | eyes only.  And then pursuant to my understanding of the

22 | protective order that you've proposed, the parties would

23 | have a time to go back and specifically designate portions

24 | of the deposition transcript, specifically confidential or

25 | attorneys' eyes only, merely confidential, and some not

1    confidential.

2         And so I would propose that we do that, we

3    provisionally make this transcript attorneys' eyes only.

4    And then, insofar as any testimony you believe should be

5    attorneys' eyes only, you can specifically designate.  I

6    think we have to make that designation before we make

7    our motions, but --

8         MR. DELEHUNT:  As far as it goes, I'm going to go

9    along with that, but I'm not going to let the witness

10   testify in detail about the preparation of this bid.

11        MR. HIGGINS:  Well, if you instruct the witness

12   not to answer, you do, so that's fine.

13        MR. DELEHUNT:  Yeah.

14        MR. HIGGINS:  We'll deal with that in the

15   appropriate way.

16   Q.   Okay.  The question pending is, employees,

17   employees only, which AMR employees currently were working

18   on the response to the county's RFP?

19   A.   Lisa Valdez, Julie Bower, Barry Elzig, Brad

20   White.  There's one more.

21   Q.   Okay.

22   A.   Lisa Chalmers.

23   Q.   Did Lisa Valdez do any work at all related to the

24   joint effort between the City of Stockton and AMR?

25   A.   No.

116

1    Q.   Same question for Julie Bower?

2    A.   No.

3    Q.   And Lisa Chalmers, same question?

4    A.   No.

5    Q.   What is Barry Elzig doing in connection with the

6  AMR's response to the RFP now?

7         MR. DELEHUNT:  You can answer generically so far,

8  but when we get into proprietary information, I'm going to

9  instruct you not to answer.  And if I miss something,

10  you'll let me know.

11         Go ahead and answer the question.

12         THE WITNESS:  He's reviewing the credentialing

13  documents.

14         MR. HIGGINS:  Q.  Is that all he's doing?

15    A.   Yes.

16    Q.   How about Brad White, what's he doing?

17    A.   He's also reviewing the credentialing documents

18  and contemplating strategy.

19    Q.   What kind of strategy is Mr. White contemplating?

20         MR. DELEHUNT:  If you can answer that

21  generically, that's fine.  But if you can't, I'm going to

22  instruct you not to answer the question.

23         THE WITNESS:  Strategy that will make us

24  responsive to the RFP.

25         MR. HIGGINS:  Q.  And what kind of strategy is

1  that?

2      A.   I don't think we're going to go there.

3           MR. DELEHUNT:  Okay.

4           MR. HIGGINS:  Are you instructing the witness not

5  to answer?

6           MR. DELEHUNT:  I am instructing the witness not   .

7  to answer at this point.

8           MR. HIGGINS:  Q.  Are you refusing to answer my

9  question?

10          MR. DELEHUNT:  Based on attorney's advice.

11          MR. HIGGINS:  I asked him a question.

12          THE WITNESS:  Yes.

13          MR. HIGGINS:  Q.  Okay, thank you.

14          The preliminary RFP work for the City of

15  Stockton and the City of Lodi, did that continue on in

16  early 2005?

17     A.   Not to my understanding.

18     Q.   So in March, there was no joint effort involving

19  the City of Stockton and AMR, in March of this year?

20     A.   Ask your question again.

21     Q.   In 2005 -- strike that.

22          That was a big leap, maybe the days got

23  confused.

24          In 2005, did AMR continue to work with the City

25  of Stockton and the City of Lodi in their joint effort

                                                         118

1   to prepare a response to the RFP?

2        A.   Yes.

3        Q.   Okay.   At some point did AMR propose that the

4   parties negotiate an LLC Agreement?

5        A.   Yes.

6        Q.   Do you remember when AMR first proposed an LLC

7   Agreement?

8        A.   When the state transportation -- when the

9   county's transportation plan was approved by the state.

10       Q.   Was there a connection between the approval of

11  that transportation plan and the decision to propose an

12  LLC?

13       A.   Yes.

14       Q.   What was the connection?

15       A.   The connection was that the state -- the

16  transportation plan approved by the state required a

17  single entity be the bidder.

18       Q.   And how did you know that?

19       A.   I read it.

20       Q.   You read the plan?

21       A.   Yes.

22       Q.   Okay.   Did the plan define single entity?

23       A.   It defined -- yes.

24       Q.   Okay.   Do you recall how it defines single

25  entity?

