*American Medical Response, Inc. v. City of Stockton*
*United States District Court- Eastern District No. 2:05-CV-01316-DFL-PAN*

# HAFEY DEPO

1

2            IN THE UNITED STATES DISTRICT COURT

3         IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

4

5   AMERICAN MEDICAL RESPONSE, INC.,)
    a Delaware Corporation,         )
6                                   )
                                    )
7              Plaintiff,           )
                                    )   No. 2:05-CV-01316-DFL-PAN
        vs.                         )
8                                   )
    CITY OF STOCKTON, a California   )   COPY
9   Municipality                    )
                                    )
10             Defendants.          )
    _____)
11  AND RELATED CROSS ACTIONS        )
    _____)
12

13              **DEPOSITION OF DAVE HAFEY**

14

15         DATE:  Wednesday, August 10, 2005 at 9:05 a.m.

16

17         DEPOSITION OFFICER:  BOBBIE JO HARR
                                CSR No. 6090, RMR
18

19         TAKEN AT:
           GAROUTTE'S
20         120 North Hunter Street, Suite 104
           Stockton, California  95202
21

22                       GAROUTTE'S
                Certified Shorthand Reporters
23          120 North Hunter Street, Suite 104
                 Stockton, California  95202
24        (209) 942-2100 or Nationwide (800) 942-2103
                    FAX (209) 942-2150
25

                                                    1

```
 1                    DAVE HAFEY,

 2    the deponent herein, having been duly and regularly sworn by

 3    the Certified Shorthand Reporter, was deposed as follows:

 4

 5                ** EXAMINATION BY MR. SIMON **

 6         MR. SIMON:  Q.  Good morning, Chief Hafey.  My

 7    name is David Simon, and I'm an attorney representing AMR

 8    in its dispute with the City, and I'm going to be asking

 9    you some questions this morning.

10         Before we get started, have you ever had your

11    deposition taken before?

12         A.   Yes.

13         Q.   Okay.  Just to probably review to you the basic

14    ground rules, you understand that you're under oath; is

15    that right?

16         A.   Yes.

17         Q.   And obviously it is a question-and-answer format.

18    If you can wait until I finish my question before you

19    start your answer, we'll have a cleaner transcript.  And

20    I'll do my best to wait until you're finished with your

21    answer before I launch into my next question.  And if we

22    can do it that way, we'll have a better, cleaner

23    transcript of the deposition.

24         And if you don't understand one of my

25    questions, please tell me and I'm happy to rephrase it.
```

7

1    Need a break, say the word, we'll take a break, okay?

2              How are you currently employed?

3         A.    Excuse me?

4         Q.    How are you currently employed?

5         A.    I'm employed by the City of Stockton.

6         Q.    What's your job?

7         A.    I'm a Deputy Fire Chief.

8         Q.    What are your responsibilities in that position?

9         A.    Do you want the job description or the areas

10   that --

11        Q.    Let's start with the job description.

12        A.    My responsibilities are to plan, organize and

13   implement Department policy as outlined by the Fire Chief.

14        Q.    Tell me the areas of responsibility that fall

15   under your job duties.

16        A.    Currently?

17        Q.    Yes.

18        A.    Deputy Chief in charge of the regional 911 center

19   which handles emergency response 911 calls for every fire

20   department in San Joaquin County, and all but one

21   ambulance provider.  I'm the Deputy Chief in charge of the

22   Emergency -- Emergency Medical Services Division, which

23   takes on responsibilities of maintaining certifications

24   and training and recruitment for all of our Department

25   paramedics and EMTs, as well as the EMS Division.

1            And then I'm also, up until a couple weeks ago,

2   an integral part in the Fire Prevention Division, as far

3   as the Arson Investigation Division.  I help investigate

4   crimes, testify in court, and actually have peace

5   officer powers.

6        Q.   Okay.  And the fire prevention duties you said as

7   of a couple weeks ago are no longer under your direct

8   supervision?

9        A.   Yes.  We had a captain retire that was in charge

10  of arson, and until we were able to get someone up to

11  speed, then I was leading that division.

12       Q.   How long have you had responsibility over EMS and

13  ambulance functions?

14            MR. HIGGINS:  That's vague.  Misstates prior

15  testimony.

16            You can answer.

17            THE WITNESS:  I don't know.  Five years, six

18  years.

19            MR. SIMON:  Q.  How long have you been with the

20  Department?

21       A.   Fourteen years.

22       Q.   I want to talk about the decision by the Stockton

23  Fire Department to enter the ambulance business in sort of

24  the 2002 time frame.

