*American Medical Response, Inc. v. City of Stockton*
*United States District Court- Eastern District No. 2:05-CV-01316-DFL-PAN*

# LEWIS DEPO

1

2               IN THE UNITED STATES DISTRICT COURT

3          IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

4

5    AMERICAN MEDICAL RESPONSE, INC.,)
     a Delaware Corporation,         )
6                                    )
                                     )
7                   Plaintiff,       )
                                     )   No. 2:05-CV-01316-DFL-PAN
8             vs.                    )
                                     )
9    CITY OF STOCKTON, a California  )
     Municipality                    )
10                                   )
                    Defendants.      )
11   _____)
     AND RELATED CROSS ACTIONS       )
12   _____)

13

                       **DEPOSITION OF MARK LEWIS**
14

15          DATE:   Wednesday, August 10, 2005, at 1:26 p.m.

16

          DEPOSITION OFFICER:   BOBBIE JO HARR
17                              CSR No. 6090, RMR

18

19          TAKEN AT:
            GAROUTTE'S
20          120 North Hunter Street, Suite 104
            Stockton, California  95202
21

22                        GAROUTTE'S
                  Certified Shorthand Reporters
23            120 North Hunter Street, Suite 104
                  Stockton, California  95202
24         (209) 942-2100 or Nationwide (800) 942-2103
                     FAX (209) 942-2150
25

                                                              1

1                        MARK LEWIS,

2     the deponent herein, having been first duly and regularly

3     sworn by the Certified Shorthand Reporter, deposed and

4     testified as follows:

5

6                    ** EXAMINATION BY MR. SIMON **

7              MR. SIMON:  Good afternoon, Mr. Lewis.

8        A.    Good afternoon, sir.

9        Q.    I'm David Simon.  I'm one of the attorneys for

10    AMR.  I'm going to be asking you some questions today.

11             You're currently employed as the City Manager

12    for the City of Stockton?

13       A.    Yes, sir.

14       Q.    How long have you been in that position?

15       A.    A little less than five years.

16       Q.    2000 or so?

17       A.    2001.

18       Q.    2001.

19             What did you do before that?

20       A.    City Manager of Union City, California.

21       Q.    For how long?

22       A.    About six years.

23       Q.    I want to ask you about the decision by the City

24    to enter into the emergency ambulance service in 2002 or

25    so.

1          Do you recall being involved in any discussions

2    about the potential of the City Fire Department entering

3    into the emergency ambulance service business?

4        A.    Yes.

5        Q.    When did you first have discussions about that?

6        A.    I don't recall the specific months, but it was

7    some time during 2002.

8        Q.    How was the subject matter brought to your

9    attention?

10       A.    From the Fire Department.

11       Q.    The Fire Department came to you with a proposal

12   to enter into the business?

13       A.    No.

14       Q.    How did the Fire Department bring up the issue?

15       A.    They were concerned about response times from the

16   ambulance providers and the number of ambulances that were

17   available at any one time to serve the public.

18       Q.    And they came to you with those concerns?

19       A.    Yes.

20       Q.    Who from the Fire Department presented those

21   concerns to you?

22       A.    The Chief and a number of his Deputy Chiefs.

23       Q.    Was that Chief Gillis at the time?

24       A.    Yes.

25       Q.    Was Deputy Chief Hafey there?

8

1      A.    Not that I remember, but there were other Chiefs

2   there that I can't remember exactly which ones they were.

3   But there was a lot of gold and blue in the room, I

4   remember that.

5      Q.    What was your response to the Fire Department?

6      A.    Well, I shared their concern, you know.  We have

7   a commitment to our public to provide high-quality EMS

8   service, and their issues related to the -- our ability to

9   provide that service.  We had -- they were telling me we

10  had instances where there were not the necessary number of

11  ambulances within the City to properly provide coverage,

12  and that -- that our response times to calls were lagging

13  as a result of that.

14     Q.    Okay.  Did you suggest that the Department

15  conduct some sort of feasibility study or investigation

16  into potentially starting its own ambulance service?

17     A.    I think that they had already done some work

18  along those lines.  Real tentative fashion, anyway.

19     Q.    So what was the next step?

20           MR. COLVIG:  Object as overbroad.

21           You can answer.

22           MR. SIMON:  Q.  After this, did something -- some

23  course of action emerge from this meeting that you had

24  with the Fire Department?

25     A.    It was just more a dialog, more a suggestion.

                                                         9

1  Asked for more information.

2      Q.   Did you have subsequent meetings with the Fire

3  Department about the provision of ambulance services?

4      A.   I'm sure I did.  I can't remember.  It was

5  probably kind of more of an ongoing dialog.  It was one of

6  their major concerns that the public get adequate service.

7      Q.   Did they ever present to you a business plan for

8  entering into this --

9      A.   At some point along that, they did.

10     Q.   Okay.  Did either the Fire Department or your

11  office ever engage a third-party consultant to evaluate

12  the Fire Department's business plan?

13     A.   I don't think we did, a third-party analysis.

14  No, I do believe there was -- we have a group of really

15  high qualified analysts in our office.  I'm pretty sure

16  that we had some internal review.

17     Q.   What were the results of the internal review of

18  the Fire Department's business plan?

19     A.   The big issue, again, was response times and

20  the -- our ability to improve service delivery to the

21  public.  And there was the feeling -- the belief was that

22  if we added some additional ambulances into the system,

23  that we'd be able to stabilize it and improve response

24  times fairly dramatically just by having increased

25  quantity of ambulances into the system and the fact that

1    there -- we'd know where they were and what they're doing

2    all the time, that that would stabilize the service

3    delivery.

4        Q.   Was the plan that was brought to you to add Fire

5    Department ambulances to the existing competitive

6    landscape with private party ambulances currently

7    providing -- then currently providing services?

8        A.   Right.  It was just to provide some additional

9    ambulances into the system, as I mentioned, to stabilize

10   it and improve response times.

11       Q.   Did the City ever contemplate trying to obtain

12   the exclusive right for the Fire Department to provide

13   emergency ambulance service in the City?

