*American Medical Response, Inc. v. City of Stockton*
*United States District Court- Eastern District No. 2:05-CV-01316-DFL-PAN*

# RODRIGUEZ DEPO

1

2                IN THE UNITED STATES DISTRICT COURT

3          IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

4

5   AMERICAN MEDICAL RESPONSE, INC., )
    a Delaware Corporation,          )
6                                    )
                   Plaintiff,        )
7                                    ) No. 2:05-CV-01316-DFL-PAN
          vs.                        )
8                                    )
    CITY OF STOCKTON, a California    )
9   Municipality,                    )
                                     )
10                 Defendants.        )
                                     )
11  AND RELATED CROSS ACTIONS         )
                                     )
12

13

14              **DEPOSITION OF EDMOND RODRIGUEZ**

15

16          DATE:  Thursday, August 11, 2005, at 9:00 a.m.

17

18          DEPOSITION OFFICER:  BOBBIE JO HARR
                                 CSR No. 6090, RMR
19

20          TAKEN AT:
            GAROUTTE'S
21          120 North Hunter Street, Suite 104
            Stockton, California  95202
22

23                      GAROUTTE'S
                Certified Shorthand Reporters
24          120 North Hunter Street, Suite 104
               Stockton, California  95202
25      (209) 942-2100 or Nationwide (800) 942-2103
                   FAX (209) 942-2150                    1

1              EDMOND RODRIGUEZ,

2   the deponent herein, having been first duly and regularly

3   sworn by the Certified Shorthand Reporter, deposed and

4   testified as follows:

5

6              ** EXAMINATION BY MR. SIMON **

7         MR. SIMON:  Q.  Good morning, Captain Rodriguez.

8   My name is David Simon, and I'm one of the lawyers for AMR

9   in its dispute with the City.  I'm going to be asking you

10  some questions this morning.

11        Can you tell me to start what your current

12  position with the Stockton Fire Department is?

13     A.   Battalion Chief.

14     Q.   So it is not Captain anymore, it is Chief?

15     A.   Correct.

16     Q.   I apologize.

17     A.   That's okay.

18     Q.   How long have you been in that position?

19     A.   Since December.

20     Q.   What are your current areas of responsibility?

21     A.   I work in Battalion 1, which is in charge of the

22  entire south side of the City, approximately one half of

23  the community.

24     Q.   And you are overall in charge of that battalion,

25  is that your role?

6

1    A.    Yes.

2    Q.    Okay.   What was your position before your current

3 position?

4    A.    I was the on-duty EMS Captain for the City.

5    Q.    What were your responsibilities in that position?

6    A.    I was in charge of the entire ambulance program

7 for my shift.

8    Q.    How long were you in that position?

9    A.    A little over one year.

10    Q.    So that would take us to December -- you were

11 Captain in charge of the EMS Division between

12 December '04 to December '05, roughly?

13    A.    December '03.

14    Q.    Okay.

15    A.    To December '04.

16    Q.    Right.   December '03 to December '04, you were

17 EMS Captain?

18    A.    Correct.

19    Q.    Okay.   What did you do before that?

20    A.    I was an Engine Company Captain.

21    Q.    Any involvement in the EMS aspect of the Fire

22 Department's operation when you were an Engine Company

23 Captain?

24    A.    Yes.

25    Q.    How long were you in that position?

7

1    A.   For approximately four-and-a-half years.

2    Q.   How long have you been with the Department?

3    A.   Going on 17 years.

4    Q.   I want to first ask you some questions about the

5    decision in 2002, roughly, of the Department to enter the

6    EMS emergency services business.

7    Did you play a role in the process of

8    evaluating whether or not the Department should enter

9    into EMS service provision?

10    A.   Yes.

11    Q.   Describe for me, if you could, what your role was

12    in that process.

13    A.   I was the executive secretary of our legal union,

14    Stockton Professional Fire Fighters, and I was asked by

15    the Chief to assist in forming a joint labor management

16    committee to look into providing transportation services

17    for our community.

18    Q.   Did you put that committee together?

19    A.   I was a member of that committee.

20    Q.   What did the committee do?

21    A.   The committee was vested with looking at the

22    current ambulance transportation system and coming up with

23    options to provide transportation in the event that one or

24    more providers left the community.

