*American Medical Response, Inc. v. City of Stockton*
*United States District Court- Eastern District No. 2:05-CV-01316-DFL-PAN*

# ELZIG DEPO

1

2                    IN THE UNITED STATES DISTRICT COURT

3            IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

4

5    AMERICAN MEDICAL RESPONSE, INC.,)
     a Delaware Corporation,          )
6                                     )
                    Plaintiff,        )
7                                     )  No. 2:05-CV-01316-DFL-PAN
          vs.                         )
8                                     )
     CITY OF STOCKTON, a California   )
9    Municipality,                    )
                                      )
10                  Defendants.       )
                                      )
11   AND RELATED CROSS ACTIONS        )
                                      )

12

13                    **DEPOSITION OF BARRY ELZIG**

14

15         DATE:   Thursday, August 11, 2005, at 1:00 p.m.

16

17         DEPOSITION OFFICER:   BOBBIE JO HARR
                                 CSR No. 6090, RMR

18

19         TAKEN AT:
           GAROUTTE'S
20         120 North Hunter Street, Suite 104
           Stockton, California  95202

21

22                         GAROUTTE'S
                   Certified Shorthand Reporters
23           120 North Hunter Street, Suite 104
               Stockton, California  95202
24       (209) 942-2100 or Nationwide (800) 942-2103
                     FAX (209) 942-2150

25
                                                            1

1                        BARRY ELZIG,

2    the deponent herein, having been first duly and regularly

3    sworn by the Certified Shorthand Reporter, deposed and

4    testified as follows:

5

6              ** EXAMINATION BY MR. HIGGINS **

7              MR. HIGGINS:  Q.  Good afternoon, sir.  My name

8    is Mike Higgins.  I represent the City of Stockton in this

9    lawsuit.

10             Would you please state your name, for the

11   record?

12        A.   Barry Elzig.

13        Q.   How do you spell Elzig, sir?

14        A.   E-L-Z-I-G.

15        Q.   Thank you.  Have you ever had your deposition

16   taken before, Mr. Elzig?

17        A.   Yes.

18        Q.   How many times?

19        A.   One time.

20        Q.   When was that?

21        A.   Eighteen, 19 years ago.

22        Q.   What kind of lawsuit was that?

23        A.   I honestly don't remember.

24        Q.   Were you a party in that lawsuit?

25        A.   No.

                                                          7

1    Q.   Okay.  As you probably recall, the procedure is

2    pretty straightforward.  I ask you questions, you answer

3    them.  Occasionally your attorney may interpose objections

4    for the record.  Unless your attorney tells you not to

5    answer one of my questions, despite the fact that he

6    stated an objection, you can answer.

7         Do you understand that?

8    A.   Yes.

9    Q.   Okay.  If you don't understand one of my

10   questions for any reason, if I mumble, say something that

11   just doesn't make sense to you, please let me know.  I'll

12   try to find out what's wrong with the question and fix it

13   and move on.

14        The court reporter is transcribing what we say

15   here today.  The court reporter cannot do that if we

16   talk at the same time.

17   A.   Okay.

18   Q.   Please allow me to finish my question, and I will

19   make a great effort to allow you to finish your answer.

20   Same thing with your attorney, if he's speaking, try to

21   let him finish so that the court reporter can do her job.

22        Okay?

23   A.   Okay.

24   Q.   Thank you.  Are you employed, sir?

25   A.   Yes.

1     Q.    Who is your employer?

2     A.    American Medical Response.

3     Q.    Do you often refer to American Medical Response

4  as AMR?

5     A.    Yes.

6     Q.    If I refer to AMR today, will you understand that

7  I'm referring to American Medical Response?

8     A.    Yes.

9     Q.    Okay.  What's your position at AMR?

10    A.    I'm the Director of Operations.

11    Q.    Do you have a particular territory?

12    A.    Yeah.

13    Q.    What's your territory?

14    A.    All of San Joaquin County.

15    Q.    Do you have responsibility for directing

16  operations in any other county?

17    A.    No.

18    Q.    At one time did you have a larger area to direct

19  operations for AMR?

