*American Medical Response, Inc. v. City of Stockton*
*United States District Court- Eastern District No. 2:05-CV-01316-DFL-PAN*

# WHITE DEPO PART 1

1

2              IN THE UNITED STATES DISTRICT COURT

3          IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

4

5    AMERICAN MEDICAL RESPONSE, INC.,)
     a Delaware Corporation,        )
6                                   )
                 Plaintiff,         )
7                                   )  No. 2:05-CV-01316-DFL-PAN
          vs.                       )
8                                   )
     CITY OF STOCKTON, a California )
9    Municipality                   )
                                    )
10               Defendants.        )
                                    )
11   AND RELATED CROSS ACTIONS      )
                                    )

12

13              **DEPOSITION OF BRADLEY WHITE**

14

15          DATE:   Friday, August 12, 2005 at 9:00 a.m.

16

17          DEPOSITION OFFICER:   BOBBIE JO HARR
                                  CSR No. 6090, RMR
18

19          TAKEN AT:
            GAROUTTE'S
20          120 North Hunter Street, Suite 104
            Stockton, California  95202
21

22                    GAROUTTE'S
              Certified Shorthand Reporters
23           120 North Hunter Street, Suite 104
               Stockton, California  95202
24       (209) 942-2100 or Nationwide (800) 942-2103
                  FAX (209) 942-2150
25

                                                        1

1                    BRADLEY WHITE,

2    the deponent herein, having been first duly and regularly

3    sworn by the Certified Shorthand Reporter, deposed and

4    testified as follows:

5

6             ** EXAMINATION BY MR. HIGGINS **

7             MR. HIGGINS:  Q.  Good morning, sir.  My name is

8    Mike Higgins.  I represent the City of Stockton.

9             Would you please state your name, for the

10   record?

11        A.   Brad White.

12        Q.   Is Brad short for Bradley or Bradford?

13        A.   Bradley Gerald White is my full name.

14        Q.   Have you had your deposition taken before?

15        A.   No.

16        Q.   The procedure is pretty straightforward.  I ask

17   questions, you answer questions.  Your attorney from time

18   to time may interpose objections for the record.

19             Unless your attorney instructs you not to

20   answer a question, you should answer the question,

21   notwithstanding an objection being stated.

22             Do you understand that?

23        A.   I'm not sure.

24        Q.   Okay.  I may ask a question and your attorney may

25   say that he objects to the question for some particular

                                                        6

1    reason, but nothing more.

2         Then you answer the question.

3    A.    Okay.

4    Q.    Okay?  I will make every effort to allow you to

5    finish your answer before I start a new question.

6         The court reporter can only transcribe what one

7    person says at a time.  If we talk together, she can't

8    do her job.  So we need to be careful.

9         Same thing with your attorney's objections.  If

10   the two of you are speaking at the same time, if you're

11   answering and he's trying to object, the court reporter

12   can't do her job.  So we need to try to separate the

13   question, the answer.  And if there's an objection,

14   separate that.

15   A.    Okay.

16   Q.    Okay?  If you don't understand one of my

17   questions, please let me know.  If I mumble, if you are

18   just distracted and you didn't hear the entire question,

19   just tell me.

20   A.    Okay.

21   Q.    If you don't understand the question because it

22   doesn't make sense to you for some reason, please tell me.

23   I'll explore the issue and try to figure out where the

24   problem is and cure it, okay?

25   A.    Okay.

7

1     Q.   Will you do that for me?

2     A.   I can.

3     Q.   Okay.  Did you attend college?

4     A.   I attended a year at junior college:

5     Q.   And what junior college was that?

6     A.   San Joaquin Delta.

7     Q.   Any other college that you attended?

8     A.   No.

9     Q.   When was that that you attended junior college

10   for one year?

11    A.   1979.

12    Q.   You're almost as old as I am.

13    A.   Almost.

14    Q.   What did you study that one year in junior

15   college?

