*American Medical Response, Inc. v. City of Stockton*
*United States District Court- Eastern District No. 2:05-CV-01316-DFL-PAN*

# WHITE DEPO PART 2

1    in this contract that would preclude a party who signed

2    the contact from going ahead to bid on the RFP if that

3    party withdrew from the relationship?

4              MR. DELEHUNT:  Same objections.

5              Go ahead.

6              THE WITNESS:  I recall that there is a paragraph

7    in there.  I don't recall if that was already negotiated

8    or not, when I was -- in those last meeting -- last one or

9    two meetings.

10             MR. HIGGINS:  Q.  So you recall no discussion --

11   you recall the paragraph.

12   A.    Yes.

13   Q.    But you recall no discussion at this first

14   meeting you attended about that paragraph?

15   A.    I don't recall any.  It may have already been

16   negotiated.

17   Q.    Mr. Hakeem, what do you remember -- what specific

18   terms do you remember Mr. Hakeem discussing at this first

19   meeting?

20             MR. DELEHUNT:  Calls for speculation.

21             THE WITNESS:  I don't recall any specifics.

22             MR. HIGGINS:  Q.  Did Mr. Meyer participate

23   continuously in the meeting, in the discussions at the

24   meeting?

25             MR. DELEHUNT:  Objection, vague and ambiguous.

34

1          THE WITNESS:  He participated in the meeting,

2     yes.

3          MR. HIGGINS:  Q.  But continually throughout the

4     meeting, was he regularly participating in the discussion?

5          MR. DELEHUNT:  Objection, vague and ambiguous.

6          THE WITNESS:  There were three entities in the

7     room participating:  A-One ambulance, AMR and the City of

8     Stockton.

9          MR. HIGGINS:  Q.  Did Mr. Meyer speak up only on

10    occasional instances when terms were being discussed?

11         MR. DELEHUNT:  Calls for speculation.

12         THE WITNESS:  I don't recall how many times he

13    spoke up.

14         MR. HIGGINS:  Q.  How about Mr. Hakeem, was he

15    continually involved in the discussions that were going

16    on?

17         MR. DELEHUNT:  Vague and ambiguous.

18         THE WITNESS:  Again, he was participating.  I

19    don't recall how often.

20         MR. HIGGINS:  Q.  Okay.  How about Chief Gillis,

21    same question?

22     A.   He participated, but I don't recall how often.

23     Q.   Mr. Hafey?

24     A.   Mr. Hafey was active in the discussion.

25     Q.   Do you recall how often?

                                                    35

1    A.    I can't say.

2    Q.    Okay.  Now that you've been talking -- or

3    testifying, excuse me, about the meeting for awhile, has

4    this refreshed your recollection as to whether or not

5    Mr. Rodriguez was present at the meeting?

6    A.    I believe he was there.

7    Q.    Okay.  Do you remember him participating at all

8    in the meeting?

9    A.    Not specifically, no.

10   Q.    Okay.  How about Mr. Rishwain?  Now that you've

11   been thinking about the meeting for awhile, do you

12   remember Mr. Rishwain participating?

13   A.    There were people coming in and out, and at that

14   time, I may not have known who they were.  I'm a -- I

15   believe Mr. Rishwain popped in and out, but I can't say

16   that for certain.

17   Q.    Mr. Hakeem was there, for the entire meeting?

18   A.    To the best of my recollection.

19   Q.    So was there any other attorney who you knew to

20   be affiliated with the City of Stockton, besides

21   Mr. Rishwain, who was at that meeting?

22   A.    I don't recall.

23   Q.    Okay.  Is it possible that there were times

24   during that meeting that Mr. Hakeem was the only attorney

25   in the room?

36

1      A.    Not that I can recall.

2      Q.    In early 2004, to your knowledge, what did those

3  parties do to begin to prepare to respond to the County

4  RFP?

5          MR. DELEHUNT:  Vague and ambiguous.

6          THE WITNESS:  My recollection is there were

7  meetings at our Charter Way office.  I attended one or two

8  of the first ones.

9          MR. HIGGINS:  Q.  Okay.  How did you know those

10 were the first ones?

11     A.    I attended the first meeting or two.

12     Q.    So it is your belief that you attended the first

13 meeting at which the City of Stockton representatives and

14 AMR representatives began to -- to prepare to respond to

15 the County RFP?

