*American Medical Response, Inc. v. City of Stockton*
*United States District Court- Eastern District No. 2:05-CV-01316-DFL-PAN*

# HAKEEM DEPO

1

2                IN THE UNITED STATES DISTRICT COURT

3          IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

4

5    AMERICAN MEDICAL RESPONSE, INC.,)
     a Delaware Corporation,          )
6                                     )
                      Plaintiff,      )
7                                     )   No. 2:05-CV-01316-DFL-PAN
            vs.                       )
8                                     )
     CITY OF STOCKTON, a California   )
9    Municipality                     )
                                      )
10                    Defendants.     )
     _____)
11   AND RELATED CROSS ACTIONS        )
     _____)
12

13                 **DEPOSITION OF MICHAEL HAKEEM**

14

15        DATE:  Friday, August 12, 2005 at 2:00 p.m.

16

17        DEPOSITION OFFICER:  BOBBIE JO HARR
                              CSR No. 6090, RMR
18

19        TAKEN AT:
          GAROUTTE'S
20        120 North Hunter Street, Suite 104
          Stockton, California  95202
21

22                       GAROUTTE'S
               Certified Shorthand Reporters
23           120 North Hunter Street, Suite 104
                 Stockton, California  95202
24     (209) 942-2100 or Nationwide (800) 942-2103
                   FAX (209) 942-2150
25

                                                            1

1   requested that I return Exhibit 46.  We discussed it.  I

2   told him I had to think about the situation.  It was the

3   very end of the deposition, I was getting ready to begin

4   this deposition.  But during lunch, it occurred to me to

5   probably deal with the issue immediately before Exhibit 46

6   is bound into the deposition.

7           Rather than wait until Monday as Mr. --

8   Mr. Delehunt asked me to get back to him by Monday.  So

9   I propose to remove what the reported -- just stipulate

10  to have the reporter remove Exhibit 46 from the record

11  and then we -- I can discuss the issue with Mr. Delehunt

12  further to determine what we need to do about it.

13          MS. BARNES:  That's fine.

14          MR. HIGGINS:  Okay.  So you stipulate to remove

15  Exhibit 46 from the record of the Brad White deposition?

16          MS. BARNES:  Yes, I do.

17          MR. HIGGINS:  Thank you very much.

18          Why don't I give it -- madam court reporter,

19  I'm going to give Exhibit 46 to Ms. Barnes to return to

20  Mr. Delehunt.

21          THE REPORTER:  Okay.

22          MS. BARNES:  I've got it.  Thank you.

23          MR. HIGGINS:  Thank you for your patience.

24      Q.  Would you please state your name for the record?

25      A.  Michael David Hakeem.

1     Q.   Thank you very much.

2         Mr. Hakeem, are you an attorney licensed to

3  practice law in the State of California?

4     A.   Yes.

5     Q.   How long have you been an attorney practicing law

6  in California?

7     A.   1974.

8     Q.   Was the first date that you began --

9     A.   I think I was sworn in in '73, so between '73 and

10  '74.

11     Q.   Have you taken depositions yourself?

12     A.   Yes.

13     Q.   Can you approximate how many depositions you've

14  taken?

15     A.   Probably 50.

16     Q.   At some point did American Medical Response, the

17  corporation, Inc., the corporation, become a client of

18  yours?

19     A.   Yes.

20     Q.   And when was the first time that -- oh, if I

21  refer to that entity as AMR --

22     A.   That's fine.

23     Q.   Is that fine?

24         When was the first time that AMR became a

25  client of yours?

8

1      A.    Some time between 1997 and 1998.

2      Q.    I don't want to get into the attorney/client

3  relationship very deeply or -- really at all, if I can

4  avoid it, insofar as it doesn't relate to this lawsuit.

5        But can you tell me, have you continually

6  represented AMR in some capacity as AMR's attorney since

7  1997, 1998, when you first started?

8      A.    I've maintained an open file on them throughout

9  that time frame.

10     Q.    Okay.  You've worked on separate matters for

11  them?

