IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AMERICAN MEDICAL RESPONSE, INC.

    Plaintiff,                                 CIV-S-05-1316 DFL PAN

    v.                                         MEMORANDUM OF OPINION
                                                   AND ORDER

CITY OF STOCKTON,

    Defendant.
_____/

CITY OF STOCKTON,

    Counterclaimant,

    v.

AMERICAN MEDICAL RESPONSE, INC.

    Counterdefendant.
_____/

    Plaintiff American Medical Response, Inc. moves for summary judgment as to defendant City of Stockton's breach of contract and breach of fiduciary duty counter claims. The City cross-moves for summary judgment as to its breach of fiduciary duty claim. For the reasons stated below, both motions are DENIED.[1]

---

[1] The City of Stockton also filed a related preliminary injunction motion. It was denied on September 26, 2005.

1

I.

The following facts are not in dispute for purposes of the pending motions. American Medical Response, Inc. ("AMR") is a large corporation that provides emergency and non-emergency ambulance service throughout the nation. (City Opp'n at 3.) It has provided these services in San Joaquin County for approximately twelve years. (AMR Mot. at 2.) Starting in 2002, the City of Stockton ("the City"), through its fire department, also began providing emergency ambulance service in and around Stockton. (Id.) Until recently, the ambulance market in the County was competitive and non-exclusive, with multiple service providers operating in Stockton, Lodi, and Tracy. (Id. at 3.)

However, in January 2003, the County Emergency Medical Services Agency ("EMS Agency") decided to establish exclusive operating areas ("EOAs") in which one or more providers would bid for the exclusive right to provide emergency services within the EOA. (Id. at 3-4.) In July 2004, the San Joaquin County Board of Supervisors adopted the EMS Agency's plan to award exclusive contracts for the following three zones: (1) the City of Stockton and surrounding area (the "Stockton Zone"); (2) the City of Lodi (the "Lodi Zone"); and (3) the City of Tracy. (Id. at 4; Welch Decl. Ex. 14.)

In early 2003, AMR and the City began to discuss collaborating on a joint bid proposal to respond to the County's anticipated Request for Proposals ("RFP") for the Stockton Zone. (City Opp'n at 5.) In June 2003, the City and AMR signed a

2

Memorandum of Understanding stating their intent to submit a joint bid for the Stockton Zone ("2003 MOU").[2] (Welch Decl. Ex. 9.) Following the execution of the 2003 MOU, representatives of AMR and the City met periodically to discuss plans for their joint bid. (City Opp'n at 5-7.) In July 2004, the City of Lodi also agreed to participate in a joint bid for the Stockton and Lodi Zones, and all three parties executed a Joint Venture Agreement (the "JVA"). (AMR Mot. at 7; Welch Decl. Ex. 10.) The JVA largely incorporated language from the 2003 MOU and included a statement that the parties would "jointly submit a response to the [County RFP] for the award of exclusive rights to emergency and non-emergency ambulance transportation within [the Stockton and Lodi Zones] . . . ." (Welch Decl. Ex. 10.) Most notably for this motion, section 4 of the JVA provided as follows:

> The parties shall equally participate in the RFP process. If any party withdraws from the joint venture prior to an award of contract from the [County] or accepts an offer from another bidder to compete for the same service area, that party will be precluded from bidding in the [County] RFP for ambulance service.

(Id.)

Throughout 2004, the parties continued to meet and discuss the terms of a bid and of their business relationship. (AMR Mot. at 10.) They began negotiating both a Limited Liability Company agreement (the "LLC agreement") and an operating agreement (the "operating agreement"). (Id.) In 2005, the parties began

---

[2] A third smaller company, A-One, also was party to the MOU. However, A-One went out of business in 2004 and is not a party to this action. (AMR Mot. at 5.)

3

meeting in earnest to finalize these agreements and their plans for a joint bid. (AMR Mot. at 11.) However, at this point, the relationship between AMR and the City began to break down. The City and AMR disagree as to why the joint venture unraveled. On June 23, 2005, AMR's regional Chief Executive Officer, Louis Meyer, informed the City Manager, Mark Lewis, that AMR was discontinuing negotiations and whatever relationship the parties had formed. (Id.) Meyer further explained that AMR intended to submit its own bid. (Id.) The City disapproved of AMR's withdrawal and informed AMR that section 4 of the JVA precluded AMR from submitting its own bid. (Id. at 13.)