1          A.     It used the word "single legal entity."

2          Q.     Do you know if a partnership is a single legal

3     entity?

4                 MR. DELEHUNT:  Calls for legal conclusion,

5     speculation.

6                 MR. HIGGINS:  I'm just asking.

7          Q.     Do you know whether a partnership is a single

8     legal entity?

9                 MR. DELEHUNT:  Same objections.

10                THE WITNESS:  It could be.

11                MR. HIGGINS:  Okay.

12                Let's mark next in order.

13                (Whereupon Plaintiff's Exhibit 13 was

14                marked for Identification.)

15                MR. RISHWAIN:  Excuse me.  I'm going to have to

16    leave.  See you later.

17                MR. HIGGINS:  Q.  For the record, what's been

18    marked by the court reporter as Exhibit 13 is a

19    single-page document, handwritten, bearing the Bates

20    number CS 003212.

21                Do you recognize this document, Mr. Meyer?

22         A.     I recognize it as a sign-in sheet.

23         Q.     You remember -- you see the second from the

24    bottom, you see --

25         A.     That's my handwriting, yes.

1            MR. HIGGINS:  Mark next in order.

2            (Whereupon Plaintiff's Exhibit 17 was

3            marked for Identification.)

4            MR. DELEHUNT:  I think this is the same document.

5    I think you handed me the same document.  This is the

6    prior document.

7            THE WITNESS:  It is the prior document.

8            MR. HIGGINS:  Oh, I'm sorry.  Let's withdraw --

9    can you cancel Exhibit 16?  I apologize.

10           MR. DELEHUNT:  Exhibit 17.

11           MR. HIGGINS:  I'm sorry.  I got confused.  Here's

12   the one for 17.

13      Q.   Do you recognize this e-mail that's printed out

14   as Exhibit 17, Mr. Meyer?

15      A.   Yes.

16      Q.   For the record, it is a single page, Bates number

17   AMR 000266.

18           You see the reference at the end of the

19   sentence in the first -- first e-mail in the string,

20   "Prior to the Stockton war on the 15th"?

21      A.   Okay.

22      Q.   Did you receive this e-mail and read it --

23      A.   Yes.

24      Q.   -- before April 15th?

25      A.   Most likely, yes.

129

1   considered exorbitant?

2           MR. DELEHUNT:  Calls for speculation.  Incomplete

3   hypothetical.

4           THE WITNESS:  Again, I think that the April 15th

5   meeting was, again, to try to rein Hafey back in to

6   reality.

7           MR. HIGGINS:  Q.  Who attended the April 15th

8   meeting?

9       A.  Again, I don't recall if the April 15th meeting

10  actually took place.

11          MR. HIGGINS:  Let's mark next in order.

12          (Whereupon Plaintiff's Exhibit 18 was

13          marked for Identification.)

14          MR. DELEHUNT:  Take your time looking at this

15  letter, Mr. Meyer.

16          MR. HIGGINS:  Especially since we're getting

17  close to the end of the deposition period.

18          MR. DELEHUNT:  Especially since it is a

19  three-page letter.  And I assume you're going to ask him a

20  number of questions about it, and I'd like him --

21          MR. HIGGINS:  Let the record reflect that the

22  court reporter has marked Exhibit 18, a three-page

23  document Bates numbered CS 001807 through and including CS

24  001809.

25      Q.  Do you recognize Exhibit 18, Mr. Meyer?

                                                    132

1        A.    I do.

2        Q.    Did you draft Exhibit 18, Mr. Meyer?

3        A.    I was part of the drafting of this letter.

4        Q.    Who else worked on this letter?

5        A.    Brad White, and counsel.

6        Q.    Okay.   Turning to the last page of the letter, is

7    that your signature?

8        A.    Yes.

9        Q.    Did you sign and send this letter to Fire Chief

10   Gary Gillis on or about March 21st, 1985?

11       A.    I did.

12       Q.    What was the purpose of this letter?

13       A.    Again, to let him know the major difficulties

14   that we were having with the latest Dave Hafey requests.

15       Q.    Okay.   Did you itemize on particular issues, is

16   that why you have headings throughout?

17       A.    Yes.

18       Q.    Okay.   There's no heading about Dave Hafey, is

19   there?

20       A.    No.

21       Q.    Okay.   Over on the last page, final paragraph,

22   first sentence says, "As time is of the essence, AMR

23   requests that Stockton take immediate action to help us

24   resolve these matters prior to April 7th, 2005."

25             Did you choose April 7th, 2005, as the response

                                                           133

1    time that AMR requested here?