25            Did you have a role in determining whether the

                                                            9

1   City of Stockton Fire Department should enter into the

2   ambulance service business?

3           MR. HIGGINS:  Objection.  Lacks foundation.

4   Assumes facts not in evidence.

5           You can answer.

6           THE WITNESS:  I'm not sure I understand your

7   question, as far as I don't have a decision-making role.

8           MR. SIMON:  Q.  I'm asking what your role was.

9           MR. HIGGINS:  If any.  Same objections.

10          THE WITNESS:  I would -- I don't understand your

11  question.  I mean --

12          MR. SIMON:  Q.  Okay.  Do you recall the City

13  considering entering into the ambulance business in like

14  the 2002 time frame?

15      A.   Yes.

16      Q.   Okay.  Did you play a role in evaluating whether

17  or not that -- the Fire Department should enter into that

18  business?

19      A.   Yes.

20      Q.   What was your role?

21      A.   I was part of discussions with the Fire Chief.

22      Q.   Okay.  Tell me what the nature of those

23  discussions were.

24      A.   We would discuss system concerns.

25      Q.   And what does that mean?

                                                        10

1          MR. HIGGINS:  Same objection.  Vague.

2          THE WITNESS:  Yes.

3          MR. SIMON:  Q.  Do you know whether the program

4   is -- let me back up.  What's the City's fiscal year?

5      A.   July 1 through June 30th?

6          MR. HIGGINS:  Speak up.

7          THE WITNESS:  I'm so sorry.

8          MR. SIMON:  Q.  So are we in fiscal year right

9   now, fiscal year 2006, for the City's budget purpose?

10         MR. HIGGINS:  Argumentative.

11         THE WITNESS:  I believe it is '05-'06, the way

12  they reference our budget.

13         MR. SIMON:  Q.  Okay.  For the prior fiscal year,

14  which I guess would be '04-'05, did the emergency

15  ambulance service lose money?

16     A.   I'm not sure.

17     Q.   To your knowledge, did any of the private

18  ambulance companies who had been operating in the City

19  before the City entered the emergency ambulance business

20  subsequently withdraw from providing services in the City

21  of Stockton?

22     A.   When?

23     Q.   After the City entered into the ambulance

24  business.

25     A.   Until what point?  Now?

1     Q.   Well, sure, let's start now.

2          MR. HIGGINS:  Well, it is end now, I think.

3          THE WITNESS:  From the time we started to the

4     time we end, that's the period?

5          MR. SIMON:  Q.  Yes.

6     A.   Yes.

7     Q.   Who?

8     A.   We had companies that added services after we

9     did, First Responder Ambulance Company and Hughson

10    Ambulance?

11    Q.   So some new private companies came into the

12    market after the City entered the market?

13    A.   Yes.

14    Q.   Did some private companies leave the market after

15    the City entered the market?

16    A.   Yes.

17    Q.   Who left the market?

18    A.   Priority One -- I'm sorry, not Priority One.

19    First Responder, and Hughson Ambulance, and A-1.  A-1 was

20    here for a long time.

21    Q.   Has the Fire Department ever transferred any

22    money back to the City General Fund to repay the initial

23    start-up funds that the City allocated?

24    A.   I don't know.

25    Q.   Have you ever included a loan repayment or a

                                                    47

1   said, "It would be nice if you guys could get together and

2   figure out how to provide the best service for the

3   County."

4      Q.   And those statements were made during the Board

5   of Supervisors meeting?

6      A.   That's correct.

7      Q.   On the record?

8      A.   Yes.

9      Q.   Do you remember which supervisors made comments

10   of that nature?

11      A.   No.

12      Q.   Did the City Fire Department ever consider

13   bidding a loan in response to the County RFP?

14      A.   Yes.

15      Q.   At the outset, when -- when the EOA was first

16   announced, did the Fire Department consider submitting its

17   own bid?

18      A.   Yes.

19      Q.   And did the Department feel that it could service

20   the entire EOA on its own without a partner?

21         MR. HIGGINS:  Objection.  That's vague.  Lacks

22   foundation.  And calls for speculation.

23         THE WITNESS:  Do you want to know if the

24   Department?  Who in the Department?  The Fire Chief?

25         MR. SIMON:  Q.  Well, did you?

1      A.    Did I?

2      Q.    Uh-huh.

3      A.    Yes.

4      Q.    You thought you could -- the City could serve the

5   entire EOA that the County had created?