14           MR. COLVIG:  Hold on.  Object as vague and

15   ambiguous.  In the City?  Him, the Fire Department, the

16   Council, or what?

17           MR. SIMON:  Q.  Let's start with your office.

18       A.   I'm sorry, can you ask that question again?

19       Q.   Let me ask it a different way.

20           Did you ever learn of efforts by anyone to give

21   the Stockton Fire Department the exclusive right to

22   provide emergency ambulance services in the City of

23   Stockton?

24       A.   By ourself?

25       Q.   Yeah.

                                                    11

1     Q.   Did you personally have any discussions with any

2   City Council members about repayment of the start-up funds

3   that had been allocated to the program?

4     A.   I don't recall whether I ever had personal

5   discussions.

6     Q.   In approving the Fire Department's proposal, did

7   the City Council express a view of when the start-up funds

8   would be repaid to the general fund?

9     MR. COLVIG:  I'm going to object as calling for

10   speculation, and vague and ambiguous as to the City

11   Council which is a body expressing.  Anybody asking

12   questions during a session, is that kind of what you mean?

13     MR. SIMON:  Yeah.  That actually -- I'll address

14   the objection by rephrasing the question.

15     Q.   Were you present at the City Council meeting

16   where the Fire Department's plan was approved?

17     A.   Yes, sir.

18     Q.   At that meeting, was there any discussion about

19   the start-up fund?

20     A.   I can't recall specifically, although there

21   probably was.  The primary concern though again wasn't the

22   start-up costs, it was the issue of providing better

23   public service.  And I remember very clearly the night

24   that the Council approved it, the program, there was one

25   ambulance in the Stockton metro area, and it had come from

1    Modesto to cover. And I -- I think at that point it was

2    just -- I think what the issue the Council was trying to

3    address is that we needed to be able to get into the

4    market to be able to stabilize it by at least providing a

5    base number of equipment and personnel into the system to

6    stabilize it, to be able to provided reasonable response

7    times.

8            Because the privates could come and go and, you

9    know, their resources could get called to other places

10   and other venues, and could be doing, you know, hospital

11   to hospital transfers, could be doing nursing home

12   transfers. And we needed to have at least a basic

13   number of high-quality ambulances available to the

14   public. And that was our effort.

15   Q.    Did you ever see an analysis of the Fire

16   Department's plan proposed by the Carlson Group?

17   A.    I don't think so. I don't even know who the

18   Carlson Group is.

19   Q.    What information was presented to the City

20   Council in support of the Fire Department's proposal to

21   enter the ambulance service business?

22   A.    There was a staff report and an analysis.

23   Q.    Was a business plan that the Fire Department had

24   prepared also provided to the City Council?

25   A.    I'm not sure that it is -- whether it was an

15

1  a year, two years?

2       A.    I think within any reasonable time frame, you

3  know.  At some point, you know, we anticipated that our

4  revenues would exceed our expenses, and as that did, you

5  know, those excessive revenues over expenses would then be

6  paid back to the -- for the start-up costs.

7       Q.    Has your office ever communicated to the Fire

8  Department dissatisfaction about the fact that thus far it

9  hasn't been able to repay any money?

10      A.    Not really, no.  I'm a typical -- not at all,

11  really, but I'm a typical City Manager, and I've always

12  kind of got one eye on the revenue and one eye on the

13  expenses.

14      Q.    Have you been the recipient of any communications

15  from members of the City Council expressing

16  dissatisfaction with the fact that the Fire Department has

17  not been in a position to pay any of the start-up funds

18  back?

19      A.    Not that I recall.  But I often receive feedback

20  from them that they're really happy with the level of

21  service that we're now providing in the community, the

22  ambulance system itself is providing.  If you want to have

23  a heart attack, you want to have it here right now.

24      Q.    I'll keep that in mind.

25            MR. COLVIG:  No, thanks.

                                                    20

1    Q.    Is it oral updates, or do you actually get formal

2    "Here's the status of the EMS program"?

3    A.    I meet bi-weekly with the Chief and monthly with

4    the Fire Union, and between the two of them, I'm pretty

5    current with what's happening.

6    Q.    Okay.  Are you familiar with a company called

7    AIS?

8    A.    No, not as I'm sitting here.

9    Q.    Do you understand that the Fire Department uses a

10   third-party vendor to do its billing?

11   A.    Yes.

12   Q.    Does AIS ring a bell as the --

13   A.    Vaguely.

14   Q.    Vaguely.  Do you ever receive any reports -- EMS

15   status reports relating to the revenue side of the program

16   that are generated by AIS?

17   A.    Only after it has been through the Fire

18   Department.

19         And I don't see their reports personally, no.

20   Q.    This is provided to the City Manager's office?

21   A.    No.

22   Q.    Okay.  Just available at the Fire Department if

23   you are -- if you wanted to see it?

24   A.    Right.

25   Q.    And you have seen these reports?

22

1      A.    Not their reports, no.

2            MR. COLVIG:   Mark, slow down and let Mr. Simon

3      finish his questions.

4            MR. SIMON:   Q.   When did you first hear that San

5      Joaquin County was seriously considering enacting an

6      Exclusive Operating Area for emergency ambulance service

7      that would include the City of Stockton?

8      A.    I don't recall specifically, but I think it was

9      sometime during 2002.  I don't remember.

10     Q.    Did you hear anything that led you to an

11     understanding of why the county was considering making

12     that change?

13     A.    Not really.  You know, I heard that they were

14     upset with the -- what they perceived was friction between

15     the various ambulance companies from -- actually, from my

16     perspective, I thought the system was working much better

17     than it ever had and was working out its kinks and bumps

18     along the road.  And I would have been happy to have that

19     continue the way it was.

20           From the time that we entered into the

21     ambulance system and brought our equipment and personnel

22     into it, other ambulance companies also brought in

23     additional personnel and equipment, and the public

24     really got the best benefit out of it, you know.  Our

25     ambulances were now responding in almost the same time

23

1      Q.    Did the prospect of a county-wide Exclusive
2   Operating Area that would include the City of Stockton
3   concern you?