25    MR. STUMP:  May the record reflect that we've

8

1    been joined in the deposition by a gentleman I haven't met

2    yet?

3           MR. RISHWAIN:  Michael Rishwain.

4           Yes, you have.

5           MR. STUMP:  Oh, I'm sorry, Michael.  My

6    apologies.  My glasses are just not good this morning.

7           Okay.

8           MR. SIMON:  Q.  Did the committee have meetings?

9    Did you formally meet to look at this option of entering

10   the ambulance business?

11      A.   Yes.

12      Q.   Over what period of time did the committee meet?

13      A.   From approximately August of 2001 until

14   September, October of 2002.

15      Q.   Who else was on the committee besides yourself?

16      A.   At the time was Captain Dave Hafey, myself,

17   Captain Ron Hittle.  Engineer Lilienthal.  Our Fire Chief.

18      Q.   Is that Chief Gillis?

19      A.   Correct.

20      Q.   Is that everybody?

21      A.   To the best of my recollection.

22      Q.   Did the committee meet on a regular basis, or was

23   it sporadic, in terms of getting together?

24      A.   I would say the community as a whole, as far as

25   time lines were to be met was probably frequent.

9

1  hearings started.

2      Q.   Other than the County reports and the annual

3  report to the City Manager, are you aware of any other

4  reports that the Department had to file that related to

5  the emergency ambulance service?

6      A.   No.

7      Q.   I want to talk a little bit about the County

8  decision to create an exclusive -- a county-wide Exclusive

9  Operating Area.

10          You're familiar with that issue, generally?

11      A.   Yes.

12      Q.   When did you first hear that the County was

13  contemplating creating a county-wide Exclusive Operating

14  Area?

15      A.   In August of 2002.

16      Q.   What did you hear in August of 2002?

17      A.   We applied and were granted our permits to

18  operate from the San Joaquin County EMS Agency in July of

19  2002.  As part of the ambulance ordinance, another

20  provider declined, protested our permits, and they were

21  granted a public hearing before the Board of Supervisors.

22          At that hearing, your client requested that the

23  Board of Supervisors look into issuing a transportation

24  plan to the state for approval, for authority to grant

25  EOAs for the areas encompassing the greater Stockton

                                                        28

1   area.

2       Q.   Was there discussion about AMR's request at that

3   County meeting?

4       A.   Yes.

5       Q.   What do you recall about the nature of the

6   discussion, other than AMR requested it?

7       A.   AMR hired a local attorney by the name of Michael

8   Hakeem, and Mr. Hakeem spoke before the board basically

9   stating that he was not challenging the City's permits,

10  but that this was his only mechanism to go before the

11  Board and request that they look into granting the EMS

12  Agency the ability to draft a report to the state to grant

13  them the authority to go through the EOA process.

14      Q.   Was this hearing before the Board of Supervisors?

15      A.   Yes.

16      Q.   Did any of the supervisors engage in discussion

17  with Mr. Hakeem about the concept of an EOA?

18      A.   Yes.

19      Q.   What do you recall about those discussions?

20      A.   The basic order of the day was that the Board of

21  Supervisors through resolution, gave permission to the EMS

22  Agency to start the process towards a EOA.

23      Q.   It happened at that first meeting?

24      A.   Yes.

25      Q.   Did the EMS Agency weigh in on the issue at that

1     Q.   Did anything occur at the County Supervisor

2  meetings you attended that led you to believe that the

3  County wanted cooperation among ambulance providers in

4  responding to its EOA RFP?

5     A.   Yes.

6     Q.   Tell me what you heard that led you to reach that

7  conclusion.

8     A.   Several of the Board members under their public

9  comments stated that the City of Stockton and American

10  Medical Response were two 800-pound gorillas that needed

11  to work together to provide the best level of services to

12  our communities.

13     Q.   Do you remember the names of the supervisors that

14  made those comments?

15     A.   One would be Dario Marenco.  Another would be

16  Jack Sieglock.

17     Q.   Were you involved in the Department's process of

18  determining how to respond to the anticipated County RFP?

19     A.   Yes.

20     Q.   Would you describe for me if you could in broad

21  terms what the Department -- what process the Department

22  followed in determining how it would respond to the County

23  RFP?

24          MR. STUMP:  Objection, vague as to time,

25  overbroad.  Calls for a narrative.  Can you be a little

1    partners to get a sense of their level of long-term

2    commitment and on the -- trying to look for people who

3    were less likely to close down units?