20    A.    Yes.

21    Q.    And when was that?

22    A.    It ended in June of this year.

23    Q.    Okay.  And what was that previous territory that

24  you were director of operations for?

25    A.    Calaveras County.

9

1    Q.   For how many years were you director of

2  operations for AMR in San Joaquin County and Calaveras

3  County?

4    A.   Approximately two years.

5    Q.   Do you know why your territory changed in June of

6  this year?

7    A.   Yes.

8    Q.   Why was it?

9    A.   We -- or Calaveras County went out to an RFP, and

10  AMR chose not to bid.

11    Q.   To whom do you report at AMR?

12    A.   Brad White.

13    Q.   Do you report to anyone else at AMR?

14    A.   No.

15    Q.   Do you know to whom Mr. White reports?

16    A.   Yes.

17    Q.   To whom does he?

18    A.   Lou Meyer.

19    Q.   In the course of your work as Director of

20  Operations in San Joaquin County for American Medical

21  Response, do you communicate frequently directly to Mr.

22  Meyer?

23    A.   Yes.

24    Q.   Okay.  Before you were Director of Operations for

25  AMR and San Joaquin and Calaveras counties, what was your

1  position if any at AMR?

2      A.   Field Supervisor.

3      Q.   Did you get promoted to Director of Operations

4  about two years ago?

5      A.   Yes.

6      Q.   How long were you Field Supervisor?

7      A.   Three years?

8      Q.   Do you remember the month in 2003 when you were

9  promoted to Director of Operations?

10      A.   Yes.

11      Q.   What month was it?

12      A.   March.

13      Q.   San Joaquin recently issued a Request for

14  Proposals for emergency ambulance services; is that

15  correct?

16      A.   Yes.

17      Q.   Are you familiar with that Request For Proposals?

18          MR. DELEHUNT:  That's a vague and ambiguous

19  question, also overbroad.

20          You can answer to the -- subject to objection.

21          MR. HIGGINS:  Q.  Are you familiar with that

22  Request For Proposal?

23          MR. DELEHUNT:  Same objection.

24          MR. HIGGINS:  Q.  Okay.  You personally, do you

25  often refer to that as an RFP?

                                                          11

1    Q.    Who is Diane Akers?

2    A.    She's a consultant.

3    Q.    She's not an AMR employee?

4    A.    No.

5    Q.    Did Diane Acres have any role in 2004 in the

6    joint effort between AMR and the City to respond to the

7    County RFP?

8          MR. DELEHUNT:  That's overbroad.  Vague and

9    ambiguous.

10          THE WITNESS:  I'm not sure what you're asking me.

11          MR. HIGGINS:  Q.  Did Ms. Akers have any role

12   whatsoever in the joint effort between AMR and the City?

13   A.    No.

14   Q.    Okay.  Did you personally have meetings with

15   Mr. Hafey in 2003 in connection with the joint effort

16   between AMR and the City to respond to the RFP?

17   A.    Yes.

18   Q.    Approximately how many meetings did you have with

19   Mr. Hafey in 2003?

20   A.    Approximately three.

21   Q.    Do you know where those meetings were held?

22   A.    Yes.

23   Q.    Where?

24   A.    The office -- AMR's offices on Charter Way.

25   Q.    When was the first of those meetings?

                                                    23

1      A.   It would be 2003, later part.

2      Q.   Okay.  Who else was present at the first meeting

3    besides you and Mr. Hafey?

4      A.   Ed Rodriguez.

5      Q.   Okay.

6      A.   And Brad White.

7      Q.   Did anyone give a presentation of any sort at

8    that meeting?

9           MR. DELEHUNT:  Vague and ambiguous.

10          THE WITNESS:  No.

11          MR. HIGGINS:  Q.  Was there any discussion of

12   confidentiality of information that would be exchanged at

13   that meeting?

14     A.   I really don't recall.

15     Q.   Did you believe that there was any obligation of

16   confidentiality upon you personally with respect to the

17   information that you learned during that meeting?