16    A.   Emergency medical technician, advanced first aid.

17    Q.   Are you currently employed?

18    A.   Yes.

19    Q.   Who is your employer?

20    A.   American Medical Response.

21    Q.   Do you personally often refer to that company as

22   AMR?

23    A.   Yes.

24    Q.   If I refer to AMR during this deposition, will

25   you understand that I mean American Medical Response, your

8

1  employer?

2      A.   Yes, I will.

3      Q.   Thank you.

4           How long have you worked for AMR?

5      A.   Approximately 26 years.

6      Q.   What was the first position you held at AMR?

7      A.   It was a wheelchair van attendant.

8      Q.   What's your current position?

9      A.   Vice-president of Operations.

10     Q.   For the entire United States?

11     A.   I oversee our operations in the State of Hawaii,

12  and then for the areas of northern California, that would

13  include Shasta County, Sacramento County, Placer County,

14  Yolo County, San Joaquin County, Contra Costa County,

15  Stanislaus County, and Tulare County.

16     Q.   In any of those counties that you oversee, does

17  AMR have a joint relationship with a governmental entity

18  related to the provision of emergency medical services?

19          MR. DELEHUNT:  Objection, vague and ambiguous,

20  calls for speculation.

21          You can answer the question.

22          THE WITNESS:  Yes.

23          MR. HIGGINS:  Q.  Okay.  In which counties that

24  you listed?

25     A.   We have a contractual relationship in Stanislaus

                                                          9

1 | County with the Modesto Fire Department.

2 | And in San Joaquin County with the Tracy Fire

3 | Department, and in Sacramento County with the Sacramento

4 | Metropolitan Fire Department.

5 | I believe that's it.

6 | Q. Okay. Did AMR collaborate in those three

7 | counties with a governmental entity to respond to an RFP?

8 | MR. DELEHUNT: Before you answer, vague and

9 | ambiguous, calls for speculation.

10 | THE WITNESS: Sacramento County, no. San Joaquin

11 | County, no. Who did I miss? Modesto, no, which is

12 | Stanislaus County.

13 | MR. HIGGINS: Q. Have you personally ever been

14 | involved in an effort to respond to an RFP for an

15 | Exclusive Operating Area for ambulance services where AMR

16 | worked jointly with some governmental entity to respond to

17 | that RFP?

18 | MR. DELEHUNT: Objection, vague and ambiguous.

19 | You can answer.

20 | THE WITNESS: No.

21 | MR. HIGGINS: Q. Did you work with the City of

22 | Stockton, you personally, in an effort to respond jointly

23 | to San Joaquin County RFP?

24 | MR. DELEHUNT: Objection, vague and ambiguous.

25 | THE WITNESS: Yes, we worked in various projects

10

1    and had an agreement to agree to move forward with them on

2    an RFP process.

3              MR. HIGGINS:  Q.  So you worked jointly in some

4    fashion with the City of Stockton to respond to an RFP

5    that expected to issue in San Joaquin County; is that

6    correct?

7              MR. DELEHUNT:  Objection, vague and ambiguous as

8    phrased.

9              You can answer.

10             THE WITNESS:  Yes.

11             MR. HIGGINS:  Q.  How long have you been

12   Vice-president of Operations in this area of yours?

13        A.   I returned -- I was the Vice-president of

14   Operations in the State of Hawaii beginning 1997 through

15   1993 -- excuse me, 2003.  1997 through 2003.  And then I

16   returned to the California area roughly May of '03.

17        Q.   When you were Vice-president of Operations in

18   Hawaii, were you ever personally involved in a joint

19   effort between AMR and a governmental entity to respond to

20   a proposal for exclusive operating rights for ambulance

21   services?

22             MR. DELEHUNT:  Objection, vague and ambiguous.

23             You can answer.

24             THE WITNESS:  We bid on government contracts.  I

25   don't believe, if I'm understanding your question

                                                              11

1    correctly, that we bid jointly with a government entity,

2    no.