16     A.    I believe that, and some time in early '04 that

17 AMR, A-One and the City of Stockton sat down and started

18 doing pre work.

19     Q.    Okay.  Who was present at this first meeting that

20 you attended?

21     A.    Chief Hafey, Mr. Rodriguez was there, Barry

22 Elzig, and myself.  Donna McCann may have been -- may have

23 been present at those meetings also.

24     Q.    Okay.  Right now, I'm just talking about the very

25 first meeting, just one meeting.  I'd like you to think

                                                    41

1    about.

2          Was there any use of a projector and a screen

3    at this first meeting?

4          A.    Not in the meeting I was at, I don't recall that.

5          Q.    Okay.  Was there any use of a white board?

6          A.    May have been, yes.

7          Q.    Okay.  Who used a white board?

8          A.    I may have used the white board, Chief Hafey may

9    have used the white board.

10         Q.    Did you personally disclose during this first

11   meeting to the other people who were there confidential

12   information about AMR's operations?

13         MR. DELEHUNT:  Vague and ambiguous.  Calls for

14   speculation, calls for a legal conclusion.

15         THE WITNESS:  My recollection is we were having

16   general -- general brainstorm-type discussion.  I don't

17   recall documents being exchanged.

18         MR. HIGGINS:  Q.  No.  I mean the information

19   itself, did you just in discussions reveal anything of a

20   confidential nature about AMR to the other participants in

21   the meeting?

22         MR. DELEHUNT:  Vague and ambiguous, calls for a

23   legal conclusion, lacks foundation, calls for speculation.

24         THE WITNESS:  I don't recall specifics.

25         MR. HIGGINS:  Q.  So you don't recall whether you

1   disclosed confidential information about AMR in that

2   meeting?

3            MR. DELEHUNT:  Same objections.

4            THE WITNESS:  I don't -- I don't recall the

5   specific -- generally, my recollection would be we

6   discussed RFP processes, in general.  I know that we

7   offered to have our RFP team lead person, Mr. Scottie

8   Sayles, come in and basically do an instructive meeting to

9   explain RFP processes to the Stockton Fire Department and

10  all the nuts and bolts of those processes, and that

11  meeting happened later.

12           Again, may not have been the -- that specific

13  day, but we had our Risk Safety Department work with the

14  Stockton Fire Department where they were noncompliant in

15  several OSHA compliance areas for providing ambulance

16  services.  Our Risk Safety Manager worked with them,

17  provided them our safety risk manual, and helped them

18  get compliant with various OSHA issues.

19           There was generalized discussion on RFP

20  credentialing documents.

21           MR. HIGGINS:  Q.  Did you say anything at that

22  first meeting to anyone at that meeting about the need to

23  maintain information about what you were doing in the

24  meeting in confidence?

25      A.   I don't specifically recall.

1       Q.   Okay.  So it is possible you did?

2           MR. DELEHUNT:  Calls for speculation.

3           THE WITNESS:  I don't specifically recall.

4           MR. HIGGINS:  Q.  You don't specifically recall

5  whether you did or not; is that right?

6           MR. DELEHUNT:  Calls for speculation.

7           MR. HIGGINS:  Q.  Is that right?

8       A.   Correct.

9       Q.   Okay.  Did you personally expect the participants

10  in that meeting to keep what went on in that meeting

11  confidential?

12          MR. DELEHUNT:  Vague and ambiguous, calls for a

13  legal conclusion, calls for speculation.

14          THE WITNESS:  Yes.

15          MR. HIGGINS:  Q.  Why?

16          MR. DELEHUNT:  Calls for speculation.

17          THE WITNESS:  If another provider were to

18  discover what we were doing, they could write something

19  better in their proposal.

20          MR. HIGGINS:  Q.  And did you believe that the

21  other participants in that meeting had an obligation to

22  maintain what went on in there in confidence?

23          MR. DELEHUNT:  Calls for a legal conclusion,

24  calls for speculation, vague and ambiguous.  Lacks

25  foundation.

44

1   THE WITNESS:  I don't recall us discussing it,

2   so...

3   MR. HIGGINS:  Q.  I'm asking about you

4   personally.  Did you believe that the other participants

5   in that meeting had an obligation to maintain information

6   about what went on in the meeting in confidence?

7   MR. DELEHUNT:  Calls for a legal conclusion,

8   calls for speculation, vague and ambiguous.