12     A.    Various matters.

13     Q.    Okay.  Do you currently represent AMR?  Are you

14  currently their attorney?

15     A.    Yes.  I'm currently one of their attorneys.

16     Q.    Okay.

17           MR. HIGGINS:  Let's mark this Exhibit -- I'm

18  sorry.  I don't have a copy for you.

19           MS. BARNES:  What is it, the subpoena?

20           MR. HIGGINS:  I'm sorry.  I didn't think to make

21  an extra copy.

22           (Whereupon Plaintiff's Exhibit 50 was

23           marked for Identification.)

24           MR. HIGGINS:  Q.  Do you recognize what the court

25  reporter has marked as Exhibit 50, Mr. Hakeem?

9

1    A.    Yes.

2    Q.    What is Exhibit 50?

3    A.    It is a subpoena that was served on me in this

4    matter.

5    Q.    Okay.  Commands you to be here today at 2:00, and

6    you are here.  It also requests production of documents

7    described in Attachment A.  Have you brought some

8    documents here today?

9    A.    Yes.

10         MR. MANION:  We have -- Mr. Hakeem and I have

11   gone through the subpoena, the description of documents,

12   and we have this stack of documents to produce to you.

13         I do want you to note that I believe the last

14   seven documents at the bottom do not have bate stamp

15   numbers on them because they were just discovered today,

16   and we had not had an opportunity to turn them over to

17   AMR's counsel in this litigation in sufficient time to

18   have them Bate stamped.

19         MR. HIGGINS:  Okay.  Thank you very much.

20         MR. MANION:  I might add that there are some

21   additional documents that would be described by various

22   categories in your subpoena.  However, in our opinion,

23   they were either protected by the Work Product Doctrine or

24   the attorney/client privilege.  We've turned those

25   doctrines over to Page Barnes or her colleagues, and I

                                                      10

1   understand that they have prepared a list of those

2   documents, a privilege list -- a privilege log.

3        MR. HIGGINS:  Great.  Thank you very much.

4        Q.   In 2002, Mr. Hakeem, you represented AMR in

5   attempts to oppose the City of Stockton's entry into the

6   ambulance business; is that right?

7        A.   If -- I don't know if that's a fair

8   characterization.  I appealed the issuance of their permit

9   to the board of supervisors in San Joaquin County and

10  requested that they not be issued the permit.

11       Q.   Okay.  I didn't mean to mischaracterize it.  I

12  was just trying to get to the point.

13       Did you make an appearance before the board of

14  supervisors to make a statement on issue?

15       A.   Yes.

16       Q.   Did you make more than one appearance before the

17  board of supervisors to make a statement on this issue?

18       A.   There was one hearing on the appeal where I

19  appeared and presented the issue as set forth in my appeal

20  document.

21       Q.   Okay.  Do you recall what your -- your arguments

22  were to the board of supervisors?

23       A.   I don't recall all the arguments.  There's a

24  document that was filed with the EMS agency which

25  articulated the various points that were raised in the

11

1    I think they were then authorized by their City Council to

2    spend money and acquire ambulances and set up an ambulance

3    program.  Whether they were actually dispatching calls to

4    their own units, I don't know at that point in time

5    whether they were operative.

6         Q.    Do you know whether they did become operative?

7         A.    They did become operative and they continue to be

8    operative through today's date.

9         Q.    Speaking of 2003, do you recall becoming aware

10   that the San Joaquin County intended to issue an RFP, a

11   Request For Proposals?

12        A.    Yes, I became aware of that.

13        Q.    To provide emergency ambulance service in the

14   Stockton area?

15        A.    I was aware that the board of supervisors was

16   going to issue an RFP.

17        Q.    Okay.  Also in 2003, did you begin working for

18   AMR in negotiations with the City of Stockton to make a

19   joint response to the County RFP?

20        A.    Yes.

21        Q.    What's the first thing that you recall the City

22   of Stockton and AMR doing in connection with the joint

23   effort to respond to the County's RFP?

24        A.    My sense of that was that there -- there was

25   dialog between the Fire Department and the AMR personnel,

13

1   that's my sense of how that original idea received its

2   initiation.