The County issued the RFP in July 2005, and the bids were due by September 22, 2005. (Welch Decl. Ex. 14.) The RFP contemplated the award of a five-year exclusive contract for emergency ambulance service in the Stockton Zone. (Id.) The City joined with Rural Metro Corporation ("Rural"). (AMR Mot. at 12.) At oral argument on these motions, the City expressed its intent to submit a joint bid with Rural. AMR also stated its intent to submit a solo bid.[3]

## II. AMR Motion for Summary Judgment

In response to AMR's complaint seeking a declaratory judgment, the City filed counterclaims against AMR for breach of contract and breach of fiduciary duty. In defense, AMR asserts that the JVA is null and void, and, therefore, unenforceable,

---

[3] According to the joint status report that was filed while these motions were under submission, AMR was the successful bidder.

4

because it contains terms violating the Sherman Antitrust Act (the "Sherman Act").  AMR now moves for summary judgment arguing that the following provisions of the JVA violate § 1 of the Sherman Act: (1) sections 1 and 2, which purport to allocate emergency and non-emergency services between the parties; and (2) section 4, which precludes a party from bidding on the RFP after it withdraws from the JVA or otherwise joins with another party to bid.  (Mot. at 16-25.)  Because the City raises genuine issues of fact regarding the alleged antitrust violations, AMR's motion for summary judgment will be DENIED.[4]

A. Legal Standard

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . ." 15 U.S.C. § 1.  When reviewing allegedly anti-competitive behavior under § 1, courts generally apply either the per-se rule or rule of reason:

> In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality - they are "illegal per se." In the second category are agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed.  In either event, the purpose of the analysis is to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of members of an industry.

---

[4] AMR also styles its motion as a motion for declaratory judgment as to section 4 of the JVA.

Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 692, 98 S.Ct. 1355 (1978).

### B.  Was the Joint Venture Legitimate?

Whether the parties here formed a legitimate joint venture is important to determining which standard of review applies. Where the joint venture between competitors is a sham entity, the restraint on trade is generally deemed per se illegal. Engine Specialties, Inc. v. Bombardier Ltd., 605 F.2d 1, 11 (1st Cir. 1979) ("The talisman of 'joint venture' cannot save an agreement otherwise inherently illegal.").  Conversely, where there is a bona fide joint venture, courts often apply rule of reason analysis. Dagher v. Saudi Ref., Inc., 369 F.3d 1108, 1118 (9th Cir. 2004) (where a legitimate joint venture engages in anticompetitive conduct, a per se rule will not apply if the "specific restraint is sufficiently important to attaining the lawful objectives of the joint venture").

The elements necessary to create a joint venture are: "(1) joint interest in a common business; (2) with an understanding to share profits and losses; and (3) a right to joint control." April Enters., Inc. v. KTTV, 147 Cal.App.3d 805, 819 (1983).  The joint venture can be formed by express contract or it can be assumed from the conduct of the parties. Id.  The existence of a joint venture depends on the parties' intent. Id.  Therefore, in most cases, "[w]hether a . . . joint venture exists is primarily a factual question to be determined by the trier of fact from the evidence and inferences to be drawn therefrom." Bank of Cal. v.

6

1  Connolly, 36 Cal.App.3d 350, 364 (1973).

2      In this case, AMR and the City dispute whether the parties
3  had a joint interest in a common business.  The City argues that
4  the venture's common business purpose was to submit a joint bid
5  in response to the RFP.  (Opp'n at 20.)  The City also asserts
6  that the parties' conduct shows they intended to work together on
7  that purpose.  (Id. at 6-8.)  The parties negotiated over a two-
8  year period, made their respective offices available to the other
9  party for bid work, used project-planning software to assign
10 tasks, and did not sign confidentiality agreements to protect any
11 proprietary information.  (Id.; Elzig Dep. at 26-29.)  In
12 addition, AMR executives repeatedly referred to the relationship
13 as a joint venture.  (Higgins Decl. Ex. 4.)

14     By contrast, AMR asserts that the parties entered into the
15 JVA in anticipation of forming a joint venture that could then
16 bid on the RFP.  (Mot. at 1.)  Because the parties never reached
17 an agreement as to how the joint bidding entity would function,
18 AMR asserts that they never formed a joint venture. (Reply at 2.)
19 The JVA did not provide for the purchase of capital or other
20 equipment, the hiring of joint venture employees, the designation
21 of a single billing entity, or the combination of resources.
22 (Id. at 5.)  Further, AMR argues, there was no "clinical
23 integration" since, under the JVA, each party continued to
24 operate its own ambulance service exactly as it had done before.
25 (Id.)