2        A.    I did.

3        Q.    Why did you choose that date?

4        A.    Because on April -- we were expecting on or about

5    April the 15th the release of the San Joaquin County RFP

6    by the Board of Supervisors.

7             MR. HIGGINS:  Let's mark next in order.

8             (Whereupon Plaintiff's Exhibit 19 was

9             marked for Identification.)

10            MR. HIGGINS:  For the record, the court reporter

11   has marked as Exhibit 19, a three-page document, Bates

12   numbered AMR 003063 through and including AMR 003065.

13       Q.    Do you recognize what's been marked as Exhibit

14   19, Mr. Meyer?

15       A.    Yes.

16       Q.    And what is Exhibit 19?

17       A.    It is a letter to me from Chief Gillis.

18       Q.    Okay.  Did you receive this letter from -- or did

19   you receive this letter on or about April 7th, 2005?

20       A.    I don't recall the date I received it.

21       Q.    Okay.  You recall receiving this letter, though?

22       A.    Yes.

23       Q.    Okay.  Turning over to the last page.  See the

24   paragraph there without a number, "I appreciate" -- see

25   the sentence beginning that -- with those words, "I

                                              134

1   appreciate"?

2        A.   Yes.

3        Q.   Okay.   Did you in fact extend the City's time to

4   respond to Exhibit 18 to April 15th?

5        A.   I did.

6        Q.   Okay.   And then AMR and the City scheduled a

7   meeting for April 15th, right?

8        A.   We did.

9        Q.   So essentially Exhibit 18 were all the points

10   that AMR was going to go to war with the City on

11   April 15th, right?

12            MR. DELEHUNT:   That's argumentative.

13            THE WITNESS:   Would you say that again?

14            MR. HIGGINS:   Q.   Exhibit 18, which is your

15   letter.

16        A.   Yes.

17        Q.   That's a description of all the points that AMR

18   was going to go to war with the City on April 15th, right?

19            MR. DELEHUNT:   Vague and ambiguous.

20   Argumentative.   Calls for speculation.   Compound and

21   misstates prior testimony.

22            You can answer.

23            THE WITNESS:   The Exhibit 18 articulates the

24   major outstanding issues.

25            MR. HIGGINS:   Q.   And you were going to discuss

135

1  those at the April 15th meeting?

2      A.   Yes.

3      Q.   Okay.  Did you understand -- well, did you

4  understand Exhibit 19 was a direct response to Exhibit 18?

5          MR. DELEHUNT:  Vague and ambiguous.

6          MR. HIGGINS:  Q.  That Chief Gillis was directly

7  responding point by point to the letter that you had sent

8  him on March 21st, 2005?

9          MR. DELEHUNT:  Objection, mischaracterizes the

10  document.  Vague and ambiguous.  Argumentative.

11          THE WITNESS:  I looked at the April 7th letter as

12  a feedback from our March 23rd meeting.

13          MR. HIGGINS:  Q.  Okay.  So you had a March 23rd

14  meeting two days after you sent your March 21st letter?

15      A.   Yes.

16      Q.   Who met on March 23rd?

17      A.   I believe in that meeting was Mark Lewis, Chief

18  Gillis, myself, Brad White, and Dave Hafey.

19      Q.   Okay.  At this meeting on March 23rd, was there

20  any discussion of first responder fees?

21      A.   I believe so.

22      Q.   Okay.  Was there disagreement over first

23  responder fees at that meeting?

24          MR. DELEHUNT:  Vague and ambiguous, overbroad.

25          THE WITNESS:  At this meeting, Mark Lewis

                                                        136

1    commented that he understood my concerns about including

2    first responder fees on top of the ambulance

3    transportation costs, because he understood, as well as I

4    did, that it could make us noncompetitive.

5         MR. HIGGINS:  Q.  So looking at Exhibit 19,

6    number 2, see that first sentence, "Both AMR and the City

7    have agreed to include, as part of the proposed fee

8    structure, a first responder fee"?

9         A.   I see that.

10        Q.   Okay.  Did that sentence inaccurately reflect

11   your understanding of the agreement on that issue at the

12   March 23rd meeting?

13        A.   Yes.

14        Q.   Okay.  Now, this letter came from Chief Gillis,

15   right?

16        A.   Yes.

17        Q.   Did you contact Chief Gillis to talk to him about

18   that sentence after you received this letter?

19        A.   No, because I -- we had scheduled an April 15th

20   meeting.

21        Q.   Okay.  At that March 23rd meeting, did anyone

22   from the City make any representations about the

23   $3.5 million in debt that had been in discussion?