6           MR. HIGGINS:  That's argumentative.  Assumes

7   facts not in evidence.  I think you can cure it very

8   easily.

9           MR. SIMON:  Well, okay.

10     Q.    You thought that the City of Stockton Fire

11  Department on its own without a partner could provide the

12  emergency ambulance services for the entire area

13  contemplated in the County EOA?

14          MR. HIGGINS:  That's vague and confusing.  Lacks

15  foundation.  Assumes facts not in evidence.

16          THE WITNESS:  No one knew if -- no one knew until

17  a couple weeks ago what the credentials were going to be.

18  We believed that we would be allowed to compete in the

19  process.  And they had consultants speak to us in the

20  County.  We were never told whether it was just going to

21  be the greater Stockton area where we're currently

22  providing services or if they were going to combine them

23  all into one.  So we discussed all alternatives on how we

24  would respond.

25          MR. SIMON:  Q.  Did you believe -- you personally

                                                        63

 1 | believe that the City of Stockton could provide emergency
 2 | ambulance service beyond the greater Stockton area?
 3 |     A.   Yes.
 4 |          MR. HIGGINS:  Dave, except for a couple breaks,
 5 | we've been going for about an hour and 45 minutes.  Can we
 6 | take another break?
 7 |          MR. SIMON:  Sure.
 8 |          (Off the record.)
 9 |          MR. SIMON:  When did the Fire Department start
10 | consideration of using a private ambulance company partner
11 | to respond to the anticipated RFP from the county?
12 |     A.   After a staff meeting.
13 |     Q.   What was discussed at the staff meeting?
14 |     A.   The Board of Supervisors meeting.
15 |     Q.   Okay.  And was the fact that the County had
16 | decided to create an EOA discussed at the staff meeting?
17 |     A.   Yes.
18 |     Q.   And was the City's -- the Fire Department's
19 | strategy for addressing an RFP that was anticipated for
20 | the EOA also discussed at the staff meeting?
21 |     A.   Yes.
22 |     Q.   What was discussed?
23 |     A.   All of the alternatives for responding to the
24 | proposal.
25 |     Q.   What were the alternatives?

1          A.    Bid a loan, bid with another ambulance provider,

2    or bid with several providers.  Bid within a JPA with the

3    other cities.  I believe those were the alternatives that

4    were discussed.

5          Q.    What does JPA stand for?

6          A.    Joint Powers Agreement.

7          Q.    As a result of the meeting, did you decide -- did

8    the Department decide to bid with a private partner?

9          A.    No.

10         Q.    That decision wasn't made at that meeting?

11         A.    That decision is made at the City Manager's

12   level.

13         Q.    Did the Department make a decision that it

14   was the defendant's position that the City ought to enter

15   into a private partnership to respond to the EOA?

16              MR. HIGGINS:   That's vague.

17              THE WITNESS:   Yes.

18              MR. SIMON:   Q.   Tell me why the Department chose

19   that option over the other options you've discussed.

20              MR. HIGGINS:   Lacks foundation.

21              THE WITNESS:   Because of comments made at the

22   Board of Supervisors meeting, by the Board of Supervisors

23   themselves.

24              MR. SIMON:   Q.   Are you referring to the comments

25   you testified about before our break about "Can't you guys

1           MR. SIMON:  Yes.

2           THE WITNESS:  I don't recall specifically at

3    which meeting did we start discussing language.  I believe

4    we were discussing the preliminary part of that language

5    at the first meeting.  And we met continuously through

6    that process until we formed a finalized Agreement to take

7    to the Council for approval.

8           MR. SIMON:  Q.  So there were a series of

9    meetings that occurred during which the formalization of

10   the relationship was discussed?

11      A.   Yes.

12      Q.   I'm going to sort of broaden my question beyond

13   specific meetings and ask you that during those meetings

14   generally, what do you recall about the discussions about

15   particular language that was to be inserted into the

16   Agreement?

17      A.   You want to know the people that were in the

18   meetings?

19      Q.   No.  I want to know what you all collectively

20   were talking about in terms of language that was to be

21   inserted into the Agreement.

22      A.   We -- through a series of these meetings, we had

23   the attorneys discussing language, and we were more

24   participants.  And it would be projected on the wall, and

25   we would go item by item the items that they wanted in the

                                                    78

 1   Agreement.  And those items are contained in the

 2   Agreement.

 3        Q.   Do you recall there being any disputes about

 4   particular terms that one party wanted in the Agreement

 5   that another party objected to?

 6        A.   I don't recall any disputes.

 7        Q.   The ultimate -- I'm sorry.

 8        A.   There was discussion on language, but I'm not

 9   aware of any, what I would characterize as a dispute.