4             MR. COLVIG:    I object as vague and ambiguous.
5             You can answer.

6             THE WITNESS:    You know, I've seen the systems
7   operate, and one of the fallbacks with an exclusive area
8   is that the provider tries -- tries to maximize his
9   resources and equipment to -- you know, to the most
10  efficient extent he can and still comply with the
11  contract, because he's got a -- you know, a profit motive
12  to do so.

13            And that doesn't always inure to the public's
14  benefit.    And so, from my perspective, the system that
15  they had in place where, you know, the City of Stockton
16  had jumped in and provided a base -- a base number of
17  ambulances and equipment, and then the private providers
18  kind of capped it over the top with, you know, a
19  competitive market, was fine.    I think it served the
20  public well.

21      Q.    Did you contemplate the prospect of an exclusive
22  contract covering the City of Stockton that the City of
23  Stockton Fire Department wasn't participating in?

24      A.    I'm sorry, I don't understand your question.

25      Q.    That's a bad question.

                                                      25

1    A.   Rarely do I do anything like that.  I don't
2  remember anything.

3    Q.   Okay.  Did you ever hear anything from the County
4  Board in connection with its deliberations over the EOA
5  that led you to believe that the County wanted ambulance
6  providers to cooperate, to respond to its anticipated RFP?

7         MR. COLVIG:  I'm going to object as vague and
8  ambiguous as to "cooperate."

9         You can answer.

10        THE WITNESS:  I don't remember, no.

11        MR. SIMON:  Q.  Were you involved at all in the
12  decision regarding how the City Fire Department should
13  respond to the County decision to create a county-wide
14  EOA?

15    A.   Was I involved in how we would respond?  Yes,
16  sir.

17    Q.   Describe for me what your role was in that
18  process.

19    A.   As the final decision maker, I would guess.  A
20  lot of work done by a lot of different people on that
21  subject.

22    Q.   Did the Fire Department take the first crack at
23  developing a strategy and then come and present something
24  to you, or were you involved in the actual development
25  of --

27

1    A.   No, I wasn't involved in the actual development.

2  They presented their thoughts.

3    Q.   What did the Fire Department present to you in

4  terms of their thoughts on dealing with the announced

5  county-wide EOA?

6         MR. COLVIG:   Object as vague as to time.

7         MR. SIMON:   Q.   I guess I'd like to focus on the

8  first -- the first communication on the topic.  If you can

9  pin that to a date, that would be great.

10    A.   Not really, I can't.  But I -- it was never their

11  intent or our intent that they would respond to be the

12  exclusive operator.  You know, we -- our -- our intent was

13  to, again, to provide a basic stability to the system, and

14  so if we were going to respond, we would only respond with

15  a partner, a private partner.

16         And the City enters into dozens of

17  public-private partnerships.  It is something that we do

18  well, and we -- we do a lot of.

19    Q.   Did the Fire Department recommend to you that

20  the -- that the Department identify a private sector

21  partner to respond to the County RFP?

22    A.   Yes, they did.

23    Q.   During your first discussions on this topic, had

24  the Fire Department identified the prospective partner or

25  partners that it was considering joining with to respond

                                                          28

1          THE REPORTER:  You said something after that, and

2     I didn't get it.

3          THE WITNESS:  I'm sorry, I don't remember, so...

4          THE REPORTER:  You have to slow down.

5          THE WITNESS:  My wife tells me that all the time.

6          MR. SIMON:  Q.  Did you agree with the Fire

7     Department's recommendation to approach the County RFP

8     with a private partner?

9     A.    Yes, I concurred with that.

10    Q.    Did you agree with their proposal to partner with

11    AMR?

12    A.    Yes, I did.

13    Q.    Were you aware that there was another private

14    party provider that was also included in the contemplated

15    relationship, A-One Ambulance?

16    A.    Yes.  There was a very small ambulance provider

17    that both Lou Meyer and Chief Gillis had a long personal

18    business relationship with, and both of them wanted to

19    kind of protect her in the whole scheme of these things

20    going on.

21    Q.    Okay.

22    A.    And I was fine with that.  I was happy to do

23    that.

24    Q.    Did the issue of partnering with AMR and A-One go

25    up to the City Council?

                                                        30

1  the coin, providing guidance to them to -- to come up with

2  an agreement that was workable and that all the parties

3  were satisfied with it.  Occasionally I'd step in and make

4  a series of decisions to help them get close to where they

5  needed to get.

6      Q.   Did you attend any meetings with the Fire

7  Department and AMR where the Agreement was being

8  discussed?

9      A.   Only occasionally.

10     Q.   Who on the City side were the people principally

11 responsible for negotiating the Agreement with AMR?

12     A.   Chief Hafey, and then there was Chief Hittle and

13 Chief Gillis.  I think those are the three primary

14 parties.  There are a host of other staff players there.

15 Those are the primary people.

16     Q.   You talked about instances where you had to

17 engage in the process and make decisions.  Can you

18 identify for me on what issues you got involved and made

19 decisions?

20     A.   When they would reach, you know, some kind of a

21 minor impasse and I'd help them kind of get over that next

22 hurdle.

23     Q.   What were the minor impasses?

24     A.   I don't know.

25          There was -- there were some operating issues

1  of which I don't really remember, nor were very

2  important to me, to be honest with you.  But the

3  importance was that they reach an agreement on them and

4  that they work them out.

5          There was issue related to first responder fees

6  that were in the original Joint Venture Agreement that

7  AMR felt like would be an impediment in the bidding

8  process, and we worked through those, that set of

9  issues.  Got a resolution on that.

10         There was an issue of, you know, how much of

11  the start-up costs, you know, we would be able to carry

12  into the Joint Venture Agreement.  And we agreed that

13  each party could carry the same amount of start-up

14  costs, whatever they would be.  I forget exactly what

15  they were at this point.

16         And so each party would have the same amount,

17  whatever that amount was.  And I think there were some

18  paramedic protocol issues, and who knows what else they

19  were working on, but...

20         There were some merging of culture issues, none

21  of which seemed to be, you know, road blocks, as far as

22  I was concerned.

23     Q.   The first issue identified relating to first

24  responder fees.  Do you remember when that hurdle

25  presented itself that required your involvement?