4         A.   Yes.

5         Q.   What were the other issues that you were

6    concerned about?

7         A.   That we felt that the Fire Chief, who has the

8    highest level of public safety within the community should

9    have the ability to dictate where ambulance stations go,

10   based on call volume, geography, access routes.

11        Q.   Any other issues that were of concern?

12        A.   We felt that the Fire Chief should have the

13   ability to dictate a minimum number of available emergency

14   ambulances.

15        Q.   Other issues?

16        A.   Those are the main ones.

17             MR. SIMON:  We've been going an hour.  Do you

18   want to take a five-minute break, and maybe we can stop

19   the stampede.

20             (Recess.)

21             MR. SIMON:  Q.  Did the Department determine,

22   based on its interviews of private ambulance companies,

23   that AMR would be the most suitable partner for responding

24   to the County EOA RFP?

25        A.   Yes.

43

1      Q.    Why did the Department make that determination?

2      A.    That was the determination made by the Fire Chief

3  and the City Manager.

4      Q.    Did you agree?

5      A.    I gave them my input.

6      Q.    What was your input?

7      A.    My input was that we had interviewed all the

8  prospective private ambulance providers, and that to do a

9  public-private partnership, we felt in essence of that

10 that Rural Metro, who has had much success with other fire

11 departments, would probably be the best option for the

12 City.

13     Q.    Did anyone other than you express the view that

14 Rural Metro would be a better option?

15     A.    Yes.

16     Q.    Who else?

17     A.    At the time Division Chief Dave Hafey.

18     Q.    Was there a meeting between you and Hafey and

19 Gillis and Lewis where the issue of which -- which private

20 provider we should pick was discussed?

21     A.    Yes.

22     Q.    Was anybody else in attendance at that meeting?

23     A.    Not to the best of my recollection.

24     Q:    Did Chief Gillis express a different view at that

25 meeting?

                                                          44

1   A.   Yes.

2   Q.   What was his view?

3   A.   He felt that his long-term relationship with Lou

4   Meyer of AMR and our legal experience was the best course

5   of action for the City to partner with.

6   Q.   Did Lewis express a view?

7   A.   Yes.

8   Q.   What was his view?

9   A.   He agreed with the Chief.

10   Q.   And so was the decision to select AMR made at

11   that meeting?

12   A.   Yes.

13   Q.   How did A-1 fit into the picture?

14   A.   A-1 was a one-ambulance small operation, run by a

15   lady by the name of Donna McCann, who we affectionately

16   called the grandmother of local EMS.  She had been in the

17   business for many, many years, and we wanted to give her

18   an opportunity to stay in the business.  And we brought

19   her into a three-fold Joint Venture Agreement, along with

20   AMR and the City to provide emergency ambulance services

21   in our respective areas.

22   Q.   Did you have concerns about the City -- the

23   Department's decision, I guess the Department and the City

24   decision to select AMR rather than Rural Metro as the

25   partner?

45

1    A.    Can you be more specific?

2    Q.    I guess what I'm trying to get at is you -- you

3    thought Rural Metro would have been a better choice.

4    A.    For a public-private partnership, yes.

5    Q.    And I guess that what I'm getting at is whether

6    you thought that the two were both acceptable but Rural

7    Metro was better, or whether you had concerns about

8    whether AMR was an acceptable partner for the City?

9    A.    My decision wasn't based on a level of

10   acceptability from one provider to the other.  But I felt

11   that Rural Metro had more experience in a public-private

12   partnership with a Fire Department than AMR did.

13   Q.    After the decision was made to select AMR, were

14   you comfortable that the City would be able to work with

15   AMR to provide ambulance service in the -- in the County

16   EOA?

17   A.    Yes.

18   Q.    During these interviews you had with different

19   providers, did the Department explain what assets it would

20   bring to public-private partnership?

21   A.    Not at that time.

22   Q.    You were just getting information from the --

23   from the provider, the private provider?

24   A.    Yes.

25   Q.    What happened after the decision was made to

46

1      Q.   Okay.  Tell me what the -- what your next

2   involvement in the process was.