18          MR. DELEHUNT:  That calls for speculation and

19   opinion and a legal conclusion.  That's an incomplete

20   hypothetical.  Also vague and ambiguous.

21          You can answer.

22          THE WITNESS:  I -- yeah, I would assume so.

23          MR. HIGGINS:  Q.  So you did assume that

24   information that you received at that meeting was

25   confidential?

                                                    24

```
 1              MR. DELEHUNT:  Same objections.

 2              MR. HIGGINS:  Q.  Is that correct?

 3              THE WITNESS:  Yes.

 4              MR. HIGGINS:  Q.  Okay.  And you felt you had an

 5    obligation to maintain the information in confidence?

 6         A.   Yes.

 7         Q.   Okay.

 8              MR. DELEHUNT:  Vague and ambiguous.

 9              MR. HIGGINS:  Q.  The next two meetings in 2003

10    that you recall, you say approximately three, were the

11    same people present at all of those meetings in 2003, that

12    you recall?

13              MR. DELEHUNT:  Compound, vague and ambiguous.

14              THE WITNESS:  No.

15              MR. HIGGINS:  Q.  Who was not at -- at a meeting?

16              MR. DELEHUNT:  Well, overbroad.  Vague and

17    ambiguous and calls for speculation.  Compound.

18              THE WITNESS:  Brad White was not at all of them.

19              MR. HIGGINS:  Q.  Okay.  Anybody else who wasn't

20    at all of them, of the four people you mentioned?

21         A.   Dave was at them.

22         Q.   Uh-huh.

23         A.   Can't tell you for sure if Ed was at all of them.

24         Q.   Okay.  Were any documents exchanged between AMR

25    and the City of Stockton representatives, Hafey and
```

1   Rodriguez at these meetings?

2          MR. DELEHUNT:  Limited as to time.  Vague and

3   ambiguous.

4          MR. HIGGINS:  Q.  These three meetings in 2003.

5     A.   No documents that I can recall.

6     Q.   Okay.  Did anyone working on this joint effort in

7   2003 develop any sort of project management spread sheet

8   or any tool like that related to the effort?

9     A.   Yes.

10    Q.   Who did?

11    A.   Dave Hafey.

12    Q.   Do you know what he developed?

13         MR. DELEHUNT:  Vague and ambiguous.  Overbroad.

14         You can answer.

15         THE WITNESS:  I saw it.

16         MR. HIGGINS:  Q.  Did he give you copies of it?

17    A.   No.

18    Q.   What did you see?

19    A.   Basically it is a -- it is a software that --

20  that runs your project for you, keeps you on a time line.

21    Q.   Okay.  And what kind of entries were in there

22  that you saw?

23         MR. DELEHUNT:  Vague and ambiguous.  Calls for

24  speculation.

25         THE WITNESS:  I have no idea.  You're just --

26

 1   you're talking pages.

 2          MR. HIGGINS:  Q.  Uh-huh.

 3      A.   I couldn't tell you.

 4      Q.   Well, did it assign tasks to people, for example?

 5      A.   Yes.

 6          MR. DELEHUNT:  Vague and ambiguous.

 7          Wait a minute.  Please give me a chance to get

 8   on the record, and take your time.

 9          MR. HIGGINS:  Q.  Did it assign tasks to you?

10          MR. DELEHUNT:  Vague and ambiguous.  Calls for

11   speculation.

12          THE WITNESS:  Yes.

13          MR. HIGGINS:  Q.  Okay.  And did you know what

14   tasks this software program was assigning to you?

15          MR. DELEHUNT:  Vague and ambiguous.  Limited as

16   to time.

17          THE WITNESS:  I would have, yeah.

18          MR. HIGGINS:  Q.  How did you learn what tasks

19   were being assigned to you?

20          MR. DELEHUNT:  Same objection, vague and

21   ambiguous, limited as to time.  Calls for speculation.

22          THE WITNESS:  As the -- as you walk through that

23   software, you put your projects in, it gets assigned to

24   somebody with a time line.