3           MR. HIGGINS:  Q.  But in Hawaii, you prepared

4    bids?

5       A.   Yes.

6       Q.   Okay.  Is there a distinction in your terminology

7    between bidding and responding to an RFP?

8           MR. DELEHUNT:  Vague and ambiguous, overbroad,

9    calls for speculation, lacks foundation.

10          THE WITNESS:  There are bids where you can bid on

11   a various contract, and then Request for Proposal is a

12   government entity putting out a request for a proposal.

13   In Hawaii there were private proposals, too.

14          MR. HIGGINS:  Q.  Do you, personally, refer to a

15   response to an RFP in California as a bid?

16          MR. DELEHUNT:  Vague and ambiguous.  Calls for

17   speculation, lacks foundation.

18          THE WITNESS:  Could be a bid or RFP.

19          MR. HIGGINS:  Q.  So you personally do sometimes

20   refer to a response to an RFP as a bid on the RFP?

21          MR. DELEHUNT:  calls for speculation, lacks

22   foundation.  Vague and ambiguous.

23          THE WITNESS:  I'm not understanding what you're

24   looking for.

25          MR. HIGGINS:  Q.  I'm trying to understand your

                                                        12

1 terminologies so that things can go easier moving forward

2 in the deposition.  So that if the word "bid" on an RFP

3 comes up, I'm trying to determine whether in your

4 terminology, you personally, whether you sometimes use

5 that term.

6    For example, would you say right now that AMR

7 intends to respond to the RFP that the County of San

8 Joaquin has issued?

9  A. Yes.

10  Q. Okay.  Would you ever refer -- you personally,

11 refer to that response as a bid?

12    MR. DELEHUNT:  Objection, vague and ambiguous.

13    THE WITNESS:  I could see me using in a sentence

14 that AMR intends to bid on the San Joaquin County RFP.

15    MR. HIGGINS:  Q.  Okay.  Thank you.

16    To whom do you report at AMR?

17  A. Chief Executive Officer Mr. Lou Meyer.

18  Q. Do you ever report to Mr. Harvey?

19  A. Not directly.

20  Q. What about Tim Dorn, do you report to him?

21  A. No.

22  Q. Does he report to you?

23  A. No.

24  Q. To whom does Mr. Dorn report?

25  A. Mr. Lou Meyer.

1     Q.   And this -- this hierarchy, your reporting to Mr.

2   Meyer, has that been in place since you returned to

3   California in 2003?

4     A.   Yes.

5     Q.   What are your duties as Vice-president of

6   Operations in the area that you supervise?

7     A.   I oversee six Directors of Operations who run

8   day-to-day operations of ambulance services throughout all

9   of the counties mentioned.

10    Q.   And in this oversight capacity, what do you do?

11    A.   Everything from assisting them with building

12  budgets, assuring they have any support they need for, you

13  know, purchasing, and anything that -- that's rubber to

14  the road for ambulances on the street.

15    Q.   Do you have authority to negotiate contracts on

16  behalf of AMR?

17         MR. DELEHUNT:  Objection, overbroad, vague and

18  ambiguous, calls for a legal conclusion.

19         You can answer it.

20         THE WITNESS:  Mr. Meyer has ultimate authority

21  over any agreement.  I do have authority to sit down and

22  negotiate, with Mr. Meyer being the final say.

23         MR. HIGGINS:  Q.  Okay.  Mr. Meyer's deposition

24  was taken in this matter a couple days ago.  And at that

25  time, he testified that currently you are working on a

                                                    14

1    response to the RFP that is issued from San Joaquin

2    County.

3           Was he correct in that statement?

4    A.    Yes.

5    Q.    He testified.  I asked, "How about Brad White,

6    what's he doing in connection?"

7           "He's also reviewing the credentialing

8    documents and contemplating strategy."