9   THE WITNESS:  In the couple meetings I was in, I

10  don't recall us sharing confidential information.

11  MR. HIGGINS:  Q.  I'm talking about what did go

12  on, though.  You testified just a minute ago that if

13  somebody outside the group learned about what was going on

14  inside, it might assist them in preparing a better

15  response to RFP, right?

16  A.   (Nods head).

17  Q.   Okay.  For that reason, you decided to keep what

18  went on in confidence, correct?

19  MR. DELEHUNT:  Calls for speculation, vague and

20  ambiguous, calls for a legal conclusion.

21  MR. HIGGINS:  Q.  You personally.

22  A.   I would not have personally gone out and shared

23  their information.

24  Q.   For that reason, correct?

25  MR. DELEHUNT:  Calls for speculation.

45

1          THE WITNESS:  I would not have gone out and

2    shared their information.

3          MR. HIGGINS:  Q.  Or AMR's information, correct?

4     A.    I wouldn't normally go out and share AMR's

5    information in an RFP process, no.

6     Q.    And you testified that the reason is because

7    letting someone outside the group know about what's going

8    on inside the group could assist someone else in preparing

9    a better response to the RFP, right?

10          MR. DELEHUNT:  Calls for speculation, vague and

11   ambiguous, calls for a legal conclusion, lacks foundation.

12          THE WITNESS:  Information, if it got out, could

13   help someone write something better in their proposal.

14          MR. HIGGINS:  Q.  Okay.  Was it important to AMR

15   that none of the participants in those meetings let

16   information about what went on in the meetings get outside

17   the group?

18          MR. DELEHUNT:  Calls for speculation as to the

19   state of mind of the party.  Vague and ambiguous.  Calls

20   for a legal conclusion.

21          THE WITNESS:  Yes.

22          MR. HIGGINS:  Q.  Okay.  Did AMR take any steps

23   to ensure that the other participants in the meeting would

24   not disclose information about what went on in the meeting

25   outside?

46

1    A.   I don't recall.

2         MR. DELEHUNT:  Vague and ambiguous.  Calls for

3    speculation as to what AMR did.

4         MR. HIGGINS:  Q.  At the time that you

5    participated in these meetings, did you believe that the

6    other -- did you believe you could trust the other parties

7    not to disclose the information outside the group?

8         MR. DELEHUNT:  Calls for speculation, vague and

9    ambiguous.

10        THE WITNESS:  Yes.

11        MR. HIGGINS:  Q.  Why could you trust them, in

12   your opinion?

13        MR. DELEHUNT:  Calls for speculation, vague and

14   ambiguous.

15        THE WITNESS:  I'm not sure how to answer your

16   question.  You're asking me to guess.

17        MR. HIGGINS:  Q.  No, I'm asking for the

18   foundation for your trust.  You said you felt you could

19   trust them.  I'm asking you why did you feel that way?

20        MR. DELEHUNT:  Calls for speculation, vague and

21   ambiguous.

22        THE WITNESS:  I don't recall why I felt that way.

23        MR. HIGGINS:  Q.  Did you think that those

24   parties who were participating also had an incentive to

25   maintain what went on at the meeting in confidence to make

47

1   revise any of the language from the 2003 Agreement that

2   became part of Exhibit 3?

3        A.   Yes.

4        Q.   What language did you personally revise, do you

5   recall?

6        A.   In reading it here, it looks like it primarily

7   changed about number -- if you can show me the other

8   Agreement.  Looks like about number 6 here is where it

9   started feeding in Lodi into the process, other than small

10  changes previous to that.

11       Q.   Okay.  At the time that you were involved in

12  working on preparing Exhibit 3, was that in 2004?

13       A.   Yes.

14       Q.   Okay.  Do you recall any discussion among the

15  people with whom you worked to create Exhibit 3, about the

16  language in paragraph 4 on page 2?

17       A.   I believe that's the same language out of the

18  previous Agreement.

19       Q.   Do you recall any discussion about that language

20  when those of you you've described worked on preparing

21  what became the Joint Venture Agreement, Exhibit 3?

22       A.   My recollection is our goal here was to

23  incorporate Lodi, and I don't recall discussing that issue

24  during that process.

25       Q.   Okay.  Looking at paragraph 7, the first sentence

1    there after number 7, do you recall discussion among the

2    parties you've described who were working to prepare

3    Exhibit 3 -- excuse me, discussions about first responder

4    fees?