3       Q.   Okay.  And what was the first thing you

4   personally were involved in, if you were, in the joint

5   effort between the City of Stockton and AMR in 2003?

6       A.   I don't have a recollection of the first thing,

7   but I do know that I had a meeting at the City Manager's

8   office in the spring of '03 relative to the concept.

9       Q.   Who else was present at that meeting?

10      A.   I don't remember who was there, but my sense of

11  it was there was more than myself and the City Manager.

12  My recollection was there was other people in the meeting,

13  but I don't remember the faces.

14      Q.   Do you recall documents being exchanged?

15      A.   No.

16      Q.   Do you know if anyone took notes of what happened

17  at that meeting?

18      A.   I took notes at the meeting.

19      Q.   What's the next thing you remember personally

20  being involved in that concerned both the City of Stockton

21  and AMR in connection with the joint effort?

22      A.   I remember writing a letter to Mark Lewis asking

23  him to consider the concept, and I set forth some terms

24  for his consideration.

25      Q.   Did Mr. Lewis respond?

                                                    14

1    A.   Yes.

2    Q.   First time you said Fire, I thought you were

3    using a metaphor, and I was trying to figure it out.

4         What's the next thing you recall after Mr.

5    Lewis responded to you?  What's the next thing you

6    recall being involved in with the City of Stockton in

7    connection with this joint effort between the City and

8    AMR?

9    A.   I think there were a series of documents that

10   were exchanged to end up with a document that was signed

11   or executed by the parties relative to the Memorandum of

12   Understanding between AMR and the City.

13   Q.   Okay.  Do you remember between -- between this

14   time when Mr. Lewis responded to you in writing the first

15   time and the signed Memorandum of Understanding that

16   you've described, you testified there's a series of

17   documents exchanged.  Was there also meetings during that

18   period that involved both the City of Stockton and AMR

19   representatives?

20   A.   I don't remember those meetings.

21   Q.   Do you remember any meeting at which you attended

22   where text was projected on a screen and the -- people in

23   attendance at the meetings discussed the text and revised

24   it right there?

25   A.   I do remember that meeting.  I don't have a sense

16

1    today that that meeting occurred in concert with that

2    document that we're discussing.

3        Q.   Okay.  So that meeting where text was projected

4    on a screen, you don't recall if that text eventually

5    became the document signed by the parties, the MOU,

6    Memorandum of Understanding you've described?

7        A.   I don't.  As I sit here today, I can't time frame

8    that particular meeting.

9        Q.   Okay.  Do you remember any discussions involving

10   representatives of both the City of Stockton and AMR, any

11   discussions about the terms for the Memorandum of

12   Understanding between those representatives?

13       A.   Can you ask that again?

14       Q.   Yes.  The Memorandum of Understanding, its terms,

15   do you remember any discussion between you -- between AMR

16   representatives and City of Stockton representatives about

17   those terms?

18       A.   My sense is there were exchanges of written

19   materials, but I don't recollect having any personal

20   dialog between the parties relative to the written

21   materials.

22            MR. HIGGINS:  Let's mark next in order.

23            (Whereupon Plaintiff's Exhibit 51 was

24            marked for Identification.)

25            MR. HIGGINS:  Q.  Mr. Hakeem, will you please

1  take a look at a document that has been marked Exhibit 51

2  by the court reporter.  For the record, Exhibit 51 is

3  Bates CS 002875 and CS 002876.  It is a two-page document.

4        It is a Memorandum dated April 17th, 2003 on

5  the letterhead of law offices of Hakeem, Ellis and

6  Marengo?

7        A.   Yes, I remember this document.

8        Q.   You've reviewed Exhibit 51, sir, and you

9  recognize it?

10       A.   Yes, and I do recognize it.

11       Q.   What is Exhibit 51?

12       A.   After the meeting, I wrote a Memorandum to the

13  Deputy City Attorney articulating what I felt were the

14  business points relative to the proposal to connect with

15  the City Fire on the process for the RFP.

16       Q.   Okay.  When you say "after the meeting," which

17  meeting are you referring to?