26     Both parties agree that the JVA did not set out critical

1  aspects of a typical joint venture, such as how AMR and the City
2  would combine resources, share profits and losses, or contribute
3  capital.  However, the JVA contemplated that if the parties won
4  the County contract, they would refine the terms of the joint
5  venture into an operating agreement. (Welch Decl. Ex. 10.) In
6  fact, in April 2003, AMR's attorney sent the City a memorandum
7  suggesting that the parties enter into a joint venture "for the
8  limited purpose of jointly participating in the RFP process and
9  thereafter creat[e] the LLC to govern and administer any contract
10 award." (Rishwain Decl. Ex. 1.) Therefore, the City and AMR may
11 have intended to pool capital, integrate, and otherwise combine
12 resources when and if the parties received the contract. This is
13 the City's contention.

14    Both parties admit that they were negotiating an operating
15 agreement and LLC agreement when AMR terminated the relationship.
16 (Mot. at 10; Opp'n at 11-12.) While the court does not have a
17 full draft of either agreement in the record, the City submitted
18 e-mail correspondence in which sections of a draft LLC agreement
19 are reproduced. (Higgins Decl. Ex. 9.) Specifically, the draft
20 provides that "the purpose of the LLC shall be to prepare the
21 [p]roposal and, if successful, provide [a]mbulance [s]ervices
22 within the defined [s]ervice [a]rea." (Id.) The agreement
23 states that the LLC will use one "agreed upon independent billing
24 entity." (Id.) In short, the agreement contemplated a common
25 business purpose and at least one combined resource, the billing
26 entity. Whether the parties intended additional integration is

8

not clear from the current record.

On this record, the proper characterization of AMR and the City's working relationship is uncertain.  From the conduct of the parties and draft agreements such as the one partially produced, a trier of fact could infer the creation of a joint venture to bid and then, if successful, to form an operating company.  On the other hand, a trier of fact could also conclude that the lack of specificity in the JVA prevented the formation of a legitimate joint venture.  Therefore, because there are genuine issues of material fact, the court cannot resolve on summary judgment whether the parties formed a bona fide joint venture by entering into the JVA.[5]

---

[5] AMR argues that without integration and economic efficiencies, a joint venture cannot exist.  It cites the Federal Trade Commission and Department of Justice Antitrust Guidelines for support, specifically the section describing agreements that are analyzed as illegal per se.  Fed. Trade Comm'n & Dep't of Justice, Antitrust Guidelines for Collaborations Among Competitors, § 3.2, 2000 WL 33534553 at *7 (2000).  The Guidelines describe a legitimate joint venture as an "efficiency-enhancing integration," which involves collaboration among the participants that benefits or will potentially benefit consumers.  Id.  Indicators of such integration "typically" include the combination of "significant capital, technology, or other complementary assets to achieve procompetitive benefits" not achievable by the parties on their own.  Id.  AMR's reliance on the Guidelines is misplaced.  First, whether or not a joint venture exists is a question of state law.  Nelson v. Serwold, 687 F.2d 278, 282 (9th Cir. 1982).  Second, the Guidelines are "intended to explain how the Agencies analyze certain antitrust issues" and are not controlling authority.  Finally, as noted above, even if the Guidelines apply, a question of fact remains as to whether the parties intended eventual integration.  See Earl W. Kinter, Federal Antitrust Laws § 11.32 (2002) ("Joint ventures may take many forms, with varying objectives and varying degrees of integration.").

9

C.  Horizontal Market Allocation

AMR asserts that even if the parties formed a joint venture, the JVA illegally allocated emergency and non-emergency ambulance services in the Stockton Zone.[6] According to AMR, if the court determines that AMR and the City, as competitors, allocated the market among themselves, then the agreement to do so is per se illegal.  See, e.g., United States v. Topco Assocs., Inc., 405 U.S. 596, 608, 92 S.Ct. 1126 (1972) ("One of the classic examples of a per se violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition.").  In the JVA, horizontal

---

[6] Section 2(b)(i) of the JVA (alleged emergency service market allocation) provides:

> The implementation schedule of 9-1-1 dedicated emergency ambulances specifically within areas known as the [Stockton Zone] by [the City], AMR, and A-One will be as follows: (i) Initially and continuing, [the City] and AMR shall each place into service an equal and even number of ALS ambulance units.  A-One shall place one ALS ambulance into service.  (ii) Any additional increase in emergency ambulance resource needs shall be alternated between the three parties for implementation with [the City] having the first right of refusal, AMR having the second and A-One having the third.