24        A.   Yes.

25        Q.   Who made representations?

                                                  137

1      A.    Both myself and Mark Lewis.

2      Q.    Okay.  What did Mark Lewis say?

3      A.    Mark Lewis characterized them as capitalization

4   costs and not bad debt.

5      Q.    And what bearing did that have on negotiations

6   for -- between the City and AMR?

7      A.    Well, the bearing was that we weren't going to

8   bring into the LLC the City's bad debt or start-up costs.

9      Q.    How did the City propose to bring into the LLC

10   bad debt or start-up costs?

11      A.    Dave Hafey said that those things needed to be

12   recouped through the LLC per the direction of the City

13   Manager.

14      Q.    When did Dave Hafey say that?

15      A.    Prior to my March 21st letter to the Chief.

16      Q.    Did anybody representing the City -- after Dave

17   Hafey said that, did anybody representing the City ever

18   tell you personally that the City did not intend to recoup

19   any of those costs through the joint effort with AMR?

20      A.    No.  The comment was that they would not

21   initially recoup those costs through the LLC, but in the

22   out years, they needed to recoup those costs.

23      Q.    Who made that comment?

24      A.    It was either Gillis or Lewis.  I'm not sure

25   which.

1    Q.    And when did either of those two gentlemen make

2    that comment?

3    A.    I believe it was during the March 23rd meeting.

4    Q.    Did AMR expect to -- strike that.

5          When AMR responds to an RFP in California for

6    an exclusive operating area for ambulance service, does

7    AMR intend to make a profit from that service?

8    A.    Yes.

9    Q.    Okay.  So if the LLC had occurred between the

10   City of Stockton and AMR, and it had made a profit, some

11   of that profit would have gone to the City of Stockton,

12   right?

13         MR. DELEHUNT:  Incomplete hypothetical,

14   argumentative, calls for speculation, assumes facts not in

15   evidence.  Compound, incomplete hypothetical.

16         MR. HIGGINS:  Q.  Right?

17   A.    Yes.

18   Q.    Okay.

19         MR. HIGGINS:  How much time so we have left?

20         Let's mark next in order.

21         (Whereupon Plaintiff's Exhibit 20 was

22         marked for Identification.)

23         MR. HIGGINS:  For the record, the court reporter

24   has marked as Exhibit 20 a multi-page document, Bates

25   numbered CS 002097 through and including 2106.

139

```
 1  STATE OF CALIFORNIA    )
    COUNTY OF SAN JOAQUIN )    ss.
 2

         I, BOBBIE JO HARR, Certified Shorthand Reporter herein,
 3  do hereby certify:
         That on August 8, 2005, at 10:00 a.m., the witness
 4  herein, LOUIS MEYER, was duly sworn:

 5       That said witness' testimony and the proceedings had at
    the time of such testimony were taken down in shorthand
 6  notes by me; I thereafter caused said shorthand notes to be
    transcribed into longhand typewriting, the following being a
 7  full, true, and correct transcription therein;
         That I am a disinterested person, and am not in any way
 8  interested in the outcome of said action; nor connected with
    nor related to any of the parties in said action, nor to
 9  their respective counsel;
                           ---o0o---
10       On August 9, 2005, all counsel were given notice of the
    preparation of the deposition, and the original deposition
11  was available for reading, correcting, approval, or signing
    in our offices until September 14, 2005.
12                         ---o0o---
    _____The witness signed the deposition and made no
13  corrections.
    _____The witness and parties waived examination and reading
14  of the deposition at the time of the taking of the
    deposition.
15  _____The witness corrected, approved, or refused to approve
    the deposition by letter to me attached thereto, and copies
16  of the letter were sent to all counsel.
    _____The witness failed to appear at my office.
17  _____The witness appeared in my office, made changes to the
    deposition, and counsel were provided with copies of the
18  changes.
    _____The witness refused to approve or sign the deposition
19  for the following reasons: _____
                                                             .
20  _____
    _____Other: _____.

21       IN WITNESS WHEREOF, I have hereunto subscribed my hand.
                          DATE: _____
22                       Bobby Jo Harr
                          _____
                          BOBBIE JO HARR, CSR NO. 6090, RMR
23  COUNSEL:  YOU WILL BE NOTIFIED OF ANY CHANGES OR CORRECTIONS
    TO THE DEPOSITION.  CONTACT OUR OFFICE IF YOU HAVE ANY
24  QUESTIONS.

25

                                                          6
```