10        Q.   The Agreement that was ultimately reached, is

11   that the document that's called the Memorandum of

12   Understanding or the MOU?

13            MR. HIGGINS:  I object.  Assumes facts not in

14   evidence.  I mean, it is true that in your Complaint you

15   refer to a document entitled Memorandum by calling it an

16   MOU.  I think it is improper to inject that fact into

17   these proceedings at this time.  It is argumentative.

18            MR. SIMON:  I'm happy to take out the OU part.

19        Q.   But a Memorandum that was signed by the parties

20   in May, June of 2003, is that the Agreement that you and

21   AMR and the parties you identified negotiated during

22   that -- the period of time that we've been discussing?

23            MR. HIGGINS:  It is vague.  If you have a copy of

24   Exhibit 1 to show him or something like that, I'm sure

25   that will help.

1    MR. SIMON:  I'm just going to ask him the

2    question.

3    MR. HIGGINS:  I object.  It is unfair to ask him

4    about a document that's already been entered into

5    evidence.  But go ahead, without showing him the document.

6    Go ahead.

7    THE WITNESS:  At my level, I'm aware that we

8    entered into an Agreement, and that it was signed by all

9    parties.  And I don't know whether it is a Memorandum.

10    Yes, I've seen several documents, but we've

11    signed an Agreement with AMR to form a joint venture for

12    the purpose of responding to ambulance.

13    MR. SIMON:  Q.  I've handed to you what has been

14    previously marked as Exhibit 1.

15    Do you recognize that document as the Agreement

16    that you all entered into?

17    MR. HIGGINS:  Take a look at the document.

18    THE WITNESS:  Your question is do I recognize

19    this document?

20    MR. SIMON:  Q.  Yes.

21    A.    Yes.

22    Q.    What is it?

23    A.    Appears to me that they took the language that we

24    had projected on the wall in the Fire Department

25    administration office and placed it in -- into an

80

1      Agreement.  But this isn't something that -- this was sent

2      from AMR's attorney to the City Manager.  This isn't

3      something that was sent to me.

4          Q.   Did you personally draft any of the language

5      that's included in Exhibit 1?

6          A.   I was a participant of several people in the room

7      that was drafting this, and I very well might have said,

8      "'Includes' is ambiguous, let's put 'included,' for

9      grammar."

10          But it was a team effort to put this document

11     together.

12          Q.   Were you personally the person who was keeping

13     the master document on your computer and making changes to

14     it as discussions went along?

15          A.   No, I did not keep the master document.  I was a

16     participant in the committee with the partnership, and I

17     was doing the typing as they were changing it.  I was a

18     secretary, in essence.  Only one with typing skills, I

19     guess.  And the attorneys were making changes, and I would

20     type it.

21          And I believe that AMR left with a copy of it.

22     Said, "Burn a copy, and here you attorneys go," I

23     believe.  I might have e-mailed it to them after the

24     meeting, I do not recall.  But I was not the person that

25     was to say drafting it, master copy, no.

                                                              81

1    concerns.

2        Q.   Which was 2005?

3        A.   I believe.

4        Q.   So after that meeting, was it your understanding

5    that the repayment of the start-up funds was no longer an

6    issue in dispute between AMR and the City of Stockton?

7        A.   Absolutely.

8            I'm sorry, can I have him stop?  I can't

9    focus --

10           MR. HIGGINS:  Yeah.  Let the record reflect that

11   Mr. Scarano is listening to the telephone -- to messages

12   or conversations over the telephone, and it is

13   distracting.

14           MR. SIMON:  We can hear that.

15           MR. SCARANO:  I'm sorry.

16           MR. HIGGINS:  It is kind of -- it is so loud that

17   it is disturbing the witness.

18           MR. SCARANO:  I'm sorry.

19           MR. HIGGINS:  Thank you very much.

20           THE WITNESS:  Thanks, Mike.

21           MR. SIMON:  Q.  Did you ever discuss first

22   responder fees as part of your RFP writing team

23   discussions?

24       A.   When you say "you" --

25       Q.   Were first responder fees discussed, among the

                                                          94

1    RFP writing team members?

2        A.    Yes.

3        Q.    Describe to me the nature of those discussions.

4        A.    Brad White provided the City with a sheet, a

5    paper that said what they were paying for first responder

6    fees in other communities, and wanted to know what we felt

7    would come back to him with a reasonable number that we

8    would -- we would include in our draft budget.