33

1    A.    I think sometime within the last few months of

2    our negotiations before they ended.

3    Q.    You said that the parties were able to work

4    through that issue.  What was the issue related to first

5    responder fees?

6    A.    It is a little bit complicated.  But -- I don't

7    know how much, you know, about fire departments and

8    ambulances and --

9    Q.    More than I did a month ago.

10    A.    Okay.  Well, years ago, fire departments, if they

11    had an EMT on the engine, that was a big thing.  Today's

12    environment, fire departments normally staff up with at

13    least one paramedic and maybe two, and we do, too.  And we

14    are the first responder.  If you get into a car wreck

15    driving home tomorrow night or wherever you go.

16    Q.    Heart attacks, car wrecks.

17    A.    Great conversation, huh?

18          Somebody dials 911.  Goes into our dispatch

19    center.  We dispatch an engine company.  And sometimes a

20    truck company, depending on whether you're on the

21    freeway or not.  And we'll get there to you pretty

22    quickly, within four, six minutes, somewhere in that

23    time frame.

24          We will stabilize you, give you treatment.  And

25    traditionally what used to happen in the past before

34

1 | there were so many ambulances in our system, then you
2 | would wait for an ambulance to come pick you up.  And it
3 | could be anywhere from, you know, eight minutes to 10,
4 | 12, 15 minutes, depending where you were.

5 |      And then traditionally what happens is that
6 | either our paramedic will hop into the ambulance and
7 | ride with you to the hospital with our engine company
8 | following behind, and then when they get you to the
9 | hospital, our paramedic will sign you off as -- to the
10 | hospital and make sure that there's a transition from
11 | our guys to the ambulance guys to the emergency room at
12 | the hospital, so that you don't die in the waiting room
13 | or wherever else, you know.  That happened to a lawyer
14 | that's visiting us there.  So -- and then our engine
15 | company goes off.

16 |      And traditionally, the engine companies didn't
17 | get its expenses for all of that work, you know, the
18 | showing up first and then all of that that takes place.
19 | The engine -- we never billed for it and that's just --
20 | the ambulance company billed their bill and the hospital
21 | billed their bill, and in my mind the real heroes on the
22 | job never got compensated for it.

23 |      And over the last, I don't know, less than ten
24 | years in California, there's been a real effort to
25 | figure out how to -- how to compensate the engine

1   company for providing that service.  And in a lot of

2   places in California, the value of that service has been

3   recognized by the ambulance companies.  I mean, they

4   understand that while they're trying to optimize their

5   system, that they -- they need to really have as a

6   critical part of that emergency care system the engine

7   company.  Because without it, if we didn't show up on

8   the scene, if you waited for an ambulance, if you were

9   in that car wreck, you may not make it.  Probably

10  wouldn't make it if you were serious -- if it was a

11  serious accident.

12          So as part of our Joint Venture Agreement,

13  since, you know, it is a critical part of the EMS

14  system, we put in there that there would be first

15  responder fees as part of the proposal.  And then AMR,

16  during their discussions with the County, I think felt

17  that -- that additional level of cost would be a

18  detriment to our joint venture proposal.

19          And initially the Fire Department was pretty

20  resistant to it because -- you know, for the reasons

21  that I just described.  And that -- I know Stockton is

22  kind of the big fish in the pond here.  And -- but there

23  are a great number of these smaller jurisdictions around

24  us, fire districts and smaller cities that kind of

25  depend on us to lead the way.  And so we, you know, just

36

 1   gave up on it.  You know, all of these other fire

 2   departments and smaller districts wouldn't -- you know,

 3   they're -- they're pretty much out of -- a fish out of

 4   water, so to speak, they wouldn't -- you know, they

 5   wouldn't be lost in the shuffle.

 6          So there was a real resistance on their part

 7   to, you know, just to give up on it.  And the issue

 8   finally popped up to my level, and I basically made the

 9   call that our Joint Venture Agreement at this point was

10   more important to the City than hanging in there for all

11   of the little fire districts on first responder fees.

12          And there was a notion that later somehow, you

13   know, we'd either get compensated through some other

14   part of the Agreement or, you know, we'd go back later

15   to the Board of Supervisors and see if we could get that

16   fixed or somehow we would be made whole in it.

17          And that's --

18      Q.   That was the work through?

19      A.   That was it, yeah.

20      Q.   Okay.  Did you get involved in any specific

21   discussions about the ultimate -- how the Fire Department

22   would be made whole?

23      A.   Not really.  It was just assured that Lou and

24   Gary and Gillis had an agreement that it would be done,

25   and that was fine with me.

                                                        37

1     Q.   Okay.  The second issue you identified was

2  related to start-up costs?

3     A.   Uh-huh.

4     Q.   Can you explain what that issue was and how it

5  came to your attention?

6     A.   There was -- there was a notion that through

7  our -- you know, we were going to get half the profits out

8  of this joint venture, and that throughout our joint

9  venture profits, we would pay back our start-up costs.

10  And there was an issue of -- you know, when you put -- put

11  the joint venture together, how much of that start-up cost

12  gets put into that joint venture account and how much

13  doesn't?

14       Just like if you were -- are you a business

15  lawyer?  Just like if you were starting up a company

16  and, you know, when you start up a company, there's a

17  certain amount of debt that gets thrown into that -- to

18  that start-up cost for the company.

19       And so there's -- that was -- that was what

20  that discussion was about.  And initially our guys

21  wanted to put all of their start-up costs into it, and

22  AMR said, "That will make us top heavy."  And the

23  agreement that was eventually reached was that we

24  wouldn't do that, that we would put in whatever they put

25  in.

1    So they put in $100, we'd put in $100.  If they

2  put in a million dollars, we'd put in a million dollars.

3  And then whatever was left out, you know, was out of the

4  Joint Venture Agreement and, you know, from our

5  standpoint, we'd just recover it over the long term to

6  our half of the profits, whatever they would be.

7    Q.   Do you recall how much -- or was it ever agreed,

8  I guess, how much each party would put into the new

9  venture?

10   A.   I don't remember exactly what it was.  But the

11  underlying agreement was whatever they put in, we'd put

12  in.  That was the deal.