3      A.   After this had been placed into Resolution and

4   adopted by the City Council, to the best of my

5   recollection, I believe in July of 2003, we held a series

6   of meetings with AMR to come up with a preliminary plan of

7   how to respond to an RFP for San Joaquin County.

8           At that time, we were under the impression that

9   the RFP was to be released some time in October or

10  November of 2003.

11     Q.   Who participated in those meetings from -- with

12  AMR from the Fire Department?

13     A.   It was myself and Division Chief Dave Hafey.

14     Q.   And who participated from AMR?

15     A.   Brad White, Barry Elzig, and Donna McCann.

16     Q.   McCann representing A-1?

17     A.   Yes.

18     Q.   How many meetings, roughly, did you have?

19     A.   Several.

20     Q.   And what can you recall about what was discussed

21  at those meetings?

22     A.   One thing I do remember is that after this had

23  been, again, placed into Resolution at the Council level

24  and adopted as City policy, we met and walked into the

25  Charter Way office of the local AMR location here, and

56

1   there was quite a bit of writing on the wall.   There's a

2   huge wall that has dry eraser boards, and there was a

3   preliminary deployment plan for emergency ambulances in

4   our area.   There was financial documentation on that wall,

5   and there were also three ways or three abilities that AMR

6   has as a corporation to make money in emergency ambulance,

7   and they were up there.

8        And as we walked in the door and sat down and

9   the doors were closed, and Brad White got up and shook

10  everyone's hands and said, "Now we're partners, we can

11  share confidential information."   And he began to

12  verbally state what all the items were on the dry eraser

13  boards.

14       Q.   Is that the first meeting or --

15       A.   That was the first meeting, yes.

16       Q.   You identified I think three types of information

17  that was up on the board.   The first was a preliminary

18  deployment plan?

19       A.   Yes.

20       Q.   Can you tell me what that was?

21       A.   A deployment plan is a general section of an RFP

22  that you would write about, and it basically states where

23  the number, how many ambulances you would put into service

24  at different times of the day or over a 24-hour period.

25       Q.   And AMR had done some work in terms of assessing

57

1    actually came out with a work flow list of who would do

2    what and time lines.  We synchronized our calendars to

3    come up with a significant amount of meeting dates in the

4    future to continually meet, bring this information

5    forward, see where we were, analyze the data, see what

6    else we needed.

7         Q.   What kind of information did you identify as

8    information you needed to gather?

9         A.   Broke it into many broad areas.  Financial

10   information, three years of audited financials, a copy of

11   the City's budget.  The different forms of cash on hand.

12   The City's ability to change assets into liquid or into

13   cash.  Different questions that are typically asked in

14   most RPSs.

15        There was biographies.  There was curriculum

16   vitaes on certain key personnel in both organizations.

17   Our management structure.  Our rules and regulations,

18   our policies and procedures, our training manuals, our

19   training programs, very extensive information.  Our

20   quality improvement programs.

21        Q.   And just so I understand, this was -- this was

22   information that AMR anticipated would be asked for in the

23   RFP based on its prior experience responding to RFPs?

24        A.   Yes.

25        Q.   And nobody knew specifically what San Joaquin

1   County RFP was going to ask for at that point?

2       A.    There are basic pieces of information that are

3   always required.  As far as how they would dictate the

4   level of service needed, that was an unknown.

5       Q.    Okay.  Did the City Fire Department go about

6   gathering the categories of information that AMR said

7   would likely be called for by the RFP?

8       A.    Yes.

9       Q.    Did you provide that information to AMR?

10      A.    Yes.

11      Q.    Did they provide similar information to the Fire

12  Department?

13      A.    Some.

14      Q.    What kinds of information did they not provide to

15  the Fire Department?

16      A.    They were not as readily forthcoming on financial

17  information or budget as the time constraints dictated.

18      Q.    When you say "they were not as readily

19  forthcoming with financial information," did you mean that

20  there's financial information that you believed you should

21  have received that they didn't provide you?

22      A.    Yes.

23      Q.    What sort of financial information did you

24  believe they should have provided that they didn't?

25      A.    Their audited financials, their last year's

1    A.    We never actually got to that conclusion.

2    Q.    Was that AMR's position in the negotiation?

3    A.    AMR had multiple positions on that.

4    Q.    What was their last position on it?

5    A.    The last position was that we were going to

6    jointly bill, but we would go through a third party.