25          MR. HIGGINS:  Q.  So did somebody say, "Okay,

                                                      27

1  now, here's what the software is doing.  Is this okay with

2  you?"  Something like that, how the process --

3          MR. DELEHUNT:· Vague and ambiguous, compound,

4  calls for speculation.  Limited as to time.

5          Is it bigger than a bread box?  Were there some

6  tasks in some software at some time that he understood?

7  I mean --

8          MR. HIGGINS:  Are you through yet?

9          MR. DELEHUNT:  I am now.

10          MR. HIGGINS:  Thank you.

11     Q.   So you looked at the software.  Is that how you

12  learned what tasks were assigned to you?

13          MR. DELEHUNT:  Vague and ambiguous.

14          MR. HIGGINS:  Q.  Huh?

15     A.   Yeah.

16     Q.   Okay.  Did you make notes or did you -- you say

17  you didn't get a copy of it, you just looked at it.  So

18  did you make notes of what was assigned to you?  How did

19  you memorialize what tasks were assigned to you?

20     A.   I don't remember.

21     Q.   Okay.  Did you ever receive a copy e-mailed or

22  otherwise of a printout of the software?

23     A.   No.

24     Q.   Okay.  How did you decide what tasks were

25  assigned to whom in this group working together?

                                                      28

1          MR. DELEHUNT:  Assumes facts not in evidence.

2          THE WITNESS:  I don't remember.

3          MR. HIGGINS:  Q.  Okay.  Was one person in

4    charge, kind of the boss saying, "Here, you do this, you

5    do that"?

6          MR. DELEHUNT:  Objection, it's vague and

7    ambiguous.

8          THE WITNESS:  No.

9          MR. HIGGINS:  Q.  Okay.  So it was collective

10   effort to assign tasks and to work together?

11         MR. DELEHUNT:  Vague and ambiguous.

12         THE WITNESS:  That's a fair statement.

13         MR. HIGGINS:  Q.  Okay.  In 2004, did the

14   frequency of your meetings with Mr. Hafey increase?

15   A.   No.

16   Q.   Do you recall how many meetings, actually

17   face-to-face meetings you had with Mr. Hafey in 2004 in

18   connection with the joint effort to respond to the County

19   RFP?

20   A.   No.

21   Q.   Did Mr. Hafey sometimes work at an office on AMR

22   property, in 2004?

23   A.   No.

24   Q.   You're not aware of any office that AMR allowed

25   Mr. Hafey to use on AMR property?

                                                           29

1          MR. DELEHUNT:  Vague and ambiguous.

2          THE WITNESS:  Yes.

3          MR. HIGGINS:  Q.  You are aware?

4     A.   Yes.

5     Q.   So AMR provided Mr. Hafey with an office on AMR

6  property in 2004?

7          MR. DELEHUNT:  Vague and ambiguous.  Calls for

8  speculation.

9          THE WITNESS:  Yes.

10         MR. HIGGINS:  Q.  Okay.  But you don't know

11 whether Mr. Hafey used it; is that correct?

12    A.   That's correct.

13    Q.   Okay.  Do you know what was in the office?

14    A.   Yes.

15    Q.   What was in the office?

16    A.   A laptop computer.

17    Q.   The joint effort between AMR and the City of

18 Stockton to respond to the County RFP continued until June

19 of 2005; is that correct?

20    A.   Yeah.

21    Q.   Okay.  During the period that AMR and the City

22 worked together in the joint effort, did the City ever

23 disclose to AMR its own ambulance service deployment

24 strategies?

25         MR. DELEHUNT:  Vague and ambiguous, calls for

                                                    30

1  it means -- what that letter meant when it referred to

2  capital costs, equal capital costs?

3          MR. DELEHUNT:  Misstates the record.

4          MR. HIGGINS:  Q.  Can I take a quick look?

5  A.    Sure.

6  Q.    Equal capital expenses, excuse me.  You don't

7  understand what that term means, in the context of that

8  letter?

9          MR. DELEHUNT:  Calls for speculation, incomplete

10  hypothetical, lacks foundation.

11          THE WITNESS:  They're agreeing to bring equal

12  capital to the table.