9           I asked, "What kind of strategy is Mr. White

10   contemplating?"

11          And he testified, "Strategy that will make us

12   responsive to the RFP."

13          Were those true statements?

14          MR. DELEHUNT:  Object to them as compound and

15   argumentative, but you can answer.

16          THE WITNESS:  Currently what I'm doing today is

17   working with our RFP team to put together our RFP

18   proposal.

19          MR. HIGGINS:  Q.  And are you making strategic

20   decisions as part of this work?

21          MR. DELEHUNT:  Objection, vague and ambiguous.

22          THE WITNESS:  Yes.

23          MR. HIGGINS:  Q.  Have you put together responses

24   to RFPs in California before?

25   A.    Yes, I have.

                                              15

1   Q.   Okay.  Have you made strategic decisions during

2   your work on other RFPs?

3   A.   Can you define what you mean by strategic?

4   Q.   A plan for a particular approach that you believe

5   would make the RFP proposal more likely to succeed.

6   A.   Yes.

7   Q.   Okay.  And what types of strategic analysis,

8   generally speaking, do you bring to bear in this -- in

9   this procedure, in your -- preparing to respond to an RFP?

10   MR. DELEHUNT:  The question is vague and

11   ambiguous, overbroad, lacks foundation.

12   You can answer it generally.

13   THE WITNESS:  And I apologize, can you repeat the

14   question?

15   MR. HIGGINS:  Can you read it back, please?

16   (Whereupon the record was read.)

17   THE WITNESS:  What we are currently doing today,

18   is we have reviewed the RFP document that was released by

19   the San Joaquin County.

20   MR. DELEHUNT:  Excuse me.  Mr. White, I think the

21   question was general, if I'm understanding the question

22   that counsel asked.  It did not relate to this particular

23   RFP that's being reviewed now.  I think he's asking

24   generally.

25   The question can be read back again, if I

16

1    speculation.  Lacks foundation.

2         THE WITNESS:  Not off the top of my head.

3         MR. HIGGINS:  Q.  What kinds of strategic

4    decisions have you been making in connection with the

5    current response to San Joaquin County RFP?

6         MR. DELEHUNT:  Instruct you not to answer the

7    question.

8         MR. HIGGINS:  On what ground?  That's clearly

9    relevant to claims on the case.

10        MR. DELEHUNT:  On the grounds that I have before,

11   it's confidential, proprietary information.

12        MR. HIGGINS:  Q.  Mr. White, do you consider the

13   strategic decisions that you've been making in connection

14   with the response to San Joaquin County RFP to be

15   proprietary confidential information?

16   A.   Yes.

17   Q.   So your current strategic analysis is sensitive

18   proprietary information?

19   A.   Yes.

20   Q.   Would it harm AMR if someone outside of AMR

21   learned about your strategic decisions in connection with

22   the current RFP response?

23        MR. DELEHUNT:  That's vague and ambiguous.  Calls

24   for speculation.

25        THE WITNESS:  Yes.

                                                    22

1       MR. HIGGINS:  Q.  How would it harm AMR?

2       MR. DELEHUNT:  Same objections.

3       THE WITNESS:  The strategies that we're providing

4  could be used by another competitor and propose something

5  that was better than what we were proposing.

6       MR. HIGGINS:  Q.  How could a competitor use the

7  knowledge of your current strategies to improve its own

8  proposal to the RFP?

9       MR. DELEHUNT:  Calls for speculation, vague and

10 ambiguous, lacks foundation.

11      THE WITNESS:  I don't know how another competitor

12 would approach that.

13      MR. HIGGINS:  Q.  But you think that that's so?

14      MR. DELEHUNT:  Asked and answered, argumentative,

15 vague and ambiguous.

16      MR. HIGGINS:  Q.  You think that that's so, that

17 if a competitor obtained information about your current

18 strategic analysis in this RFP process, that that would

19 assist a competitor in making a better bid on this RFP?