5         A.    I don't recall specifics, but, yes, I believe we

6    would have.

7         Q.    Okay.  Now, that's something that related to

8    Lodi, right?

9         A.    Correct.

10        Q.    And it related to the City of Stockton?

11        A.    Again, the goal in this revision was to bring

12   Lodi into the Agreement.

13        Q.    Okay.  And you see 7B discusses first responder

14   fees to cover the marginal cost.  Do you see that, at the

15   very end of 7B?

16        A.    Yes.

17        Q.    Did you have any role in negotiating that

18   particular language in Exhibit 3?

19             MR. DELEHUNT:  Assumes facts not in evidence,

20   lacks foundation.

21             THE WITNESS:  Yes, I believe I would have.

22             MR. HIGGINS:  Q.  Okay.  How about 7C, which

23   gives examples of marginal costs, did you have any role in

24   drafting the language that appears in paragraph 7C of

25   Exhibit 3?

                                                         90

1    A.   I don't recall specific discussion, but I guess I

2  would assume I was involved in that.

3    Q.   Okay.  Did you review the entire Joint Venture

4  Agreement in final form before anyone signed it on behalf

5  of AMR?

6         MR. DELEHUNT:  Calls for speculation, vague and

7  ambiguous.

8         THE WITNESS:  Did I review this document and --

9         MR. HIGGINS:  Q.  Yes, in final form before

10  anyone signed it on behalf of AMR?

11    A.   Yes.

12    Q.   Okay.  And you see on the last page, there's a

13  signature above American Medical Response, Inc.?

14    A.   I do.

15    Q.   Do you recognize that signature?

16    A.   I do.

17    Q.   Whose is it?

18    A.   That's Lou Meyer.

19    Q.   Did you advise Mr. Meyer that this Agreement --

20  that he should sign this Agreement?

21         MR. DELEHUNT:  Calls for opinion and conclusion.

22  Calls for a legal conclusion.

23         THE WITNESS:  I gave it to him as the final

24  review.  I don't recall that I recommended -- we had a

25  discussion where I recommended signing it.

91

1    A.   Yes.

2    Q.   Did you read paragraph 15 before you presented

3    the final form of Exhibit 3 to Mr. Meyer for his

4    signature?

5    A.   I would have read this entire document prior to

6    giving it to Mr. Meyer for his signature.

7    Q.   This entire document, including paragraph 15,

8    correct?

9    A.·  That is correct.

10   Q.   Thank you.

11        MR. HIGGINS:  Why don't we take a quick break?

12        Oh, we can stay on the record.

13   Q.   For the record, I apologize for not mentioning at

14   the outset of the deposition, that you're entitled to a

15   break whenever you want one, except technically when a

16   question is pending, unless there's an issue of privilege,

17   at least that's my understanding of the law.  So please

18   let me know if you want a break.

19        (Recess.)

20        MR. HIGGINS:  Back on the record.

21   Q.   You realize you're still under oath, Mr. White?

22   A.   Yes.

23   Q.   Great.

24        I'd like you to take a look at what has

25   previously been marked in this litigation -- here, you

99

1    can put Exhibit 3 back here, if you want.

2            Previously marked as Exhibit 31.

3            I'd like you to take a look at it, and then

4    tell me when you have finished looking at it.

5        A.   Okay.

6        Q.   Do you recognize Exhibit 31, Mr. White?

7        A.   I do.

8        Q.   Did you draft Exhibit 31?

9        A.   Yes, I did.

10       Q.   Did you draft it in March of 2004?

11       A.   Yes, I did.

12       Q.   Did you send it to Barry Elzig?

13       A.   Yes, I did.

14       Q.   Did you assign Barry Elzig to be the team leader

15   in connection with the joint effort with the City of

16   Stockton and A-One Ambulance to respond to the San Joaquin

17   County RFP?

18       A.   Yes.

19       Q.   Did you relieve him of some of his normal duties

20   at that time so that he could particularly focus on the

21   RFP process?

22       A.   I did.

23       Q.   See down at the very bottom, "SFD Request," do

24   you see that?  Does that refer to the Stockton Fire

25   Department?

100

1      Q.   Same thing, under the sub bullet point, "What if

2   City of Stockton?"  Do you see the very last entry there?

3   It is on page 2 of the document, Exhibit 31, the sentence

4   beginning "Remaining funds go into," do you see that?  And

5   then later in the sentence, there's a reference to "The

6   JV"?

7           What were you referring to there?

8           MR. DELEHUNT:  Calls for speculation, vague and

9   ambiguous.