18       A.   The Memorandum indicates that there was a meeting

19  with Mike Rishwain on April 15th, 2003.  That's a

20  different meeting than the meeting with the City Manager.

21       Q.   Okay.  Was that meeting with Mr. Rishwain on

22  April 15th, 2003 after the meeting you've testified about

23  in the City Manager's office?

24       A.   I believe so.

25       Q.   Okay.

18

1     A.    And I do remember that that meeting with Mr.

2  Rishwain, there was just the two of us in the meeting.

3     Q.    How long did that meeting last?

4     A.    Oh, probably 45 minutes to an hour, something

5  like that.  It may have been a half hour or 40 minutes,

6  something like that.

7     Q.    The paragraph that has number one on the first

8  page of Exhibit 51.

9     A.    Uh-huh.

10    Q.    It begins, "There may be a Constitutional

11  prohibition."  Do you see that?

12    A.    Uh-huh.

13    Q.    Who raised that issue during your meeting with

14  Mr. Rishwain?

15    A.    Let me read the paragraph.

16          I believe that was Mr. Rishwain's concern.

17    Q.    The Constitutional prohibition?

18    A.    For a city to enter into a partnership.  And I'm

19  reading this with respect to unlimited liability for the

20  activities of a nonmunicipal partner, but it may have been

21  something that we both jointly discussed.

22    Q.    Uh-huh.

23    A.    But it wasn't something that I remember going to

24  the meeting thinking about.

25    Q.    Okay.  Do you remember who raised the issue of

19

1   forming a Limited Liability Company, LLC?

2       A.    I think that was an idea that I had formed prior

3   to the meeting.

4       Q.    Do you see the reference to the City, AMR, and

5   A-One?  Do you recall who proposed including A-One, the

6   entity that you referred to there as A-One?

7       A.    Would have been AMR's concept to include A-One in

8   the program.

9       Q.    A-One is the name of a business entity?

10      A.    It was a small ambulance company in Stockton.

11      Q.    Okay.

12      A.    Owned by a single person who carried on when her;

13  husband passed away, and there was some sympathy in the

14  industry to help that person continue to keep her business

15  viable.

16      Q.    I see.  Do you know how many ambulances A-One

17  operated at this time in 2003?

18      A.    Somewhere between one and three, more likely to

19  be closer to one or two.

20      Q.    Did you represent A-One as well as AMR in this

21  meeting with Mr. Rishwain on the 15th of April 2003?

22      A.    I don't know how to characterize the definition

23  of representation, but I do know that I was aware of the

24  need to include A-One, and I indicated to Mike Rishwain

25  that we wanted to have A-One included in the program.

20

1    Q.   Paragraph number two, there's a reference to the

2    option to enter into a joint venture.  Do you see that?

3    A.   Yes.

4    Q.   Do you recall who raised the possibility of

5    entering into a joint venture?

6    A.   I think that was probably something that both

7    Mike and I discussed, given the information that there's a

8    limited number of structures that one could utilize for

9    this type of a format.

10    Q.   Okay.

11    A.   It isn't -- scratch that last comment.

12    Q.   Sure.  I need to go back.  A-One, the woman you

13    talked about who was operating that, was that Donna

14    McCann?

15    A.   Yes.

16    Q.   Thank you.  Paragraph number three, do you

17    remember whose ideas this reflects in your Memorandum?

18    A.   Well, there's two sentences.  The first sentence,

19    the business plan to participate was a concept that I

20    think had already surfaced, in terms of it being fair to

21    both AMR and the City, they would both get an equal

22    deployment program from the RFP.

23    Q.   Uh-huh.

24    A.   That they would share the deployment.

25         The second sentence regarding the withdrawal of

21

1    joint venture and precluding the ability to compete,

2    that came from the City Fire e-mail that had surfaced

3    some weeks before from City Fire.  That was one of the

4    bullet points in the City Fire e-mail.

5        Q.   Okay.  And this -- the language, though, in

6    number three, does this exactly track the language that

7    was in that e-mail?