Section 1 of the JVA (alleged non-emergency service market allocation) provides:

> Except as set forth below, the response to the RFP will allow each signatory to provide non-emergency ambulance transportation within their own zones.  AMR and A-One will be exclusively responsible for non-emergency interfacility transfers, critical care transfers, long distance transfers, scheduled wait and returns and HMO/PPO contractual agreements.

Welch Decl. Ex. 10.

10

competitors AMR and the City do allocate the emergency and non-emergency services market between them.  AMR argues that this is sufficient to deem the JVA per se illegal.

However, such "literalness is overly simplistic and often overbroad."  Broad. Music, Inc. v. Columbia Broad. Sys., Inc., 441 U.S. 1, 9, 99 S.Ct. 1551 (1979).  Courts avoid applying a per se standard without some knowledge of the competitive landscape and effect of the allegedly pernicious provision. See Augusta News Co. v. Hudson News Co., 269 F.3d 41, 47 (1st Cir. 2001) ("The categorical descriptions of per se offenses are quite misleading for anyone not well versed in antitrust."); Tower Air, Inc. v. Fed. Express Corp., 956 F.Supp. 270, 284 (E.D.N.Y. 1996) ("[T]here is a presumption in favor of the rule of reason standard and departure from that standard must be justified by demonstrable economic effect, rather than formalistic distinctions."); William C. Holmes, Antitrust Law Handbook § 2.16 (2005) ("[A]pplication of the label 'per se horizontal restraint' to conduct should be the outcome of reasoned analysis, and not a substitute for that analysis").

Here, the determination of whether the market allocation provision is anti-competitive is intertwined with the question of how the joint venture would have affected competition.  The allocation provisions alone would have little effect unless the joint venture between AMR and the City eliminated any meaningful competition in the bidding process.  AMR argues that because

11

either of the two entities could serve the entire Stockton Zone on its own, the parties would have eliminated competition by entering into the JVA and allocating the market among themselves. However, on this record, there is no evidence that the joint venture between AMR and the City excluded all other competitors from the bidding process. Indeed, two other private companies submitted a letter of intent to bid for the contract. (Supplemental Higgins Decl. Ex. 2.)

While AMR alleges that AMR and the City were the most worthy competitors, the evidence before the court does not show that their combination eliminated all other competition. Without such evidence, the court is not persuaded that the mere labeling of the JVA provisions as a horizontal market allocation is sufficient to merit application of a per se standard. See SCFC ILC, Inc. v. VISA USA, Inc., 36 F.3d 958, 965 (10th Cir. 1994) ("To be judged anticompetitive, the agreement must actually or potentially harm consumers."); Chicago Prof'l Sports Ltd. P'ship v. NBA, 961 F.2d 667, 670 (7th Cir. 1992) ("Whenever producers invoke the antitrust laws and consumers are silent, the [potential or actual harm] inquiry becomes especially pressing.").[7] Therefore, AMR's motion for summary judgment as to

---

[7] For similar reasons, AMR's reliance on In Re B&J School Bus Serv., Inc., 116 F.T.C. 308 (April 22, 1993) (FTC File No. 9010172), is misplaced. In B&J, the four major competitors in the market combined to bid, won the bid, and performed the awarded contract for many years. Their performance under that contract did not result in any change to their business practices; they did not combine resources, change service areas,

12

sections 1 and 2 of the JVA is denied.

### D. Bid Preclusion Claim

Section 4 of the JVA prohibits a member of the joint venture from leaving the joint venture to bid on its own or from joining another partner to submit a joint bid. AMR claims that the provision is per se illegal under § 1 of the Sherman Act. The City counters that the provision is not per se illegal and is subject to review under rule of reason analysis. Disputed factual issues and facts missing from the record prevent the court from determining at this juncture whether the per se or rule of reason standard should apply.