9        Q.    Did you include a number?

10            MR. HIGGINS:   That's vague.

11            THE WITNESS:   Did I include a number?

12            MR. SIMON:   Q.   (Nods head).

13       A.    No.

14       Q.    Did the Department provide a proposal for a first

15   responder fee?

16       A.    Yes.

17       Q.    What was that proposal?

18       A.    Per AMR's request, they asked us to cost out only

19   one paramedic per engine, strictly their educational

20   incentive pay, and we provided that number to AMR.  As my

21   understanding, AMR agreed with the number.

22       Q.    What was the number?

23       A.    I don't recall.

24       Q.    After that exchange with the number that you

25   provided to AMR, was there any subsequent discussions

                                                        95

1    about first responder fees?

2         A.    I didn't provide the number.

3         Q.    After the number was provided to AMR, were there

4    any subsequent discussions about first responder fees?

5         A.    Yes.

6         Q.    What were the nature of those discussions?

7         A.    I received a telephone call from Barry Elzig.

8         Q.    When?

9         A.    During the baseball camp for the City.  I believe

10   it was the first week of June.  I was at the camp when I

11   received the telephone call.

12        Q.    What did Elzig tell you?  I'm sorry.  I'm sorry.

13              You said June.  June of this year?

14        A.    Yes.

15        Q.    Okay.  What did Mr. Elzig tell you during that

16   telephone conference?

17        A.    He said we had to rename first responder fees.

18   That the Board -- they had intelligence back from the

19   Board of Supervisors that they didn't want to see the word

20   "first responder fees" in our documents.  And he had

21   reported that if we had to have the word "first responder

22   fee" in the document, it would be a deal killer.

23              And I told him back that we don't discuss deal

24   killers at our level, and that -- I asked if he would

25   have the Fire Chief speak with Chief -- or Lou Meyer

                                                          96

1    directly, that it wasn't my role to discuss deal

2    killers.

3         And he said that Mr. Scarano had e-mailed our

4    attorney Chris Platten with a couple agreements that

5    would take it -- take the first responder fees out, the

6    word "first responder fee" out, and possibly supplement

7    the same amount of revenue that we were going to receive

8    in first responder fees captured under medical supplies,

9    renaming it "medical supplies."

10   Q.   Was it your understanding that the parties agreed

11   to essentially substitute "medical supplies" for "first

12   responder fees"?

13        MR. HIGGINS:  Objection.  Assumes facts not in

14   evidence.  Argumentative.

15        Do you know what question is pending?

16        THE WITNESS:  No.

17        MR. HIGGINS:  Would you like to have it read

18   back?

19        THE WITNESS:  I'm sorry.

20        MR. HIGGINS:  Please read the question back.

21        (Whereupon the record was read.)

22        MR. HIGGINS:  I'll object on the grounds it

23   assumes facts not in evidence, argumentative, lacks

24   foundation.

25        THE WITNESS:  I don't negotiate for the City.  It

97

1    was my understanding that we were to pick a date for all

2    the attorneys to get in a room and make a decision on how

3    they were going to rename those.  I don't have the

4    authority to agree to that.

5                 MR. SIMON:  Q.  Do you have an understanding of

6    whether an agreement was reached on that issue?

7                 MR. HIGGINS:  That's vague.

8                 THE WITNESS:  Yes.

9                 MR. SIMON:  Q.  What is your understanding?

10        A.    That there was an e-mail from the Fire Chief to

11   AMR stating that first responder fees are off the table,

12   per the City Manager.  I received a copy of that e-mail.

13        Q.    What did you understand that to mean?

14        A.    That we were going to rename the first responder

15   fees to something of equal value.

16        Q.    During your RFP writing team meetings, did AMR

17   express its view that the City's cost structure was too

18   high to make the bid competitive?

19        A.    Yes.

20        Q.    Did the City take any steps to address that issue

21   raised by AMR?

22        A.    Yes.

23        Q.    What did you do?

24        A.    We agreed to meet AMR's number.

25        Q.    Did they give you a target cost number?

                                                            98

1     A.   Yes.

2     Q.   And do you remember what that was?

3     A.   Bidding $870 a call.  There was a meeting with

4  the City Manager, Lou Meyer, myself, I don't know if Mike

5  Hakeem was in the room or not.  And that's when they

6  clearly said that the expenses are too high to win a bid.

7  We need to live on one-half of the revenue that we brought

8  in, and we have to bid at least 870.  So you had to live

9  on -- I believe the number was $5.3 million.  "And

10  what" -- in that same meeting, "What you do with your

11  profit afterwards is your business."