13   Q.   Do you know whether an agreement was reached on

14  what the amount would be?

15   A.   Yeah, there was.

16   Q.   You just don't remember what the amount was?

17   A.   Right.

18   Q.   Okay.  When were you involved in addressing the

19  start-up cost issue?

20   A.   Before the other issue.

21   Q.   Before first responder?

22   A.   Yeah.

23   Q.   Calendar year 2005?

24   A.   Well, I'm guessing, yeah.  Yeah.

25   In my mind, these are real typical discussions

1  that do take place when you're having these kind of

2  meetings, nothing extraordinary.

3      Q.    Did you ever tell anybody from AMR that it was

4  critical to the City that this venture that would be

5  responding to the RFP would generate sufficient revenue to

6  pay back the start-up costs?

7      A.    I don't really remember doing that.  But, again,

8  I'm a typical City Manager, and I probably could have very

9  well have said, you know, "Hey, one of our goals is to,

10  over the long term, recover our costs."  But I didn't have

11  very many, if -- independent discussions with AMR.  In

12  fact, I don't think I ever had any, other than to shake

13  hands and -- and where I was the sole person in there,

14  there was a sole AMR guy there, there was always somebody

15  else there.

16      Q.    At those kinds of meetings where you were present

17  and AMR representatives were present, did you ever hear

18  anyone from AMR express concern about the notion of, you

19  know, recovering these costs over time?

20      A.    The one -- the meeting where we reached agreement

21  where we'd put in what they put in, whatever it was,

22  that's -- I'm sure that kind of discussion was had.

23      Q.    All right.  After this agreement was reached

24  about each side putting in equal amounts, were there any

25  subsequent discussions that you were involved in about

40

1   start-up costs?

2       A.   Not that I remember.  No, I was pretty much

3   the -- they would bounce these decisions up to me, we'd

4   make a call on it, and expected my guys to follow through,

5   and they did.  Try not to revisit the same thing more than

6   once.

7           MR. SIMON:  Off the record.

8           (Off the record.)

9           MR. SIMON:  Q.  The agreement that was reached on

10  start-up debt, was that memorialized in any way?

11      A.   I'm assuming it was.  I think it was, yeah.

12      Q.   Do you recall in what form?

13      A.   This should be in the Agreement that they were

14  negotiating.

15      Q.   The ultimate --

16      A.   Operating Agreement or whatever it was.

17      Q.   Okay.  You had mentioned two other issues where

18  you got involved.  One was about paramedic protocol.  Can

19  you just tell me briefly what that was?

20      A.   I don't remember what the detail was.

21      Q.   A minor issue?

22      A.   I thought it was pretty minor.

23      Q.   What about merging of culture issues, what were

24  you referring to there?

25      A.   Well, you had -- you know, in a private company,

41

1    and then you have a Fire Department, you know, one's a

2    public company and one's a private company.  And you merge

3    those two together, and there's a bunch of little issues

4    that you got to work out.  Like I said, we -- I love

5    public-private partnerships.  We do dozens of them.  And

6    there's a common set of issues you got to work through.

7         Q.   And you characterize these as minor issues?

8         A.   Sure.  Like, you know, certain -- their union,

9    our union.  You know, where you house the ambulances, all

10   those kinds of things, you know.  In time, if everybody

11   has good faith, you'll work those things through.

12        Q.   I want to back up in time a little bit to the --

13   2003, when AMR and the City were negotiating the original

14   Agreement relating to their relationship.

15        A.   Uh-huh.

16        Q.   I assume you were aware as City Manager of the

17   Memorandum that was signed in like May, June, 2003,

18   between the City, A-One, and AMR?

19        A.   I think there were two agreements.  One was a

20   Letter Agreement, and the other was a Joint Venture

21   Agreement.

22        Q.   I'm talking about the first one, which -- in

23   fact, it is -- I'll slow you Exhibit 1.  On the bottom.

24   Exactly where you'd expect it to be.

25             Is Exhibit 1 the Letter Agreement that you were

                                                          42

1   just referring to?

2          A.    If I could just have two seconds.

3          Q.    Sure, take your time.

4                Do you recognize Exhibit 1?

5          A.    Yes.

6          Q.    What is your understanding of what that document

7   is?

8          A.    It was the first Agreement between the -- first

9   Joint Venture Agreement between the City of Stockton and

10  AMR and A-One.

11         Q.    Did you personally play any role in negotiating

12  the terms of Exhibit 1?

13         A.    I wasn't the lead negotiator in these

14  negotiations, but I did participate, to some degree.

15         Q.    Do you recall any particular issues in which you

16  were involved relating to the terms of Exhibit 1?

17         A.    I think I was kind of involved in most of them,

18  to some degree.  Some very little and some a little bit

19  more.

20         Q.    Which ones were you more involved in negotiating?

21         A.    Probably a little bit more involved in Item

22  Number 4, and to a little degree to Item Number 5.  To

23  some degree in 6.  Pretty much -- that was pretty much it,

24  I think.

25         Q.    Did you sign this Agreement on behalf of the

                                                      43

1  City?

2      A.   Uh-huh, that's my signature.

3      Q.   What was your --

4      A.   Doesn't look like my signature, huh?

5      Q.   I won't comment.

6           What was your understanding of the intent of

7  Exhibit 1?

8      A.   This was our Agreement to enter into a joint

9  venture with the three parties that I talked about.

10     Q.   For what purpose?

11     A.   To respond to the County RFP.

12     Q.   You indicated that you were more involved in the

13 negotiation of Item Number 4, and from memory, I think

14 Item Number 4 -- maybe I can --

15     A.   Pass it back and forth, how's that?

16     Q.   Deals with the effect of one of the parties from

17 withdrawing from the relationship.  And tell me, if you

18 could, what the nature of your involvement in the

19 negotiation of that provision was.

20     A.   Well, we didn't want -- we didn't want to happen

21 what happened.  We didn't want to spend all of our time

22 and effort working with a joint venture partner and have

23 them withdraw and leave us high and dry.  And that's --

24 that was -- the provision was to prevent that from

25 happening.  We didn't want to be with somebody for two

44

1   years and then walk up to the threshold there and then

2   have them drop you.