7    Q.    Not AIS?

8    A.    We would put out RFPs for AIS to compete.   AMR

9    could compete.   Just several billing companies out there.

10   Q.    But no final agreement had ever been reached on

11   that issue?

12   A.    No.

13   Q.    Other than the billing information from AIS, are

14   you aware of other financial information, other than

15   budget stuff that we talked about, that the City supplied

16   to AMR?

17   A.    We provided a forecast of budget projections and

18   revenue projections that were highly confidential as part

19   of the information that we exchanged, or -- let me correct

20   that.   Not exchanged, that we gave them.

21   Q.    Budget projections and revenue projections?

22   A.    Yes.

23   Q.    What were the nature of the budget projections

24   that you provided?

25   A.    When you apply or submit for an RFP, they

1   generally ask you to submit budgets, full cost budgets for

2   a certain period of years into the future so that they're

3   able to ascertain that the provider has a financial means

4   to carry out the service, stay in service, you know, has

5   the ability to pay for the service. So we had to come up

6   with forecasts obviously showing what the Fire

7   Department's budget would be hyperextended out for several

8   years.

9       Q.   And the revenue projections you referred to are

10  part of those budget forecasts?

11      A.   They were a separate document, but that was the

12  initial projections that we needed.

13      Q.   Any other financial information that you're aware

14  of that the Department shared with AMR?

15      A.   To the best of my recollection, no.

16      Q.   One of the other categories of information that

17  you had identified earlier was policies and procedures.

18      A.   Uh-huh.

19      Q.   And we talked about several that you were

20  responsible relating to procedure manual, training,

21  communications, rescue capabilities. Were there other

22  categories of information that would have fallen under

23  that general classification of policies and procedures

24  that you're aware of that the Fire Department supplied to

25  AMR?

73

 1   Stockton, American Medical Response, and A-1 Ambulance to

 2   also include the City of Lodi, specifically the Lodi Fire

 3   Department.

 4        Q.   Were you involved in any of the discussions that

 5   led up to the creation and execution of Exhibit 3?

 6        A.   Yes.

 7        Q.   Describe for me what -- what you can recall about

 8   those discussions.

 9             MR. STUMP:   That's real general.   Objection,

10   vague and ambiguous.

11             MR. SIMON:   Q.   Can you answer the question?

12        A.   Can you be more specific?

13        Q.   Yeah.   Why don't we start with the question of

14   whether you attended meetings at which the Joint Venture

15   Agreement marked as Exhibit 3 was discussed?

16        A.   Yes.

17        Q.   One meeting or multiple meetings?

18        A.   I would say, for this document there was a

19   couple.

20        Q.   All right.   What do you recall was discussed at

21   the first meeting relating to the Joint Venture Agreement?

22        A.   There was actually conversations that preceded

23   any of the meetings.

24        Q.   What was the nature of those conversations?

25        A.   Barry Elzig of AMR approached myself and then

                                                      77

1   Division Chief Dave Hafey and requested that we assess AMR

2   with bringing the City of Lodi, specifically the Lodi Fire

3   Department into the Joint Venture Agreement between the

4   three existing parties, as AMR felt that that would

5   increase their chances because they were going to be the

6   loan bidder.  And at that time, Zone 4, which is now

7   called Zone A, which is the greater Lodi area, they needed

8   assistance from our Department to help them establish,

9   based on the same parameters and have the City of Lodi

10   partner on with our Joint Venture Agreement.

11      Q.   And did you make contact with the Fire Department

12   of the City of Lodi?

13      A.   Yes.

14      Q.   Describe the nature of those discussions.

15      A.   Our Fire Chief contacted Chief Michael Pretz of

16   the City of Lodi Fire Department and expressed our desire

17   to join with them in our Joint Venture Agreement.

18   However, he was -- or had been selected by the county to

19   be on the RFP and system design at that time.

20      Q.   And he felt that might be an obstacle to the Lodi

21   Fire Department participating in the processes?

22      A.   He was not clear.

23      Q.   Did you have any subsequent discussions with the

24   Lodi Fire Department about it joining your arrangement

25   with AMR?