13          MR. HIGGINS:  Q.  It says "equal capital

14  expenses."  Do you know what capital expenses are?

15          MR. DELEHUNT:  Again, vague and ambiguous.

16          THE WITNESS:  I guess I don't.

17          MR. HIGGINS:  Q.  Okay.  Would you take a look at

18  Exhibit 6?  I'd ask you to take a look at the e-mail at

19  the top, first.

20          It is a printout of an e-mail from Chief --

21  Fire Chief.  Do you see that first sentence, "First

22  responder fees are off the table, per the CM"?

23  A.    Yes.

24  Q.    Is this the written memorialization you testified

25  about earlier where someone from the City -- or Chief

                                                          79

1   Gillis from the City said that first responder fees were

2   off the table?

3          MR. DELEHUNT:  Calls for speculation, vague and

4   ambiguous, mischaracterizes the document.

5          THE WITNESS:  This could be how I learned about

6   it.

7          MR. HIGGINS:  Q.  Okay.  Did you receive this

8   e-mail toward the end of June of this year?

9          A.    Yep.

10         Q.    Okay.  You see the e-mail down below.  You see

11  that the -- right about -- oh, not quite in the middle of

12  the page, it says, "Dave Hafey, June 21st, 2005, 3:21

13  p.m."?

14         A.    Yes.

15         Q.    Do you see the e-mail text that follows?

16               Do you recognize that e-mail?

17         A.    Okay.

18         Q.    Do you recognize that e-mail underneath the name

19  Dave Hafey?

20         A.    Yes, I do.

21         Q.    Did you receive a copy of that on or about

22  June 21st?

23         A.    Yes, I did.

24         Q.    Do you recall when AMR terminated its

25  relationship with the City related to a joint effort to

                                                              80

1    date.

2         Q.    You don't recall a meeting --

3         A.    No.

4         Q.    -- on April 15th?

5               Okay.

6               At this time in April 2005, AMR was negotiating

7    both with the City of Lodi and with the City of Stockton

8    pursuant to the 2004 Joint Venture Agreement that you

9    looked at earlier, Exhibit 3; is that correct?

10        A.    That's correct.

11        Q.    And this back and forth reflected here in

12   Mr. White's e-mail over first responder fees, that was

13   part of the negotiation ongoing at that time; is that

14   correct?

15        A.    Yes.

16        Q.    And, at this time, April of 2005, AMR was

17   negotiating with the City of Stockton over first responder

18   fees, correct?

19             MR. DELEHUNT:  Calls for speculation.  Lacks

20   foundation, vague and ambiguous.

21             THE WITNESS:  Yes, the talks were going on.

22             MR. HIGGINS:  Let's mark next in order.

23             (Whereupon Plaintiff's Exhibit 43 was

24             marked for Identification.)

25             MR. HIGGINS:  For the record, the court reporter

                                                      100

1   has marked as Exhibit 33 a multi-page document, Bates

2   numbered CS 003368, through and including 3374.

3          THE WITNESS:  Okay.

4          MR. HIGGINS:  Q.  Do you recognize Exhibit 43,

5   Mr. Elzig?

6      A.   Yes, I do.

7      Q.   What is it?

8      A.   This is the RFP project software that I referred

9   to earlier.

10     Q.   Okay.  Mr. Hafey kept this software file on his

11  computer?

12     A.   Yes.

13     Q.   Okay.  And so he kept the master?

14     A.   That's correct.

15     Q.   Okay.  You see over in the right-hand column, the

16  first -- not the first.  Let's go down to -- in the middle

17  column, I'm sorry, the big column.  "See verification

18  letters"?  Do you see that?

19     A.   Yeah.

20     Q.   Okay.  And "See AMR, EMS verification letters,"

21  you go across, do you see over on the right-hand side

22  "Barry"?

23     A.   Yes.

24     Q.   Is that a reference to you?

25     A.   Yes.

101

1    Q.   Okay.  Do you see the next entry for Barry is

2    "AMR provide template for endorsement letters"?  That's

3    line 35.