20      MR. DELEHUNT:  Calls for speculation, vague and

21 ambiguous, lacks foundation.

22      THE WITNESS:  It could.

23      MR. HIGGINS:  Q.  It could.  How could it?

24      MR. DELEHUNT:  Asked and answered, calls for

25 speculation, vague and ambiguous, lacks foundation.

                                                    23

1    THE WITNESS:  I -- without an example, I'm not

2  sure how I could answer that.

3    MR. HIGGINS:  Q.  What makes you think that it

4  could lead to that?  You testified under oath that you

5  think it could.  Why do you think it could?

6    MR. DELEHUNT:  Asked and answered, vague and

7  ambiguous, argumentative, lacks foundation, calls for

8  speculation.

9    THE WITNESS:  I'm not sure how to speculate to

10  answer your question.

11    MR. HIGGINS:  Q.  Well, I'm not asking you to

12  speculate.  I'm asking you to explain your answer.  You

13  testified under oath that you believe that if a competitor

14  obtained information about your strategic analysis right

15  now in this RFP process, that that could help that

16  competitor improve its own bid in response to the RFP.

17  I'm asking you how?  What makes you think it could --

18    MR. DELEHUNT:  Calls for speculation.

19    MR. HIGGINS:  Q.  -- help that competitor?

20    MR. DELEHUNT:  Calls for speculation, vague and

21  ambiguous, lacks foundation.

22    THE WITNESS:  I think, as I stated, that if

23  someone had my strategy, they could propose something

24  better than that.

25    MR. HIGGINS:  Q.  And how could they use your

24

1  strategy to propose something better?

2     A.   They would write in their proposal something

3  better.

4     Q.   So they would know what you were going to do and

5  be able to act accordingly; is that correct?

6          MR. DELEHUNT:  Calls for speculation, lacks

7  foundation, incomplete hypothetical, vague and ambiguous.

8          THE WITNESS:  They could write something better

9  in their proposal.

10         MR. HIGGINS:  Q.  Okay.  So if they obtained your

11  strategic information, then they could take that into

12  account when they drafted their own bid; is that correct?

13  Is that what you're getting at?

14         MR. DELEHUNT:  Vague and ambiguous, calls for

15  speculation, incomplete hypothetical, lacks foundation.

16         THE WITNESS:  They could write something better

17  in their RFP proposal.

18         MR. HIGGINS:  Q.  What do you mean by "something

19  better"?

20     A.   I don't know what you're -- the specific that

21  you're speaking to, so I don't know how to answer that.

22     Q.   I'm not.  I'm speaking specifically to your

23  understanding and belief.  That's the specific issue here,

24  now.  I'm asking what you mean about how this knowledge of

25  your strategic analysis could help a competitor write

                                                        25

1    something better?  What do you mean, you?

2         MR. DELEHUNT:  Calls for speculation, incomplete

3    hypothetical, vague and ambiguous, lacks foundation.

4         THE WITNESS:  And I'm not sure how to answer you

5    any better other than they could write something in their

6    proposal that would be better than ours.

7         MR. HIGGINS:  Okay.  Well, clearly your client

8    has no explanation as to why this is sensitive proprietary

9    information.  And we should move ahead and allow him to

10   answer questions on the issue.

11        MR. DELEHUNT:  He's not going to.

12        MR. HIGGINS:  Why not?

13        MR. DELEHUNT:  Because I instructed him not to,

14   and I stated the basis of my instruction.  He's not going

15   to answer these questions.

16        MR. HIGGINS:  Okay.  It is relevant, and it is

17   not privileged.  He has an obligation to answer these

18   question.

19        MR. DELEHUNT:  You can argue all you want.  I've

20   instructed him not to answer on the basis that they are

21   trade secret, they're proprietary information.

22        MR. HIGGINS:  What trade secrets generally are at

23   issue here?