10          THE WITNESS:  Conceptual idea on my part.

11          MR. HIGGINS:  Q.  Okay.  You see "Compliance"?

12  See that heading?

13     A.   Yes.

14     Q.   And then there's a big gap there with the word

15  "Redacted" stamped in there.  Do you know what sort of

16  information was in that area that's been redacted?

17     A.   I don't.

18     Q.   Okay.

19          You can give that back to me, if you like.

20          I'd like you to take a look now at what has

21  previously been marked in this litigation as Exhibit 11.

22  Take a look at it, and tell me when you're finished.

23          Do you recognize Exhibit 11, Mr. White?

24     A.   I do.

25     Q.   Did you draft Exhibit 11?

                                                        102

1    A.   Yes, I did.

2    Q.   Did you draft it in April 2004?

3    A.   Yes, I did.

4    Q.   Did you send it to Lou Meyer at that time?

5    A.   By the header, it is appears I did, yes.

6    Q.   Okay.  Do you see down under the heading "San

7    Joaquin"?  Why were you sending that information about San

8    Joaquin to Mr. Meyer?

9         MR. DELEHUNT:  Compound, vague as phrased.  But

10   you can answer the question.

11        THE WITNESS:  It would have been to update him on

12   the status of the San Joaquin -- it is a status update on

13   San Joaquin.

14        MR. HIGGINS:  Q.  Okay.  Do you see the second

15   bullet point, first sentence says, "Preliminary RFP work

16   is underway with SFD and A-One Ambulance."

17        Does SFD refer to Stockton Fire Department?

18   A.   Yes, it does.

19   Q.   And what preliminary RFP work do you recall being

20   underway at the time you drafted this memo?

21   A.   At that point in time, I believe, as I testified

22   earlier, we had had preliminary educational meetings with

23   Stockton Fire discussing what does an RFP process look

24   like?  How do you do the writing, and various things.  We

25   offered to bring in our RFP team to do that process.  And

103

1   probably at this time we were doing our safety work with
2   them also, as I discussed earlier.

3       Q.   To prepare for the RFP that the parties were
4   working on in April of 2004, did you at AMR assume that
5   you would need such things as biographical information
6   about personnel who would be in the entity or entities
7   responding to the RFP?

8           MR. DELEHUNT:  Vague and ambiguous as phrased.
9   Overbroad.

10          THE WITNESS:  Yes.

11          MR. HIGGINS:  Q.  Okay.  Is that standard
12  information that normally would be part of a response to
13  an RFP?

14          MR. DELEHUNT:  Calls for speculation, vague and
15  ambiguous, lacks foundation.

16          THE WITNESS:  Resumes, as an example, yes, are
17  generally -- of key personnel are generally kept in an RFP
18  proposal.

19          MR. HIGGINS:  Q.  Are there other types of
20  documents that are generally placed in an RFP, that you're
21  aware of?

22      A.   Yes.

23      Q.   Okay.  At this time in April of 2004, had AMR and
24  City of Stockton together begun to gather such documents
25  and prepare such documents for a joint effort to respond

                                                    104

1   to the County's RFP?

2          MR. DELEHUNT:  Vague and ambiguous, overbroad.

3   Calls for speculation and lacks foundation.

4          THE WITNESS:  We may have begun that process at

5   this point, yes.

6          MR. HIGGINS:  Q.  Okay.  Are you aware that at

7   some point AMR and the City of Stockton definitely did do

8   that kind of work?

9          MR. DELEHUNT:  Vague and ambiguous.

10          THE WITNESS:  Yes, I believe we did.  Barry Elzig

11   would be the one who would have been dealing with them on

12   that, and I believe Mr. Hafey held those documents in his

13   computer.

14          MR. HIGGINS:  Q.  Okay.  You see the second

15   sentence next to this bullet point, "Anticipate LFD"?