8        A.   Pretty much.  We produced it today.

9        Q.   Can you look at the documents you produced today

10   and show me this e-mail?

11       A.   It may take me a few minutes to find it.

12       Q.   Are the documents in chronological order?

13       A.   They're in chronological -- let me restate that.

14   They're grouped by year, but they're not calendered within

15   a given year.

16           MS. BARNES:  Except the ones that were added at

17   the back today.

18           MR. MANION:  The ones without the bate stamp

19   numbers.

20           MR. HIGGINS:  All right.  Thank you.

21           Let the record reflect that Mr. Hakeem has

22   selected a document from the stack of documents produced

23   today and handed it to me.  Thank you.

24           THE WITNESS:  I believe it is the last item on

25   the page.

                                                    22

1            MR. HIGGINS:  Q.  The one with the number seven

2   next to it?

3       A.   I didn't look at the number.  I'd have to look at

4   it again.

5       Q.   Okay.  Would you take a look at that sentence

6   next to number seven?

7       A.   Yes.

8       Q.   Okay.  Would you compare that to the second

9   sentence in paragraph three in your memo of April 17th,

10   2003?

11       A.   Yes, I have compared it with the second sentence

12   in number three.

13       Q.   Okay.  Do you see differences between the two?

14       A.   I don't see any significant or substantive

15   differences between the two.

16       Q.   Okay.  Do you see the part -- well, see the very

17   end of the second sentence in paragraph three.  "Or accept

18   an invitation to join or participate with any third party

19   bidder (successful or otherwise)."

20            Do you see that?

21       A.   I do see that, and I don't think that's a

22   substantive difference.

23       Q.   But that is in addition to the language that is

24   in the e-mail that you've produced, correct?

25       A.   Correct.

                                                        23

1      Q.   Okay.

2      A.   Without arguing --

3      Q.   I'm just asking for -- as a matter of fact.

4      A.   Okay.

5      Q.   Okay.  And then you see the language right in the

6  middle of the second sentence of paragraph three in your

7  April 17th, 2003 memo.  It says, "And to also preclude the

8  ability to compete against the joint venture."

9           Do you see that?

10     A.   Uh-huh, I see that.

11     Q.   Okay.  Is that language included in the sentence

12  in the e-mail that you've produced?

13     A.   I believe it is the same as that party will be

14  excluded from competing, as the language precludes the

15  ability to compete against.

16     Q.   Okay.  The e-mail says, "If any party withdraws

17  from this Agreement prior to an award in the EOA process,"

18     A.   And this sense says --

19     Q.   "that party will be excluded from competing."

20     A.   Correct.

21     Q.   So the exclusion from competing depends upon

22  withdrawal, in paragraph seven of this e-mail; isn't that

23  correct?

24           MS. BARNES:  Objection, calls for opinion.

25           THE WITNESS:  I guess I'm not following the

                                                    24

1    thought process that you wouldn't be able to compete if

2    you were in a joint proposal.

3         MR. HIGGINS:  Q.  Why is that?

4         A.   Well, you can't -- you can't submit mutually

5    exclusive proposals in the RFP process.

6         Q.   What do you mean by "mutually exclusively

7    proposals"?

8         A.   You couldn't submit a bid on your own and also

9    submit a bid with the City.

10        Q.   Why not?

11        A.   My understanding is that the RFP is structured so

12   that that doesn't occur.

13        Q.   How is it so structured?

14        A.   Well, I don't have the RFP in front of me.  My

15   understanding is that's how it is structured to include

16   that.

17        Q.   This is the RFP that actually issued recently?

18        A.   Yes.

19        Q.   But at this time in 2003 when you were exchanging

20   documents with representatives of the City about potential

21   terms for an Agreement, there was no RFP, right?

22        A.   No, not at that time.

23        MS. BARNES:  Okay.  I guess -- why don't we take

24   a short break.

25        (Off the record.)

                                                      25

1          MR. HIGGINS:  Let's mark this next in order, for

2    the record.

3          MR. MANION:  You want to insert it back in the

4    documents we produced so that they all stay intact?