As with the market allocation argument, AMR asserts that even if the parties created a joint venture, the bidding preclusion provision should be reviewed under a per se standard. AMR relies upon the decision in COMPACT v. Metro. Gov't of Nashville & Davidson County, 594 F.Supp. 1567, 1576 (M.D. Tenn. 1984). In COMPACT, the district court found that a bidding agreement among all three of the minority-owned architectural firms in the Nashville area was per se illegal. Id. at 1571. It determined that the agreement among members to only bid as a group, and not as individual firms, was an attempt to "peg the price of minority participation." Id. Moreover, by agreeing to

---

or integrate operations. Here, the parties never submitted a joint bid and, therefore, never performed under a contract. Therefore, the court has no similar evidence of anticompetitive effect before it.

13

1  refrain from individually competing against the joint venture,
2  the joint venture eliminated competition among minority-owned
3  firms.  Id. at 1576.  AMR asserts that section 4 of the JVA is
4  similar because it requires AMR and the City to bid only as a
5  group and does not allow one party to bid individually.

6      The City counters that Rothery Storage & Van Co. v. Atlas
7  Van Lines, Inc., 792 F.2d 210 (D.C. Cir. 1986), should apply
8  because, like Rothery, section 4 of the JVA was an ancillary
9  agreement.  (Opp'n at 25.)  In Rothery, the court determined that
10 the challenged restraint was "subordinate and collateral to a
11 separate, legitimate transaction" -- the elimination of the free-
12 riding problem, and applied the rule of reason.  759 F.2d at 224.
13 The City contends that the bidding preclusion provision was a
14 necessary part of a "pro-competitive joint venture," both because
15 it put teeth into the parties' fiduciary obligations to one
16 another and because it served as consideration for entering into
17 the joint venture itself.  (Opp'n at 22, 27.)

18     On the record as it now stands, the court is not prepared to
19 decide whether either the per se or rule of reason standard
20 applies to section 4 of the JVA.  In both COMPACT and Rothery,
21 there was extensive evidence regarding the effect each respective
22 provision had on competition.  Here, there is no similar
23 evidence.  The court has been given very little about the
24 ambulance service bidding market, and what, if any, combinations
25 of potential bidders would best serve that market.  As a
26

14

consequence, it is not readily apparent whether a joint venture of the City and AMR would have provided optimal service to the County or whether the enforcement of this provision would eliminate all meaningful competition. Therefore, AMR's motion for summary judgment as to section 4 of the JVA is denied.[8]

### III. The City's Cross-Motion for Summary Judgment

The City filed a cross-motion for summary judgment as to its breach of fiduciary duty claim against AMR. As stated above, the court cannot determine as a matter of law whether the parties formed a joint venture in the first place. In the alternative, even if a joint venture existed, there are a number of disputed facts regarding whether AMR took confidential information from the joint venture to use against the City in its bid. These facts go directly to whether AMR breached its fiduciary duty.

### A. Breach of Fiduciary Duty - Legal Standard

Assuming the parties entered into a joint venture, the City

---

[8] AMR also cites to a group of cases holding that bid-rigging is per se illegal. See, e.g., Movie 1 & 2 v. United Artists Communications, 909 F.2d 1245, 1253 (9th Cir. 1990) (agreement between movie exhibitors to split the market for movie license amongst themselves, to the exclusion of other exhibitors, per se illegal under § 1 of the Sherman Act). However, while the cases relied upon by AMR involve a party's ultimate exclusion from bidding, they are distinguishable from the facts currently at issue here. The cases involve parties colluding to eliminate bidding competition where both of the parties involved in the collusion benefit from that scheme. AMR has not alleged that it and the City engaged in such collusion. Also, both parties could not simultaneously benefit from the implementation of section 4. By definition, if one of the parties walked away, it could not bid at all and, therefore, could not provide ambulance services in the Stockton Zone.

15

asserts that AMR breached a fiduciary duty by bidding in response to the RFP.  The City argues that even after leaving the joint venture, and without respect to section 4 of the JVA, AMR had an ongoing fiduciary duty to refrain from competing against the City.  (Mot. at 17.)  It cites a California Supreme Court case, <u>Leff v. Gunter</u>, 33 Cal.3d 508 (1983), to support this proposition.  However, in <u>Leff</u>, the court had both a fully developed record and a jury finding that the defendant breached a fiduciary duty to a joint venture.  <u>Id.</u> at 516-17.  Here, the unraveling of the joint venture is the subject of much dispute, and a jury has not found a breach of fiduciary duty.

To succeed on its breach of fiduciary duty claim, the City must demonstrate that AMR misused information acquired from the joint venture.  <u>See</u> <u>id.</u> at 514-17 (relying on cases involving a former partner's misrepresentation, concealment of information, or misuse of information belonging to the partnership).  This inquiry requires a showing that AMR obtained confidential information from the City in the first place.  The City fails to make this showing.