12     Q.   Were you personally involved in reducing the

13  Department's cost structure in order to meet that target

14  number?

15     A.   Yes.

16     Q.   What did you do?

17     A.   We had -- I had spoke to every captain on the

18  Fire Department during DC quarterly -- or during meetings

19  with captains to discuss why we were going to have to take

20  significant pay cuts that the union would have to approve

21  in order for us to be able to meet the expected number

22  that AMR provided and to be able to be successful in our

23  bid for services.

24     Q.   So pay cuts was one area of cost reduction that

25  you explored?

99

1    A.    The -- the actual person responsible for the

2    Department for reducing the expenses in negotiating with

3    the union to receive cuts was Chief Hittle.  He's the one

4    that was responsible for that.

5    Q.    Other than seeking pay cuts from the union, did

6    the Fire Department do anything else to reduce its cost

7    structure to meet the target number that AMR provided you?

8    A.    Yes.

9    Q.    What else did you do?

10    A.    When you say "you," you're talking about me or

11    the Fire Department?  I'm sorry.  I'm not trying to be an

12    ass, but --

13    Q.    Why don't you start off with what you did,

14    personally.

15    A.    I asked our analyst to come up with a shopping

16    list of items that could be considered to save money so

17    Chief Hittle and the union would have a tool to work with

18    in negotiations to reduce our bottom line to 5.3.

19         Some of those items required meeting

20    concessions.  Some of those items that Rick came up with

21    provided City Manager decisions.

22    Q.    You referred to analyst.  Is that Rick

23    Butterworth that you're talking about?

24    A.    Yes.

25    Q.    The analyst that you asked to do that?

                                                    100

1       A.    I don't know.

2       Q.    When was the first time you heard that AMR felt

3  that there were anti-trust issues with the relationship

4  between the City and AMR?

5             MR. HIGGINS:   That's vague.

6             THE WITNESS:   The first time I met Mr. Scarano in

7  a meeting in the Round Room in City Hall.

8             MR. SIMON:   Q.   Do you remember when that was?

9       A.    No.

10      Q.    2004, 2005?

11      A.    I don't remember the date.

12      Q.    What did Mr. Scarano tell you?

13            MR. HIGGINS:   Objection.   Assumes facts not in

14  evidence.

15            THE WITNESS:   To clarify the "you," Mr. Scarano

16  sat through several meetings with me, and the majority of

17  the conversations were between attorneys and stuff.   I

18  would provide some documents.   So I'm not the "you."

19            MR. SIMON:   Q.   What did he say that you heard

20  about anti-trust issues?

21      A.    He was --

22            MR. HIGGINS:   Excuse me.   That's vague.   Are you

23  talking about this meeting that is described?

24            MR. SIMON:   Yes.

25            MR. HIGGINS:   Okay.

1            THE WITNESS:  I don't understand what anti-trust

2   is, except in the simplest forms.  Mr. Scarano was

3   providing arguments to Christopher Platten and the

4   attorney for the City of Lodi and Mike Rishwain on what he

5   felt was a risk of someone perceiving anti-trust.  But no

6   way am I aware of anyone stating that we have done

7   anything that violates anti-trust laws.  They were trying

8   to protect themselves from the perception of that.

9            MR. SIMON:  Q.  What was your recollection of the

10  discussion at that meeting after Mr. Scarano raised the

11  anti-trust issue?

12           MR. HIGGINS:  Assumes facts not in evidence.

13           THE WITNESS:  Can you repeat that one again?

14           MR. SIMON:  Q.  You're at a meeting.  Mr. Scarano

15  raises anti-trust issues.  Did anybody say anything in

16  response?

17           MR. HIGGINS:  Same objection.

18           THE WITNESS:  Yes.

19           MR. SIMON:  Q.  What was said?

20      A.   By who?

21      Q.   Well, you tell me.  Who said what?

22           MR. HIGGINS:  That's a fragment.  It is not a

23  clear question.  It is vague.

24           THE WITNESS:  I believe Janis, the City attorney

25  for Lodi, was in the room, and she disagreed.  I don't

                                                    103

1    know how she voiced that in legal stuff.  I believe

2    Christopher Platten, who has a strong understanding of

3    anti-trust, told him it was nonsense, and I think that was

4    the word he used.

5          And I believe after the meeting, the attorneys

6    spoke.  And I was still in the room, and I believe Mr.