3       Q.   Did the City propose inclusion of that term in

4   the Memorandum?

5           MR. COLVIG:  Hold on.  I'm going to object as

6   vague and ambiguous.

7           You can answer.

8           THE WITNESS:  By "the City," do you mean us, me,

9   Fire Department, everybody?

10          MR. SIMON:  Q.  Yeah, I meant everybody globally.

11      A.   Globally.

12          I think it was a mutual provision.  I think

13  both parties wanted that protection.

14      Q.   Do you recall whose idea it was to include that

15  provision in the Agreement?

16          MR. COLVIG:  I object as overbroad.  Vague and

17  ambiguous.  You mean on behalf of the City, or anybody?

18          MR. SIMON:  No.

19          MR. COLVIG:  Who raised it the first time, or

20  what?

21          MR. SIMON:  Q.  Yeah, that's my question.  Who

22  raised it the first time?

23      A.   I would gather -- to guess, I -- my recollection

24  is it was a provision that both parties wanted to have

25  protect -- for protection.  I don't -- AMR didn't want us

                                                        45

1 | to -- wanted the same level of protection that we did, I
2 | think, on that.

3 |     Q.   And you don't recall who the first person to
4 | raise the idea was?

5 |     A.   I really don't.

6 |         I do remember the language was negotiated.  So
7 | it was -- there was some give and take in the
8 | construction of it.

9 |     Q.   In what respect was the language negotiated?

10 |     A.   I just -- I don't remember exactly.  I do
11 | remember that there was some give and take, and that AMR
12 | went back to their legal side a couple of different times,
13 | and, you know, we had our legal guys look at it, and it
14 | was wordsmithed.

15 |     Q.   Do you recall how the language was changed as a
16 | result of the negotiations?

17 |     A.   Not specifically, but it was changed.  I think
18 | your colleague over there was involved in the wordsmithing
19 | of that provision, as I remember.

20 |     Q.   When you use the term "wordsmithing," was the
21 | concept ever changed, or was it just a matter of how the
22 | concept was articulated in the document that was being
23 | discussed?

24 |     A.   I think the underlying concept was fairly well
25 | maintained through the wordsmithing, as I remember.

1      Q.   The Joint Venture Agreement labeled Exhibit 28

2    contemplated a subsequent agreement between the parties,

3    correct?

4          MR. COLVIG:   Object as vague and ambiguous and

5    overbroad.   Calling for legal conclusion.

6          You can answer.

7          THE WITNESS:   It was -- there was always

8    contemplated that there would be a more detailed Operating

9    Agreement between the parties that described the actual

10   day-to-day operations of the new joint venture.

11         And that Agreement would deal with the real

12   lower level of detail about everything from, you know,

13   how you collected your accounts receivable and who did

14   what, to paramedic protocol and how you responded to

15   calls, and the operating procedures between --

16   harmonized between the two organizations.

17     Q.   At the time the Joint Venture Agreement was

18   signed, were the parties in a position at that time to

19   submit a bid to the County in response to an RFP?

20     A.   I don't understand your question.

21     Q.   Had the parties reached agreement on how services

22   would be provided to address accounting RFP at the time

23   Exhibit 28 was signed?

24         MR. COLVIG:   Object as vague and ambiguous and

25   overbroad.

53

1           You can answer.

2           THE WITNESS:  I think so, yeah.  There's

3    obviously a lot of detail to be worked out, but there -- I

4    think there was enough understanding with these two

5    agreements to submit a response to the County.

6           MR. SIMON:  Q.  Did you understand that the

7    parties had enough agreement on operational issues to

8    calculate a bid price at the time the Joint Venture

9    Agreement was signed?

10      A.   You'll never have that level of information until

11   you're just ready to submit the bid.

12      Q.   Okay.  And that wasn't in June of 2004?

13      A.   The bid was just released here in the last couple

14   of weeks.

15      Q.   Do you recall as the parties were trying to

16   finalize the terms of their Operating Agreement and bid,

17   AMR expressing concerns about the City's cost structure?

18      A.   Yes.

19      Q.   Who from AMR expressed those concerns?  Did you

20   hear directly from them, or are you hearing this through

21   the Fire Department?

22      A.   I think at one point I heard it directly from Lou

23   Meyers.

24      Q.   All right.

25      A.   And at that point, we embarked on a major effort

                                                    54

1   to restructure our costs.  We went into immediate

2   negotiations with our Fire Union, which is no easy task,

3   and get them to agree to significant concessions,

4   take-backs, to restructure our costs.  And that was

5   completed just a month ago, which will result in

6   significant savings to not only us, but also to the joint

7   venture.

8      Q.   What did Mr. Meyer tell you about his view of the

9   City's cost structure?

10     A.   Just that our costs were not in alignment with

11  theirs, and that we needed to restructure ours so they're

12  a little more in parallel, more in harmony.  And we agreed

13  and went and restructured and got the union to agree to a

14  whole series of take backs and signed -- took the changed

15  MOU back to the City Council, and the Council approved it.

16     Q.   I'm sorry, I didn't follow the last part.

17     A.   Oh, once we reached agreement with the union, we

18  took it to City Council, and the Council approved it.

19     Q.   When did that happen?

20     A.   Within the last month.

21     Q.   Some time in July?

22     A.   Uh-huh.  Probably mid July, early July.

23     Q.   Do you recall discussions with AMR about forming

24  a single entity LLC to submit the bid to the County?

25     A.   Just generally.

                                                    55

1    Q.    What were you told about the LLC issue?

2          MR. COLVIG:  By who?

3          MR. SIMON:  I just want to know what he heard,

4    and I guess I'll ask him who.

5          MR. COLVIG:  I instruct you not to answer about

6    any conversations you had with counsel.

7          Ask him about others, and then I'll object as

8    vague and ambiguous and overbroad.