1    A.    Yes.

2    Q.    Tell me about that discussion.

3    A.    Our Fire Chief made an arrangement to have all

4    the parties back at City Hall in their office to discuss

5    the eventuality or possibility of having the City of Lodi

6    join in our joint venture group.  Prior to the meeting

7    commencing, Lou Meyer from AMR raised an objection that

8    the City of Lodi Fire Department, specifically Chief

9    Pretz, had to make a decision he was either going to be

10   part of the RFP selection committee or he was going to

11   partner up, and that no confidential information or no

12   aspects of this Agreement would be shared with him until

13   he made that fundamental decision.

14   Q.    Did the Fire Department agree with Mr. Meyer's

15   position?

16   A.    Yes.

17   Q.    Did Chief Pretz make a decision to join in the

18   venture?

19   A.    Chief Pretz excused himself from the room,

20   contacted at that time the EMS Agency director, voiced his

21   concern, and excused himself from the RFP system design

22   committee.

23   Q.    Were there any other conversations between the

24   Fire Department of Stockton and the Lodi Fire Department

25   prior to the initial meetings about creating the Joint

79

1   Venture Agreement?

2      A.   Only what I collectively said earlier, that we

3   advised him that we had a desire to bring him into our

4   Agreement and that he needed to make a decision on which

5   course he was going to go.

6      Q.   The first meeting then that was related to the

7   Joint Venture Agreement, by that point, had Chief Pretz

8   made a decision to join the group?

9      A.   During that first meeting, he made a decision,

10  after that phone call that I just described.

11     Q.   What else do you remember about the discussions

12  at that first meeting?

13     A.   Once Chief Pretz committed to and spoke with the

14  City Attorney and the City Manager of Lodi and was given

15  permission to entertain the negotiations with the existing

16  parties, we placed this document in a PowerPoint format

17  and projected it on the wall and went through each item by

18  item and made changes and additions as were needed.

19     Q.   Was your starting point document the text of

20  Exhibit 1, the Memorandum Agreement?

21     A.   To the best of my recollection, yes.

22     Q.   Other than adding Lodi as another participant,

23  what do you recall was discussed with respect to changes

24  to the Agreement?

25     A.   Other than adding the different areas that

1 | STATE OF CALIFORNIA    )
   | COUNTY OF SAN JOAQUIN )    ss.

2

   |     I, BOBBIE JO HARR, Certified Shorthand Reporter herein,
3 | do hereby certify:
   |     That on August 11, 2005, at 9:00 a.m., the witness
4 | herein, EDMOND RODRIGUEZ, was duly sworn:

5 |     That said witness' testimony and the proceedings had at
   | the time of such testimony were taken down in shorthand
6 | notes by me; I thereafter caused said shorthand notes to be
   | transcribed into longhand typewriting, the following being a
7 | full, true, and correct transcription therein;
   |     That I am a disinterested person, and am not in any way
8 | interested in the outcome of said action; nor connected with
   | nor related to any of the parties in said action, nor to
9 | their respective counsel;
   |                        ---o0o---
10 |     On August 12, 2005, all counsel were given notice of
   | the preparation of the deposition, and the original
11 | deposition was available for reading, correcting, approval,
   | or signing in our offices until August 16, 2005.
12 |                        ---o0o---
   | _____ The witness signed the deposition and made no
13 | corrections.
   | _____ The witness and parties waived examination and reading
14 | of the deposition at the time of the taking of the
   | deposition.
15 | _____ The witness corrected, approved, or refused to approve
   | the deposition by letter to me attached thereto, and copies
16 | of the letter were sent to all counsel.
   | _____ The witness failed to appear at my office.
17 | _____ The witness appeared in my office, made changes to the
   | deposition, and counsel were provided with copies of the
18 | changes.
   | _____ The witness refused to approve or sign the deposition
19 | for the following reasons: _____
   | _____.
20 | _____ Other: _____.

21 |     IN WITNESS WHEREOF, I have hereunto subscribed my hand.
   |     DATE: _____
22 |     _Bobbie Jo Harr_____
   |     BOBBIE JO HARR, CSR NO. 6090, RMR
23 | COUNSEL:  YOU WILL BE NOTIFIED OF ANY CHANGES OR CORRECTIONS
   | TO THE DEPOSITION.  CONTACT OUR OFFICE IF YOU HAVE ANY
24 | QUESTIONS.

25

                                                              4