4    A.   Okay.

5    Q.   Okay.  Was that a reference to you?

6         MR. DELEHUNT:  Calls for speculation.

7         THE WITNESS:  Yeah.

8         MR. HIGGINS:  Q.   Okay.  And then also you see

9    the name Elzig over there in the right-hand side on the

10   first page, "Copies of Ambulance Permits," line 29.

11   A.   Yeah, I see it.

12   Q.   Okay.  Are those Barry's -- references to Barry

13   and Elzig, indications that the tasks were assigned to

14   you?

15   A.   Yes.  I'm sorry.

16        MR. DELEHUNT:  Calls for speculation as phrased,

17   but you can answer.

18        THE WITNESS:  Yes.

19        MR. HIGGINS:  Q.   Okay.  Turning over to page 2,

20   over in the left hand column, it's item 42.  Do you see

21   that?

22   A.   Yeah.

23   Q.   "Stockton Fire Department to provide bios on all

24   senior staff."

25        Did Stockton Fire Department provide AMR with

                                                         102

1    biographical statements for their senior staff, to your

2    knowledge?

3         A.   No.

4         Q.   You don't know?

5         A.   No, they did not.

6         Q.   How do you know they did not?

7         A.   I never received them.

8         Q.   Do you know if anyone else at AMR received them?

9         A.   I do not.

10        Q.   Okay.  So you don't know if anyone at AMR

11   received it; is that correct?

12             MR. DELEHUNT:  Misstates prior testimony.  He

13   testified he didn't receive them.

14             MR. HIGGINS:  Q.  So you don't know if anybody at

15   AMR received them, do you?

16             MR. DELEHUNT:  Misstates prior testimony.

17   Argumentative.

18             THE WITNESS:  I don't know.

19             MR. HIGGINS:  Q.  Okay.  Turning over to page 3,

20   do you see line 80?  "Describe how AMR and SFD can be

21   networked."

22        A.   Yeah, I see it.

23        Q.   Okay.  And go all the way over to the right, the

24   name in the right hand column is Erdman.  Do you know who

25   that refers to?

                                                      103

1  STATE OF CALIFORNIA    )
   COUNTY OF SAN JOAQUIN  )   ss.
2
        I, BOBBIE JO HARR, Certified Shorthand Reporter herein,
3  do hereby certify:
        That on Thursday, August 11, 2005, at 1:00 p.m., the
4  witness herein, BARRY ELZIG, was duly sworn:

5       That said witness' testimony and the proceedings had at
   the time of such testimony were taken down in shorthand
6  notes by me; I thereafter caused said shorthand notes to be
   transcribed into longhand typewriting, the following being a
7  full, true, and correct transcription therein;
        That I am a disinterested person, and am not in any way
8  interested in the outcome of said action; nor connected with
   nor related to any of the parties in said action, nor to
9  their respective counsel;
                        ---oOo---
10      On August 12, 2005, all counsel were given notice of
   the preparation of the deposition, and the original
11 deposition was available for reading, correcting, approval,
   or signing in our offices until September 16, 2005.
12                      ---oOo---
   _____ The witness signed the deposition and made no
13 corrections.
   _____ The witness and parties waived examination and reading
14 of the deposition at the time of the taking of the
   deposition.
15 _____ The witness corrected, approved, or refused to approve
   the deposition by letter to me attached thereto, and copies
16 of the letter were sent to all counsel.
   _____ The witness failed to appear at my office.
17 _____ The witness appeared in my office, made changes to the
   deposition, and counsel were provided with copies of the
18 changes.
   _____ The witness refused to approve or sign the deposition
19 for the following reasons: _____
                                                             .
20 _____ .
   _____ Other: _____ .
21      IN WITNESS WHEREOF, I have hereunto subscribed my hand.
                        DATE: _____

22                      _____
                        BOBBIE JO HARR, CSR NO. 6090, RMR
23 COUNSEL:  YOU WILL BE NOTIFIED OF ANY CHANGES OR CORRECTIONS
   TO THE DEPOSITION.  CONTACT OUR OFFICE IF YOU HAVE ANY
24 QUESTIONS.

25
                                                          5