24        MR. DELEHUNT:  I'm not going to argue it with

25   you.  I'm not going to debate it with you.  I've stated my

                                                        26

1  position.  I've stated my objection.  That's it.

2      MR. HIGGINS:  Under California Law of Privilege,

3  you have to identify the trade secrets.

4      MR. DELEHUNT:  I've stated my objection.  I've

5  stated my position.  Move on.

6      MR. HIGGINS:  Q.  When did you first become aware

7  that San Joaquin County government was considering issuing

8  an RFP for an Exclusive Operating Area for emergency

9  ambulance services?

10     A.  That would have around the time -- well, when I

11  came back from the State of Hawaii, which was May-ish of

12  '03.

13     Q.  Okay.  At that time when you -- in 2003, when you

14  came back to the State of California, did anyone at AMR

15  tell you that AMR was considering working with the City of

16  Stockton to respond to that RFP?

17     A.  Yes.

18     Q.  Okay.  Who told you?

19     A.  I believe it would have been Mr. Lou Meyer.

20     Q.  Mr. Meyer tell you this before you actually

21  returned to California?

22     A.  I don't believe so.

23     Q.  Okay.  So after you came back to California and

24  settled in, then you spoke to Mr. Meyer and he told you

25  that AMR was considering working with the City of Stockton

27

1   to respond to the RFP?

2       A.    Yes.

3       Q.    Was this in a face-to-face meeting that he told

4   you?

5       A.    I don't recall.

6       Q.    Was it very soon after you returned to California

7   that Mr. Meyer told you this?

8       A.    Yes.

9       Q.    Did Mr. Meyer tell you that you personally were

10  going to be working on this project with the City of

11  Stockton to respond to the RFP?

12      A.    Not that I recall.  But by taking over the

13  County, that would be a given.

14      Q.    Okay.  And do you remember the first meeting that

15  you ever had with anyone from the City of Stockton to

16  discuss AMR and the City collaborating in an effort to

17  respond to the RFP?

18      A.    Yes.

19      Q.    When was that meeting?

20      A.    It would be roughly somewhere between May and

21  June of 2003.

22      Q.    At the time that you returned to California to

23  take over this Vice-president of Operations position in

24  California that you now own, was there a written Agreement

25  between the City of Stockton and AMR related to their

28

1   joint effort to respond to the RFP?

2       A.    There was a document being negotiated at the

3   time.

4       Q.    Were you involved in those negotiations?

5       A.    I attended one, possibly two, which were the very

6   last meetings where they were negotiating the MOU.

7       Q.    The first of these meetings that you attended,

8   where was the meeting held?

9       A.    It was at a conference room at City Hall.

10      Q.    Who was present?

11      A.    On AMR's side, Lou Meyer, myself, Mike Hakeem,

12  Donna McCann from A-One Ambulance.   Chief Gillis.

13      Q.    Okay.   That's fine.   You're moving on beyond the

14  AMR side.

15      A.    Correct.

16      Q.    Okay.

17      A.    Chief Gillis from the Stockton Fire Department,

18  Chief Hafey, Stockton Fire Department.   Ed Rodriguez from

19  the Stockton Fire Department may have been there.   There

20  was a City Attorney that came in, and I don't remember.

21  It may have been Mr. Rishwain.

22           That's all I recall.

23      Q.    Do you remember when this meeting was?

24      A.    I don't remember exact dates.

25      Q.    Was it in April of 2003?

29

1    A.   Could have been.

2    Q.   How long was the meeting?  How long did it last?

3    A.   One to two hours.

4    Q.   And was it your understanding that the terms of a

5  contract were being negotiated at this meeting?

6         MR. DELEHUNT:  Calls for a legal conclusion.

7         You can answer.

8         THE WITNESS:  I was an observer, basically, would

9  be how I would describe my role in that meeting.  I was so

10  new coming back, moving my family back and forth, I'm not

11  sure what the -- what the tenets were at that time.

12         MR. HIGGINS:  Q.  But I'm asking you for what you

13  observed.