16   Does that refer to Lodi Fire Department?

17       A.   I'm sorry, where are we at?

18       Q.   San Joaquin heading?

19       A.   Yes.

20       Q.   Second bullet --

21       A.   That would be Lodi Fire.

22       Q.   Okay.  "Anticipate LFD joining the Joint

23   Venture."

24          What Joint Venture did you refer to there?

25          MR. DELEHUNT:  Calls for an opinion and

1   conclusion and a legal conclusion.

2          THE WITNESS:  I believe my reference would have

3   been that we were working to bring them into the Joint

4   Venture Agreement.

5          MR. HIGGINS:  Q.  Exhibit 3 that you testified

6   about earlier?

7     A.   Yes.

8     Q.   Okay.  Do you recall a time when Donna McCann

9   became an employee of AMR?

10     A.   Yes.

11     Q.   Okay.  Is she currently an employee of AMR?

12     A.   Yes, she is.

13     Q.   When she first became an employee of AMR, do you

14   recall if the City of Stockton paid part of her salary?

15     A.   This was a period of time where they paid a

16   portion of it, yes.

17     Q.   Do you recall what period of time that was?

18     A.   I don't.

19     Q.   Do you recall what portion they paid?

20     A.   They were paying half.

21     Q.   Okay.

22          MR. HIGGINS:  I'd like to mark next in order.

23          (Whereupon Plaintiff's Exhibit 47 was

24          marked for Identification.)

25          MR. HIGGINS:  Q.  Mr. White, I'd like you to take

1    wrap up?

2         MR. DELEHUNT:  Yes.  By "quick," do you mean

3    five -- for example, five minutes?

4         MR. HIGGINS:  Less than five minutes, if

5    possible.

6         (Recess.)

7         MR. HIGGINS:  Back on the record.

8    Q.   You understand you're still under oath,

9    Mr. White?

10   A.   Yes.

11   Q.   Do you have an understanding as to why AMR was

12   initially interested in teaming up with the City of

13   Stockton to respond to the County's RFP?

14   A.   I wouldn't have been in California at that time.

15   Q.   I understand that.  But do you have an

16   understanding as to why?

17   A.   I couldn't say.  I wasn't here at the time.

18   Q.   When you came back and found out that such an

19   effort was contemplated, did anyone tell you why AMR had

20   made that decision?

21   A.   I don't recall anyone telling me that.

22   Q.   Did you have an understanding as to why AMR had

23   made that decision?

24        MR. DELEHUNT:  Asked and answered.

25        THE WITNESS:  I -- no one -- I don't recall

135

1   STATE OF CALIFORNIA   )
    COUNTY OF SAN JOAQUIN )   ss.
2
        I, BOBBIE JO HARR, Certified Shorthand Reporter herein,
3   do hereby certify:
        That on August 12, 2005, at 9:00 a.m., the witness
4   herein, BRADLEY WHITE, was duly sworn:

5       That said witness' testimony and the proceedings had at
    the time of such testimony were taken down in shorthand
6   notes by me; I thereafter caused said shorthand notes to be
    transcribed into longhand typewriting, the following being a
7   full, true, and correct transcription therein;
        That I am a disinterested person, and am not in any way
8   interested in the outcome of said action; nor connected with
    nor related to any of the parties in said action, nor to
9   their respective counsel;
                         ---o0o---
10      On August 13, 2005, all counsel were given notice of
    the preparation of the deposition, and the original
11  deposition was available for reading, correcting, approval,
    or signing in our offices until September 15, 2005.
12                       ---o0o---
        _____The witness signed the deposition and made no
13  corrections.
        _____The witness and parties waived examination and reading
14  of the deposition at the time of the taking of the
    deposition.
15      _____The witness corrected, approved, or refused to approve
    the deposition by letter to me attached thereto, and copies
16  of the letter were sent to all counsel.
        _____The witness failed to appear at my office.
17      _____The witness appeared in my office, made changes to the
    deposition, and counsel were provided with copies of the
18  changes.
        _____The witness refused to approve or sign the deposition
19  for the following reasons: _____
    _____.
20      _____Other: _____.

21      IN WITNESS WHEREOF, I have hereunto subscribed my hand.
                         DATE: _____
22                       _____
                         BOBBIE JO HARR, CSR NO. 6090, RMR
23  COUNSEL:  YOU WILL BE NOTIFIED OF ANY CHANGES OR CORRECTIONS
    TO THE DEPOSITION.  CONTACT OUR OFFICE IF YOU HAVE ANY
24  QUESTIONS.

25

                                                              4