5          MR. HIGGINS:  Why don't we put the original back

6    in the documents and we'll mark a copy made and Mr. Hakeem

7    can look at it.  And this is Exhibit 52.

8               (Whereupon Plaintiff's Exhibit 52 was

9               marked for Identification.)

10          MR. HIGGINS:  Mr. Hakeem, please take a look at

11    Exhibit 52.

12          Tell me if you recognize it?

13    A.    Yes.  That's the e-mail that was in my file.

14    Q.    And that's what you've just been testifying about

15    in connection with the number seven sentence there?

16    A.    Yes.

17    Q.    Do you remember who provided this to you?

18    A.    I don't.

19    Q.    There's no indication here that you were cc'd?

20    A.    No, that's correct.

21    Q.    Okay.  Do you recall discussion with Mike

22    Rishwain during your meeting on April 15th about this

23    paragraph number seven in the e-mail?

24    A.    I don't.

25    Q.    Okay.

1       A.    I don't recall discussing this with him.

2       Q.    And when you drafted your Memorandum of

3    April 17th, 2003, did your discussion of this issue in

4    paragraph number three, did that reflect your

5    understanding of paragraph seven in the e-mail?

6       A.    Yes.

7       Q.    Okay.

8       A.    I do recollect discussing item number seven with

9    Mike.

10      Q.    Item number --

11      A.    Seven.

12      Q.    In the e-mail?

13      A.    Yes.  With Mike Rishwain at the meeting, but I

14   don't recollect whether it related to this document or

15   not.

16      Q.    Okay.  So you had no recollection as to whether

17   or not your version of this concept -- the sentence in

18   your memo begins "This concept."  Your version of this

19   concept reflects any of the discussion you had with Mike

20   Rishwain?

21      A.    I'm not sure I understand the sentence.  My

22   utilization of the language in number three, at least as

23   to the second sentence, was intended to address item

24   number seven in this memo.  And I did not discuss this

25   memo, Exhibit 52, that is, I didn't discuss that exhibit

                                                        27

1   STATE OF CALIFORNIA   )
    COUNTY OF SAN JOAQUIN )    ss.
2

3        I, BOBBIE JO HARR, Certified Shorthand Reporter herein,
    do hereby certify:
         That on August 12, 2005, at 2:00 p.m., the witness
4   herein, MICHAEL HAKEEM, was duly sworn:

5        That said witness' testimony and the proceedings had at
    the time of such testimony were taken down in shorthand
6   notes by me; I thereafter caused said shorthand notes to be
    transcribed into longhand typewriting, the following being a
7   full, true, and correct transcription therein;
         That I am a disinterested person, and am not in any way
8   interested in the outcome of said action; nor connected with
    nor related to any of the parties in said action, nor to
9   their respective counsel;
                           ---oOo---
10       On August 13, 2005, all counsel were given notice of
    the preparation of the deposition, and the original
11  deposition was available for reading, correcting, approval,
    or signing in our offices until September 15, 2005.
12                         ---oOo---
    _____The witness signed the deposition and made no
13  corrections.
    _____The witness and parties waived examination and reading
14  of the deposition at the time of the taking of the
    deposition.
15  _____The witness corrected, approved, or refused to approve
    the deposition by letter to me attached thereto, and copies
16  of the letter were sent to all counsel.
    _____The witness failed to appear at my office.
17  _____The witness appeared in my office, made changes to the
    deposition, and counsel were provided with copies of the
18  changes.
    _____The witness refused to approve or sign the deposition
19  for the following reasons: _____
    _____.
20  _____Other: _____.

21       IN WITNESS WHEREOF, I have hereunto subscribed my hand.
                           DATE:
22                              _____
                              _Bobbie Jo Harr_
23                              BOBBIE JO HARR, CSR NO. 6090, RMR
    COUNSEL:  YOU WILL BE NOTIFIED OF ANY CHANGES OR CORRECTIONS
24  TO THE DEPOSITION.  CONTACT OUR OFFICE IF YOU HAVE ANY
    QUESTIONS.

25

                                                              4