B.  <u>Confidential Information</u>

The City argues that the following three categories of confidential information were provided to AMR during the duration of the joint venture: (1) the City's financial "bottom line;" (2) the City's system design, deployment plans, response times, dispatch and communication requirements, employee safety programs and disaster plans, and vehicle maintenance programs; and (3) the

City's billing practices and efficiencies, including information about collections and "payor mix." (Confidential Supplemental Mot. at 2-3.)

### 1. City's financial "bottom line"

The RFP requires the following expense information for a bidder's proposed operating budget: (1) personnel wages and benefits; (2) vehicle fuel, repair and maintenance, and equipment lease/depreciation; (3) medical supplies, equipment lease/depreciation, and repair and maintenance; and (4) rent, insurance, utilities and telephone, office supplies and postage, professional services, and taxes. (Rishwain Decl. Ex. 4.) As for a bidder's projected revenues, it requires the following: (1) patient charges; and (2) other sources of income. (Id.)

The City fails to show that AMR knows anything other than already public information or information that is determinable from the public record. The public can obtain information regarding most budget items, such as payroll and benefit information and equipment costs. (Lewis Dep. at 55, 67-69; Gillis Dep. at 50, 54-56, 65.) And, as discussed below, the patient charges (or payor mix) could probably be predicted by AMR even without access to the City's numbers. Finally, it is at least possible that the miscellaneous expenses and other potential sources of income could be reverse engineered from the otherwise public information and total budget number. Therefore, it is not clear that AMR has any confidential insight into the City's budget.

17

### 2. Operations Information

The RFP also requests details in each of the following categories: (1) initial and ongoing deployment plan; (2) response time standards; (3) dispatch and communication requirements and equipment; (4) ambulances, ambulance equipment, and supplies; (5) employee safety programs; (6) vehicle maintenance programs; (7) disaster preparedness plans; and (8) personnel information. (Rishwain Decl. Ex. 4.) AMR asserts that, like the City's budget, all of the City's information regarding these categories is a matter of public record. (Opp'n at 27.)

In reviewing the record now before the court, it appears that the City's response time standards, dispatch and communications equipment information, and employee safety programs are public or were at least disclosed to parties other than AMR. (Rodriguez Dep. at 23-25, 74; Hafey Dep. at 110.) In addition, there is evidence that a request for information regarding the department's equipment was granted because the information was a matter of "public record." (Gillis Dep. at 50.) Therefore, it would seem that information regarding the ambulances and related equipment and supplies would also be public. That leaves deployment plans, vehicle maintenance programs, disaster preparedness plans, and personnel information as possible areas where AMR knows something that the greater public does not know. Based on the existing record, the court cannot determine whether any of these categories provide AMR with information that it could use against the City in the bidding

process.

### 3. Billing Information

Finally, the City asserts that AMR also obtained confidential information regarding its billing practices, specifically its payor mix analysis (the types of insurance carriers or other payors that the City encountered in each applicable neighborhood) and collection rates (the amounts the City was able to collect from insurance companies for ambulance charges).  (Id. ¶ 25.)  AMR asserts, and the record shows, that the City regularly files a report with the County that details insurance information for each patient that it transports. (Rodriguez Dep. at 25.)  It is not apparent whether this includes all of the information necessary for a payor mix analysis or whether the County makes this report available publicly. However, this may not matter.  AMR has similar payor mix information of its own from operating its ambulance service in the Stockton Zone.  (Opp'n at 28; White Dep. at 65-66, 72-73.) In addition, as with the payor mix, AMR likely has collection rate information from its own operations and did not need to rely on similar information from the City.  Therefore, whether AMR has the City's confidential billing information cannot be resolved.

In sum, there are genuine issues of material fact as to whether AMR has the City's confidential information and whether this information is of any use to AMR.  Therefore, the question of whether it has misused the information in violation of a fiduciary duty to the joint venture cannot be resolved on this

record.  The City's cross-motion is DENIED.

IV.

For the reasons stated above, AMR's motion for summary judgment or declaratory judgment is DENIED.  The City's cross-motion for summary judgment as to its breach of fiduciary duty claim is also DENIED.

IT IS SO ORDERED.

Dated: 3/27/2006

_____
DAVID F. LEVI
United States District Judge