7    Platten says, "Ah, you know, that was a loss leader, a

8    red herring," or something like that, and "We're going

9    to build something nice here."  And I don't recall

10   Mr. Scarano's response to that.

11         But the impression I had was it really isn't an

12   issue, we just needed to tighten this up a little

13   better.  That was the impression I had.

14   Q.   Did you ever participate in any discussions after

15   that meeting where the anti-trust issue was discussed?

16         MR. HIGGINS:  Objection.  "The anti-trust issue"

17   assumes facts not in evidence.  Misstates prior testimony.

18         THE WITNESS:  I remember being in discussions

19   where the attorneys again were talking about what legal

20   entity would be the best entity to avoid the perception of

21   anti-trust for Priority One.  They felt there was going to

22   be a lawsuit from Priority One, and they wanted to pick

23   the right entity.  So that would probably be the next

24   evolution of anti-trust issues.

25         MR. SIMON:  Q.  Can you recall any other

                                                      104

1    how we were going to assure the quality of paramedics

2    and actually had them provide ideas on how we could

3    write that to show that we are unbeatable in an RFP

4    together, because we have common goals, we have common

5    strategies, and we can compliment each other, and we

6    described how we would compliment each other on all

7    aspects on what's covered in an RFP:  Financial,

8    operation, disaster, staffing, training, it was

9    everything.

10          MR. SIMON:  Q.  Okay.  And you consider all of

11    those categories, disaster, training, financial to be

12    confidential information of the City's?

13          MR. HIGGINS:  Objection, that misstates his

14    testimony.  Argumentative.

15          THE WITNESS:  Let me give you an example.  Anyone

16    could get a list of all the radio equipment that the City

17    has.  There's no way that they would be able to understand

18    the capabilities that this equipment has, as far as how it

19    relates to you would be actually utilizing it and

20    responding and how -- we specifically -- how we're going

21    to write how we use this equipment, that would never be --

22    that's extremely confidential.  And it is also a matter of

23    national security, some of that stuff.  You cannot take a

24    911 communication center and say the redundancy.  If

25    someone knew the redundancy of a communication center, oh,

                                                    110

1    my gosh.  But we trusted our partner.

2         MR. SIMON:  Q.  Okay.  Tell me what other

3    confidential Fire Department information you shared with

4    AMR.

5         A.   I have.  It is everything of our communication

6    system.  Our billing process that we use and method of

7    collections, we actually sent AMR, upon their request.

8    They requested to go meet with our billing people from AIS

9    to discuss how we could write about our great method of

10   billing services and how they compliment each other.

11        Our billing provider provided AMR with

12   proprietary information to that company, upon my

13   direction.  I specifically told AIS, "Feel free to share

14   everything about our process and anything that you do

15   for us."  That's extremely confidential, especially when

16   you're talking about writing -- because you have to

17   write in our RFP, your process and method for collecting

18   revenue.

19        Q.   Okay.  What else?

20        MR. HIGGINS:  That's a vague fragmentary

21   question.  I object.

22        THE WITNESS:  Deployment strategies.

23        MR. SIMON:  Q.  What do you mean by deployment

24   strategies?

25        A.   We specifically discussed with AMR at what level

                                                      111

1    the system would get to with ambulance numbers, on when

2    these reserve ambulances placed in fire stations would be

3    activated to respond to calls, to maintain compliance.

4           If our competitors knew that, they would build

5    a design that would one up that threshold, specific

6    thresholds that were established for emergency response.

7        Q.    What other Fire Department confidential

8    information did you share with AMR?

9        A.    We discussed our strategy on how to deal with

10   hospital saturation and the inability for ambulance crews

11   to get patients off of gurneys.

12       Q.    What other confidential information did the Fire

13   Department share with AMR?

14       A.    Salaries of specific individuals.  Employees

15   aren't even allowed to know what someone else makes.

16   There is no employee that knows exactly what I make.

17       Q.    What other confidential information did you share

18   with AMR?

19       A.    Labor relations.

20       Q.    What do you mean by labor relations?

21       A.    They were aware that they were negotiating with

22   the union to fulfill the requirements to meet their target

23   number.

24       Q.    What other confidential information did the Fire

25   Department share with AMR?

112

1    A.   Might have discussed some disciplinary issues as

2    it relates to staffing.

3    Q.   With respect to particular employees?

4    A.   Employees, yes.

5    Q.   What other confidential information did the Fire

6    Department supply to AMR?

7    A.   Specific -- I'm just going to use global.

8    Specific documents as it relates to revenue projections

9    greater than one year.  We projected -- gave them

10   projections of multi-year projections on how we felt the

11   health industry would pay.