9          Go ahead and answer, with that instruction.

10         THE WITNESS:  I'm not sure how to answer that.

11   There were a couple of different formats that they were

12   thinking about using as the vehicle for the Joint Venture

13   Agreement, everything from a JPA to a -- you know, an LLC

14   to some other partnership form.  And I wasn't really

15   overly concerned about whatever form it would take as long

16   as it reflected the original -- as long as that form

17   reflected the -- the underlying Agreement of the joint

18   venture.

19         And that's -- that's -- I think the Fire

20   Department had some other concerns related to the

21   structure, but my bottom line was as I just articulated.

22   Q.    Did you ever hear that AMR had concerns about

23   the -- the joint venture as it currently was constituted

24   being an anti-trust problem?

25   A.    Early on.

                                                      56

1          MR. COLVIG:  Again, I'll just caution you not to

2     talk about conversations you had with counsel.

3          THE WITNESS:  Okay.  Yeah, early on, and that --

4     when they were talking about the initial Joint Venture

5     Agreement and the subsequent one, and I think it was part

6     of the reason why they wanted to tweak the language a

7     little bit, and I was fine with that.

8          MR. SIMON:  Q.  Did you ever hear that AMR had

9     any trust concerns with the arrangement after the Joint

10    Venture Agreement, Exhibit 28 was signed?

11         A.   No.

12         Q.   Did you ever hear any connection between the --

13    AMR's desire to form an LLC and compliance with the

14    anti-trust laws?

15         A.   No.  Again, I -- like I said, I wasn't -- I

16    wasn't really concerned to the form of the final

17    Agreement, as long as it was in harmony with our earlier

18    Joint Venture Agreement.

19         Q.   Let me preface this question by saying I don't

20    want you to tell me about legal advice you received.  But

21    did you ever seek legal advice about the anti-trust

22    implications with the City's relationship with AMR?

23         A.   Our lawyers were aware of what AMR's concerns

24    were, and both parties, both lawyers, felt like those

25    issues were fairly dealt with.

                                                        57

1    Q.   That was going to be my next question.  Is it

2    listed as a -- as an asset or as an expense item?

3    A.   It was probably expensed in the years that they

4    were occurred -- incurred.

5    Q.   So if we went pouring through the, I'm sure  a

6    thousand-page City budget, we're not going to find a line

7    item that reflects --

8    A.   We spend a million dollars a day for City

9    operations.

10    Q.   And half of that on your law firm?

11        MR. COLVIG:  I hope.  I wish.  Half of that is my

12    salary.

13        THE WITNESS:  Don't take any of that down.

14        Quit it, you guys.

15        MR. SIMON:  Q.  So --

16    A.   Keep my legal counsel in order here.

17    Q.   So to the best of your recollection, the start-up

18    funds were just treated as an expense in the year that

19    they were allocated?

20    A.   That's my best guess.

21    Q.   Okay.  Are you aware of confidential proprietary

22    business information that the Fire Department shared with

23    AMR?

24    A.   Just generally.

25    Q.   What's your general understanding of the nature

62

1  of that information?

2     A.   That they -- at AMR's request, they shared with

3  them their payor mix, their accounts receivable

4  collections, and other related financial information.

5     Q.   The payor mix information, can you give me a

6  little bit more detail as to what you're referring to?

7     A.   That -- you know, out of 100 calls, so many of

8  them were insurance, so many of them were Medicare, so

9  many of them were private pays, and, you know, what their

10  collection percentages were for each one and as it related

11  to specific areas of the City.  Because every area of the

12  City is a little bit different.  Some areas are quite

13  different than other areas.  If you're in Brookside,

14  you've got one kind of a payor mix, and if you're in

15  southeast Stockton, you got a whole other mix.

16     Q.   Is it your view that that information would not

17  be available to the public?

18     A.   No, it would not be.

19     Q.   Has that ever been requested in a public records

20  request?

21     A.   No.

22     Q.   Why do you feel that that information is not

23  available to the public?

24     A.   First of all, there's no single report that's

25  available.  It is all information that's just collected.

63

1   It is not -- and then secondly, it is -- it is just simply
2   confidential financial information, which we wouldn't
3   release.  It has to do with whether or not you pay your
4   bills or not.  And what your insurance is and individual
5   parties.  If you're a -- if you had ambulance service and
6   you had -- you owed us some money for that services, all
7   that information would be confidential related to whether
8   you paid your bill and when you paid it, who paid it for
9   you, what was your insurance, how long it took to pay,
10  where you lived.  All that information would be not
11  subject to public disclosure.

12      Q.   Would your answer be different if the information
13  was contained in a document or series of documents and it
14  was aggregated and de-identified so that it didn't reflect
15  a particular individual's information but rather general
16  percentages?

17      A.   Not really.

18      Q.   Why would that not be --

19      A.   Because it would be --

20      Q.   I'm sorry.  Let me just -- for the transcript.

21           Why would that not be a public record?

22      A.   Because it goes back to the base data.

23      Q.   So your position is that because the aggregated
24  data is supported by individual specific data, that it is
25  confidential and wouldn't be disclosed?

1      Q.    When did they tell you that?

2      A.    Within the last year.

3      Q.    Does the City's fiscal year '05-'06 budget for

4  emergency ambulance services assume that the City will at

5  least participate in the county's exclusive operating

6  area?

7      A.    I don't really understand your question.

8      Q.    Are the revenue projections that the City has

9  used for its budget for the emergency ambulance service

10  department, do those numbers assume that the City is

11  participating in providing services under the EOA?

12      A.    Do you mean do we assume that we're in business?

13  Because if we're not participating in the EOA, we're out

14  business.

15      Q.    Okay.  So the answer is yes?

16      A.    To certainly -- to some degree, yeah, there's an

17  assumption in there.  And if we're not in the -- if we

18  don't get to bid, then we're going to shut down, it's that

19  simple.

20      Q.    Okay.  How did you learn that AMR was withdrawing

21  from the relationship with the City?

22      A.    Lou Meyer.

23      Q.    What did he tell you?

24      A.    He said, "They're withdrawing."

25      Q.    What was the context of that conversation?

1        A.    We had a scheduled meeting to work out the last

2    few issues related to the Agreement, the Operating

3    Agreement.  And the -- said he wanted to meet with me

4    before the meeting.