14         Did you observe people at that meeting

15  negotiating terms of a contract?

16         MR. DELEHUNT:  Calls for a legal conclusion.

17         You can answer.

18         THE WITNESS:  What I believe I was watching was

19  three entities negotiating a very high-level Agreement to

20  agree that would require further Agreements down the road

21  to move forward into an RFP process.

22         MR. HIGGINS:  Q.  Did you see anyone taking notes

23  at that meeting?

24    A.   There was a time when Chief Hafey had the

25  contract up on a screen on a PowerPoint presentation, and

                                                    30

1    he was typing in to the Agreement.

2       Q.   Okay.  So there was a screen and projection of a

3    contract?

4       A.   There was a MOU being projected.

5       Q.   And Chief Hafey was typing while this projection

6    was on the screen?

7       A.   Correct.

8       Q.   And things that Chief Hafey typed showed up on

9    the screen?

10      A.   (Nods head).

11      Q.   You have to speak up so the court reporter can

12   transcribe it.

13      A.   I'm sorry.  That's my recollection.

14      Q.   So there would be discussion about something, and

15   then someone would tell Chief Hafey to type that into the

16   computer so it would show up on the screen?

17           MR. DELEHUNT:  Assumes facts not in evidence.

18           THE WITNESS:  I don't recall.

19           MR. HIGGINS:  Q.  Other people in the room were

20   discussing terms, and Chief Hafey was typing; is that

21   correct?

22      A.   There were terms being discussed of the MOU.

23      Q.   Okay.  But other people in the room were

24   discussing it, right?

25      A.   Yes.

31

1      Q.   Okay.  Do you remember who in particular in that

2   room was discussing the terms of the MOU?

3      A.   It was my perception there were attorneys

4   discussing different points.  Mr. Meyer and Chief Gillis,

5   and Chief Hafey certainly had input also.

6      Q.   And you had no input, at all?

7      A.   I don't recall having specific input.

8      Q.   Okay.  And do you recall whether the process

9   involved discussion and then reaching some consensus on a

10   particular language and Mr. Hafey typing that language in?

11      MR. DELEHUNT:  Calls for speculation, vague and

12   ambiguous.

13      THE WITNESS:  Yes.

14      MR. HIGGINS:  Q.  Okay.  Did Mr. Meyer

15   participate in these discussions about particular language

16   to put into the document that was projected on the screen?

17      A.   Yes.

18      Q.   Which provisions in the contract did Mr. Meyer

19   discuss with the others?

20      A.   I don't recall specifically.

21      Q.   Do you recall any discussion at that meeting

22   about first responder fees?

23      A.   If I have the document, I could --

24      Q.   Okay.  We can look at it later.

25      Sitting here without a document in front of

                                                    32

1   you, you don't have any independent recollection of

2   discussion about first responder fees?

3       A.   I know that there's discussion of that in the

4   document.  I don't recall the discussion that was going on

5   about it.

6       Q.   Okay.  Do you remember any discussion about

7   creating, quote, "marriage between the parties"?

8           MR. DELEHUNT:  Calls for speculation, vague and

9   ambiguous.

10          THE WITNESS:  No.

11          MR. HIGGINS:  Q.  Do you remember anyone using

12  the term "marriage" to describe the relationship?

13      A.   I don't recall.

14      Q.   Somebody may have, you just don't recall?

15      A.   I just don't recall.

16      Q.   Do you recall any discussion about a provision in

17  the contract that would preclude anybody who entered into

18  the contract from bidding on the RFP if that party

19  withdrew from the relationship?

20          MR. DELEHUNT:  Calls for a legal conclusion,

21  speculation.

22          You can answer it is.

23          THE WITNESS:  I apologize.  Can you repeat that?

24          MR. HIGGINS:  Q.  Yeah.  Do you remember any

25  discussion at this meeting about a term -- a proposed term

                                                        33