12   Q.   What other confidential information did the City

13   Fire Department share with AMR?

14   A.   The actual payor mix of each unit as it relates

15   to geography.

16   Q.   What else?

17   A.   Easier if I had that spread sheet.

18        We provided them with information that -- what

19   we felt comfortable with, as far as when timing out an

20   emergency vehicle.  That's something that an RFP has to

21   ask for.

22   Q.   What else?

23   A.   Provided them with tours of City buildings as it

24   relates to how we would provide operations under an RFP

25   structure.

                                                        113

1     Q.   Any other confidential information?

2     A.   There's tons.

3     Q.   I want to try to exhaust your memory.

4     A.   Then we're going to be here, because I got it.

5  Just a matter of dragging it out of me.  I'm trying my

6  best.

7        We had them go to our fleet maintenance

8  facility so they have an understanding of what equipment

9  we have and how it will be used in an RFP.

10     Q.   What else?

11     A.   We discussed strategies on how we would perform

12  emergency dispatch in a way that we both felt that the

13  Board of Supervisors would want to read about in an RFP.

14        We discussed creating all new layers of

15  redundancy for our communications system as part of

16  enhancement to the current system that San Joaquin

17  County utilizes.

18     Q.   What else?

19     A.   We discussed strategies for bringing others on

20  board to make our bid stronger, i.e., the City of Lodi and

21  the City of Tracy.

22     Q.   What else?

23     A.   We discussed the number that we felt would win

24  the RFP, the rates.

25     Q.   What else?

114

1        A.    My memory is coming back now to get more

2    specific.

3              I specifically remember our very first team

4    meeting, Brad White coming in, and stating now that we

5    have a Joint Venture Agreement, that we can -- we can

6    share confidential and proprietary information.  And he

7    started out by saying, "Here is the way that you make

8    money in the ambulance industry."  And he provided three

9    methods.

10             And I told him seven more.

11             So I described to him methods of obtaining

12   revenue to help enhance the service.

13       Q.    What other confidential information did you

14   provide the -- the Fire Department provide to AMR?

15       A.    We discussed our relationships that we currently

16   have with EMS staff and the county staff.

17       Q.    What else?

18       A.    We discussed our record management system and the

19   capabilities of that system providing data to San Joaquin

20   County EMS.  And we discussed ways of enhancing that

21   system to provide the County with more information.

22             MR. SCARANO:  Can we go off the record, for a

23   second?

24             (Off the record.)

25             MR. SIMON:  Q.  Did AMR provide the Fire

                                                    115

1  STATE OF CALIFORNIA    )
   COUNTY OF SAN JOAQUIN )    ss.
2
        I, BOBBIE JO HARR, Certified Shorthand Reporter herein,
3  do hereby certify:
        That on August 10, 2005, at 9:05 a.m., the witness
4  herein, DAVE HAFEY, was duly sworn:

5       That said witness' testimony and the proceedings had at
   the time of such testimony were taken down in shorthand
6  notes by me; I thereafter caused said shorthand notes to be
   transcribed into longhand typewriting, the following being a
7  full, true, and correct transcription therein;
        That I am a disinterested person, and am not in any way
8  interested in the outcome of said action; nor connected with
   nor related to any of the parties in said action, nor to
9  their respective counsel;
                         ---o0o---
10      On August 11, 2005, all counsel were given notice of
   the preparation of the deposition, and the original
11 deposition was available for reading, correcting, approval,
   or signing in our offices until September 15, 2005.
12                       ---o0o---
   _____The witness signed the deposition and made no
13 corrections.
   _____The witness and parties waived examination and reading
14 of the deposition at the time of the taking of the
   deposition.
15 _____The witness corrected, approved, or refused to approve
   the deposition by letter to me attached thereto, and copies
16 of the letter were sent to all counsel.
   _____The witness failed to appear at my office.
17 _____The witness appeared in my office, made changes to the
   deposition, and counsel were provided with copies of the
18 changes.
   _____The witness refused to approve or sign the deposition
19 for the following reasons: _____
   _____.
20 _____Other: _____.

21      IN WITNESS WHEREOF, I have hereunto subscribed my hand.
                   DATE: _____
22                 _____
                   BOBBIE JO HARR, CSR NO. 6090, RMR
23 COUNSEL:  YOU WILL BE NOTIFIED OF ANY CHANGES OR CORRECTIONS
   TO THE DEPOSITION.  CONTACT OUR OFFICE IF YOU HAVE ANY
24 QUESTIONS.

25

                                                            4