5             And I said, "Well, you know, I'd just as soon

6    have my guys in there."  So I brought in the Chief and a

7    couple of other guys.  And I think that he had -- he

8    might have been alone.  I don't remember.  He might have

9    had somebody with him.

10            And he basically said for three reasons, they

11   were going to go -- end the Agreement and go on their

12   own.

13       Q.    What were the reasons he gave you?

14       A.    First was that they had been testing the Board of

15   Supervisors on the whole joint venture process, and he

16   thought we were a political liability.

17            The second was that there seemed to be some

18   problems with his guys working with our guys working out

19   the details of the Agreement, and that they'd reached

20   frustration with that.

21            And the third reason was that he felt like his

22   reputation would suffer if he ended up in a joint

23   venture with the City.

24       Q.    Did he explain why he thought his reputation

25   would suffer?

1        A.    Not really.  It was a short meeting.

2        Q.    What did you say in response?

3        A.    I said I was surprised, I was shocked, really.

4    That I was going to hold him accountable.  My belief is

5    and is today is that we have an Agreement and that we

6    relied on that Agreement.  They brought us all the way up

7    to this point in time.  We spent two years on this.  And

8    we're right at a week away from the proposals being

9    issued, and he dumps us, basically, takes the bride to the

10   altar and says, "Sorry, we're not getting married."

11           And puts -- you know, puts us in a really

12   noncompetitive position.  You know, my initial thought

13   was that we'd have to shut down and not go forward.

14           You know, basically immediately shut down to

15   save money because there's no sense in proceeding to

16   offer that service to the public if we were -- if we

17   weren't going to compete.

18        Q.    You ultimately decided not to do that?

19        A.    Ultimately decided not to do that.

20        Q.    We'll talk about that in a second.

21        A.    And that was it.  They packed up their bags and

22   left.  We had an exchange of letters, and that was it.

23        Q.    So you were surprised to hear that AMR had made

24   the decision to withdraw?

25        A.    I was shocked.

82

1  Q. What was the date of that meeting, do you

2 remember?

3  A. Not as I'm sitting here, but it was a couple,

4 three weeks ago.

5  Q. June?

6  A. Yeah.

7  Q. I was looking for a letter here.

8  A. If you want me to find it.

9  Q. No, that's all right.  We can figure it out from

10 the documents.

11  A. Probably June 23rd.

12  Q. That sounds right.

13   Was it your view that during the last months of

14 negotiations between AMR and the Fire Department, that

15 the -- that AMR was attempting to extract concessions

16 from the City that hadn't been previously agreed to?

17  A. Not really.  My view was that there was some hard

18 negotiations taking place on both sides, and that the

19 routine would follow that they'd either reach an agreement

20 on them or they'd pop them up to my office and I'd

21 facilitate an agreement, which I'd done all the way to

22 this point.

23  Q. And at the time you had this meeting with Mr.

24 Meyer, there weren't any pending disputes or issues that

25 had percolated up to you?

83

1    A.   I was told that there were a couple of issues

2    that had popped up, and my response to them was that,

3    bring them in and we'll resolve them and solve them and

4    we'll be off to the races.

5    Q.   Do you know what those issues were?

6    A.   Not that I'm -- as I'm sitting here, I really

7    don't.  We never really had a chance to talk about them.

8    Q.   After your initial reaction of maybe we're going

9    to have to shut down the ambulance service.

10   A.   Uh-huh.  It was so late in the process, we

11   didn't -- we didn't have time to -- we wouldn't have had

12   time to -- we didn't believe we'd have time to find

13   another partner.  And then to put a bid together, and it

14   was a huge problem.  Major problem.

15   Q.   When did you make the decision to continue to

16   pursue the bid?

17   A.   We got our guys together, and they were

18   absolutely committed to make it happen.  They all

19   committed to work weekends and nights and Saturdays and

20   Sundays and holidays and kids' birthdays, wives'

21   anniversaries, and do whatever it took to make it happen.

22   And I said, "Fine, I'm with you."

23   Q.   How long after the meeting with Mr. Meyer did

24   that discussion take place?

25   A.   Within a couple of days.

84

```
 1    STATE OF CALIFORNIA    )
      COUNTY OF SAN JOAQUIN )    ss.
 2

          I, BOBBIE JO HARR, Certified Shorthand Reporter herein,
 3    do hereby certify:
          That on August 10, 2005, 2005, at 1:26 p.m., the
 4    witness herein, MARK LEWIS, was duly sworn:

 5        That said witness' testimony and the proceedings had at
      the time of such testimony were taken down in shorthand
 6    notes by me; I thereafter caused said shorthand notes to be
      transcribed into longhand typewriting, the following being a
 7    full, true, and correct transcription therein;
          That I am a disinterested person, and am not in any way
 8    interested in the outcome of said action; nor connected with
      nor related to any of the parties in said action, nor to
 9    their respective counsel;
                            ---o0o---
10        On August 11, 2005, all counsel were given notice of
      the preparation of the deposition, and the original
11    deposition was available for reading, correcting, approval,
      or signing in our offices until September 15, 2005.
12                          ---o0o---
      _____The witness signed the deposition and made no
13    corrections.
      _____The witness and parties waived examination and reading
14    of the deposition at the time of the taking of the
      deposition.
15    _____The witness corrected, approved, or refused to approve
      the deposition by letter to me attached thereto, and copies
16    of the letter were sent to all counsel.
      _____The witness failed to appear at my office.
17    _____The witness appeared in my office, made changes to the
      deposition, and counsel were provided with copies of the
18    changes.
      _____The witness refused to approve or sign the deposition
19    for the following reasons: _____
      _____.
20    _____Other: _____.

21        IN WITNESS WHEREOF, I have hereunto subscribed my hand.
                           DATE: _____
22                          Bobbie Jo Harr
                           BOBBIE JO HARR, CSR NO. 6090, RMR
23    COUNSEL:  YOU WILL BE NOTIFIED OF ANY CHANGES OR CORRECTIONS
      TO THE DEPOSITION.  CONTACT OUR OFFICE IF YOU HAVE ANY
24    QUESTIONS.

25
                                                              4
```